IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION

———————————————————————————————————————

| | | |
|---|---|---|
| CARBON PROCESSING AND | ) | |
| RECLAMATION, LLC, et al., | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| v. | ) | No. 09-2127-STA-cgc |
| | ) | |
| VALERO MARKETING AND | ) | |
| SUPPLY CO., et al., | ) | |
| | ) | |
| **Defendants.** | ) | |

———————————————————————————————————————

ORDER GRANTING IN PART, DENYING IN PART DEFENDANTS' MOTION TO
DISMISS THE AMENDED COMPLAINT
———————————————————————————————————————

Before the Court is Defendants' Motion to Dismiss the Amended Complaint (D.E. # 28)

filed on July 2, 2009.  Plaintiffs responded in opposition, and Defendants have filed a reply brief.

For the reasons set forth below, the Motion to Dismiss is **GRANTED IN PART, DENIED IN**

**PART**.

## BACKGROUND

Plaintiffs' Amended Complaint asserted six causes of action against Defendants: fraud in

the inducement (Count I), fraud/promissory fraud (Count II), promissory estoppel and equitable

estoppel (Count III), violation of the Tennessee Consumer Protection Act ("TCPA") (Count IV),

breach of contract (Count V), and conversion (Count VI).  According to the Amended

Complaint, Carbon Processing and Reclamation ("CPR") is engaged in the business of

purchasing and selling certain petroleum products, including, but not limited to, a certain grade

1

of refined oil known in the industry as "No. 6 Fuel Oil" or "Slurry," and referred herein as "No. 6 Fuel Oil."  Am. Compl. ¶ 7.  No. 6 Fuel Oil is typically, though not exclusively, used for such purposes as heating blast furnaces and fueling generators for utility plants.  *Id*. at ¶ 8.  Defendants are in the business of, *inter alia*, refining oil to produce various petroleum products of varying grades including conventional gasoline and diesel fuel.  *Id*. at ¶ 9.  As a byproduct of Valero's refining operations, Valero generates No. 6 Fuel Oil.  *Id*. at ¶ 10.  Despite the fact that there are some uses for No. 6 Fuel Oil, it is ordinarily regarded as a lower tier product in the refining industry.  *Id*. at ¶ 11.  Refiners are ordinarily obligated to pay the costs of storage and disposal of No. 6 Fuel Oil.  *Id*. at ¶ 12.  Valero stores certain No. 6 Fuel Oil, including certain No. 6 Fuel Oil generated in Memphis at its Memphis facility in large tanks.  *Id*. at ¶ 13.  Valero has limited storage capacity for No. 6 Fuel Oil in Memphis.  *Id*. at ¶ 14.  Valero cannot operate its refinery without a means to store or dispose of No. 6 Fuel Oil.  *Id*. at ¶ 15.  Valero must keep its storage capacity of No. 6 Fuel Oil in "balance."  *Id*. at ¶ 16.  If Valero fails to have such capacity, it must slow or stop refinery operations.  *Id*.

Until the fall of 2007, Valero sold its No. 6 Fuel Oil directly to purchasers on a "spot" basis, which in the oil industry refers to a transaction where a purchaser and seller transact a sale on an irregular basis based on standard industry terms, rather than pursuant to a written term sales contract.  *Id*. at ¶ 17.  In Memphis, No. 6 Fuel Oil can be removed from Valero's Memphis facility either by trucks or barges, because of the proximity of Memphis to the Mississippi River.  *Id*. at ¶ 18.  In 2007, removing the No. 6 Fuel Oil through the use of trucks, as opposed to barges, was extremely costly to Valero.  *Id*. at ¶ 19.  This was due primarily to the fact that the relatively small capacity of trucks relative to the large size of Valero's tanks.  *Id*.  Upon information and

2

belief, the cost savings to Valero of using barges rather than trucks exceeded $1.0 million per month.  *Id*.  On Tuesday, July 3, 2007, Hal Tryon ("Tryon"), a Trader in Valero's Intermediate Feed Stocks and Fuels Division, sent an e-mail to CPR inquiring as to whether CPR was willing to purchase some of Valero's No. 6 Fuel Oil from its Memphis refinery.  *Id*. at ¶ 20.

Between July 3, 2007 and September 2007, CPR made several "spot" purchases of Valero's No. 6 Fuel Oil from Valero's Memphis refinery.  *Id*. at ¶ 21.  As part of each of Valero's "spot" sales to CPR, the parties agreed to the chemical makeup with regard to the No. 6 Fuel Oil sold.  *Id*.  For example, one "spot" sale on August 29, 2007 showed API gravity of 11.7, Viscosity of 60.72 CTS, Sulfur content of 0.876%, Ash content of 0.007, Aluminum content of 15 mg/kg of ppm and Silicon content of 25 mg/kg or ppm.  *Id*.

In the fall of 2007, CPR and Valero met on three occasions to negotiate terms for CPR's future purchases of No. 6 Fuel Oil from Valero.  *Id*. at ¶ 22.  Present at each of these meetings were Jones and Steve Mis on behalf of CPR and David Olson ("Olsen"), Valero's Director of Supply and Trading, and Tryon on behalf of Valero.  *Id*.  At one of these meetings, on or about October 18, 2007, Olson, on behalf of Valero, extended an offer to CPR that Valero sell all of Valero's No. 6 Fuel Oil manufactured at the Memphis refinery to CPR.  *Id*. at ¶ 23.  Valero offered to sell its No. 6 Fuel Oil Free on Board ("FOB") or on a "delivered" basis or some combination thereof.  *Id*.  An FOB contract is one that is characterized by the buyer nominating the vessel to be used for delivery, and the goods become the buyer's once the seller moves the goods to a position over the rail or flange of the vessel being used.  *Id*.  A delivered contract is one in which the seller nominates the vessel to be used and pays for such vessel to transport the goods to the buyer's designated delivery point and the goods become the buyer's when the seller

3

discharges product over the rail or flange into the buyer's tank.  *Id*.  Under either the proposed FOB or delivered contract, CPR and Valero agreed that CPR had an immediate right to possession and a right to immediate possession of the No. 6 Fuel Oil at the time that it was produced by Valero.  *Id*.

At that time, CPR informed Valero that in order to remove Valero's No. 6 Fuel Oil, CPR would have to procure barges for use on the Mississippi River since, as CPR informed Valero, CPR had no readily available barges for this purpose.  *Id*. at ¶ 24.  CPR and Valero were also aware at this time that there was an extreme shortage of barges available on the Mississippi River.  *Id*.  At that same time, Olson, on behalf of Valero, promised CPR that if CPR could procure barges, Valero would sell CPR all of the No. 6 Fuel Oil stored and manufactured at the Valero facility in Memphis through both FOB and delivered contracts, as described in paragraph 44 of the First Amended Complaint.  *Id*. at ¶ 25.

After the initial promises were made by Valero at the October 18, 2007 meeting, CPR then went about the process of securing barges that could accommodate all of Valero's No. 6 Fuel Oil in Memphis.  *Id*. at ¶ 26.  To that end, CPR identified two brand-new barges under construction and owned by Martin Marine Co. ("Martin") that were available for lease.  *Id*.  Martin informed CPR that Martin would lease the two barges for the price of $9,500.00 per day plus fuel and lubricants, if there were a commitment to lease the barges for at least a three-year term.  *Id*. at ¶ 27.  On or about October 25, 2007, Martin sent CPR a contract for the lease of the barges for three years.  *Id*. at ¶ 28.  CPR informed Valero that Martin would lease the barges either to Valero or for Valero's purposes for either three or four years.  *Id*. at ¶ 29.  On or about November 3, 2007, CPR delivered a copy of the October Martin lease to Valero.  *Id*.  Valero

asked CPR to go back to Martin and inquire as to whether it would be willing to lease the barges for a shorter term. *Id*. at ¶ 30. Martin informed CPR that, indeed, it would be willing to shorten the lease duration to a two-year term. *Id*. at ¶ 31. CPR notified Valero of Martin's willingness to agree to a two-year lease as requested by Valero. *Id*. at ¶ 32. CPR and Valero initially discussed having Valero lease the barges directly from Martin. *Id*. at ¶ 33. However, at a meeting on December 14, 2007, Valero asked CPR if CPR would be willing to lease the barges from Martin. *Id*. At the same December 14, 2007 meeting, CPR told Valero, through Tryon and Olson, that it would only enter into the lease with Martin for the barges if Valero agreed to sell CPR all of the No. 6 Fuel Oil stored and manufactured at the Valero facility in Memphis for the same two-year duration as the barge contract, so that CPR was not in a situation where it was leasing barges without a product to ship on them. *Id*. at ¶ 34. Also at the same December 14, 2007 meeting, Valero through Tryon and Olson reached agreement with CPR to sell to CPR all of the No. 6 Fuel Oil stored and manufactured at the Valero refinery in Memphis for a two-year term that matched the two-year term of the barge lease that CPR was to enter into with Martin. *Id*. at ¶ 35. At that time, Valero asked CPR to enter into the lease with Martin. *Id*. Valero through Tryon and Olson promised to memorialize in writing the agreements made at the December 14, 2007 meeting. *Id*. at ¶ 36.

On February 4, 2008, CPR had not yet signed the Martin barge lease because Valero had not yet memorialized the CPR/Valero agreements from December 14, 2007. *Id*. at ¶ 37. Between the time of the December 14, 2007 meeting between CPR and Valero and February 4, 2008, Martin notified CPR that it had other uses for the barges and that if CPR did not sign the Martin lease, Martin would put the barges to use for other customers. *Id*. CPR immediately

5

notified Valero of Martin's position and further informed Valero that it would not sign the Martin lease without the memorialization of the December 14 agreements.  *Id*. at ¶ 38.  Valero responded by promising CPR that it would enter into a written memorialization of the December 14 agreements and comply with those agreements if CPR went ahead and entered into the Martin leases so that the barges could be secured for Valero's benefit.  *Id*. at ¶ 39.

Relying on Valero's promises and agreements made in the December 14, 2007 meeting and Valero's further promises specified above, CPR thereafter, on February 5, 2008, signed a contract with Martin to lease the two barges and a related tug boat from it for the same two-years.  *Id*. at ¶ 40.  In fact, due to Valero's representation as to the No. 6 Fuel Oil produced in Memphis, CPR leased a larger tugboat from Martin than it might have otherwise needed.  *Id*. This larger tugboat had larger engines and thus burned more fuel but was necessary to meet Valero's aggressive delivery schedule which was driven by Valero's needs.  *Id*.  CPR would not have entered into the lease with Martin if Valero had not agreed to sell CPR all of its No. 6 Fuel Oil from the Memphis refinery for the same two-year term.  *Id*. at ¶ 41.  At the time that it made its representations, Valero knew that CPR would not have entered into the lease with Martin if Valero had not agreed to sell CPR all of its No. 6 Fuel Oil from the Memphis refinery for the same two-year term and that CPR was reasonably relying on Valero's representations.  *Id*. at ¶ 42.

CPR's reliance on Valero's promise to sell CPR all of Valero's No. 6 Fuel Oil also caused CPR to forego looking for alternative sources of No. 6 Fuel Oil along the Mississippi River.  *Id*. at ¶ 43.  On February 21, 2008, Valero through Tryon and Olson and CPR through Jones and Steve Mis met to discuss the agreement that they reached in December 2007 and

which they, at that time, agreed would be memorialized in writing. *Id*. at ¶ 44.  The parties

acknowledged that the following terms had been agreed upon and needed to be included in the

memorialized written agreement:

(a) The agreement would be for two years total, commencing on the date of the first load

which was on or about February 26, 2008;

(b) CPR would lift three loads of oil per month at the Memphis refinery of approximately

43,000 to 50,000 barrels per lift;

(c) On the CPR lifts, CPR would pay for the No. 6 Fuel Oil at the market rate for such

oil, less a $7.00 per barrel discount from March through September and a $9.00 per barrel

discount for lifts occurring during the months of October through February.  This agreement is

referred to between the parties as the "FOB" (Free On Board) Agreement.  Valero agreed and

understood that CPR had a minimum freight cost of $4.50 per barrel due to the Martin lease.

CPR and Valero agreed that the aforementioned discounts would be set for the term of the

agreement;

(d) In addition, Valero would deliver all of its remaining No. 6 Fuel Oil produced at the

Memphis refinery, using its own equipment, to CPR at a port in New Orleans, Louisiana

nominated by CPR.  This delivered oil was to be paid for by CPR at the market rate for such oil

less a $3.00 per barrel discount for oil delivered between March and September and a $5.00 per

barrel discount for oil delivered between October and February.  This agreement was referred to

between the parties as the "Delivered Agreement";

(e) Valero agreed to a "fuel escalator" which provided CPR with additional discounts in

the amount of CPR's actual fuel cost to compensate CPR for increased costs associated with the

fuel used to power the barges it was using to pick up the oil on the FOB agreement;

(f) CPR and Valero agreed that the No. 6 Fuel Oil had to meet minimum specifications before CPR would be obligated to accept delivery.  For example, the Parties agreed to an API Gravity of 10 - 12 maximum, a flash point of 150 degrees Fahrenheit, Viscosity of 50 minimum and 75 maximum CST, a sulfur content of no greater than 1%, Ash content of 0.05 maximum, Aluminum content of 50 mg/kg or ppm and Silicon content of 50 mg/kg or ppm;

(g) CPR and Valero agreed that in the event that CPR was asked to lift No. 6 Fuel Oil from the Memphis refinery and sent the barges to Memphis refinery and Valero was unable to load the barges with No. 6 Fuel Oil meeting the agreed upon specifications, Valero would adjust the price to compensate CPR for the No. 6 Fuel Oil being out of the agreed upon specifications;

(h) Valero agreed to pay CPR "demurrage" in the amount of $500 per hour for every hour that CPR's barges were idled at the refinery waiting to be loaded;

(i) CPR and Valero agreed that to the extent that the Memphis refinery did not generate sufficient quantities of No. 6 Fuel Oil to comply with the agreements, Valero would supply CPR with No. 6 Fuel Oil generated at other Valero refineries.  *Id*.

Notwithstanding Valero's agreements on December 14, 2007 and the fact that CPR had already entered into the barge lease, Valero notified CPR that it was unilaterally changing the structure of the parties' prior agreements from two-year terms to a one-year term with a one-year "evergreen" extension provision, which took effect at the end of the first year.  *Id*. at ¶ 45. Valero represented to CPR that Valero's internal contracting policy required certain executive approval for all contracts in excess of one year.  *Id*. at ¶ 46.  Valero told CPR that it was necessary to do the deal as a one-year agreement with a one-year "evergreen" provision so as to

8

avoid the time-consuming approval process at Valero. *Id.* Valero represented that this structure would have the same effect as a two-year agreement. *Id.* Valero further represented that with the price of oil so high and with the refinery running at peak capacity, the No. 6 Fuel Oil had to be removed as soon as possible and that Valero did not have time to seek and obtain the internal authority that would have been necessary with any other structuring of the two-year term. *Id.* Valero demanded that CPR immediately begin lifting the No. 6 Fuel Oil from Valero's Memphis refinery and again represented and promised that it would memorialize the terms that it had agreed upon. *Id.* at ¶ 47.

In February 2008, Valero demanded that CPR haul the first load of No. 6 Fuel Oil from Valero's Memphis refinery under the FOB Agreement. *Id.* at ¶ 48. At that time, the price of crude oil in the global oil market was approximately $100 per barrel and rising and Valero was operating its Memphis refinery at full or near full capacity. *Id.* At this time, CPR inquired of Valero as to the status of Valero memorializing the parties' agreements in writing. *Id.* at ¶ 49. Valero through Olson represented that the person at Valero responsible for memorializing the agreements (*i.e.* Tryon) was out of work with an injury but again promised that a writing memorializing the parties' agreements would be issued by Valero. *Id.* at ¶ 50. Valero through Olsen demanded that CPR follow the terms that were agreed upon in December 2007, regardless of the fact that it was not memorialized, and take the No. 6 Fuel Oil because otherwise Valero would have to slow down or shut down its Memphis refinery. *Id.* at ¶ 51. Valero's promises to memorialize the agreements in the future further enticed and induced CPR to load the oil. *Id.* As requested, CPR began the process necessary to lift the No. 6 Fuel Oil under the terms of the agreements. *Id.* at ¶ 52.

On or about February 26, 2008, Valero through Olson sent written documents, referred to by the Parties as the "953 Draft," which contained many of the subjects to which CPR and Valero agreed in the FOB Agreement, and written documents referred to by the parties as the "954 Draft," which contained many of the subjects that the parties had agreed to in the Delivered Agreement.  *Id*. at ¶ 53.  The various iterations of the partial memorializations of the FOB Agreement shall generally be referred to as "953"s and the various iterations of the partial memorializations the Delivered Agreements shall be referred to as "954"s as these were how the parties referred to them; 953 and 954 were the last three numbers of their Valero Contract Number.  *Id*.

The Draft 953 constitutes a writing to indicate a contract for sale of goods including quantity that was signed by Valero, notwithstanding the fact that certain terms of the 953 Draft submitted by Valero were inconsistent with the FOB Agreement.  *Id*. at ¶ 54.  By way of example, and not by way of limitation, the 953 Draft contemplated that the shipping would be done by "ocean going vessel," when in fact the parties had agreed upon the use of barges as provided by Martin.  *Id*.  In fact, Valero was well aware that an ocean-going vessel could not load in Memphis due to the draft requirements on the Mississippi River.  *Id*.  Further, the discounts that were given to CPR by Valero in the 953 Draft were lower than those which CPR relied upon to enter into the Martin lease.  *Id*.  Likewise, there were "pricing bands" included in the 953 Draft, which ostensibly provided that the agreement was only in effect while the price of crude oil in the global oil market was between $85.00 and $115.00 per barrel.  *Id*.  This term did not reflect any agreement of the parties.  *Id*.  Moreover, the 953 Draft did not contain the one-year "evergreen" provision, or the original two-year term, which Valero had promised in order to

induce CPR into entering in the two-year barge lease with Martin.  *Id*.  Finally, CPR never agreed to any of the "boilerplate" language in the 953 Draft, which included a choice of forum clause.  *Id*.  The 954 Draft constitutes a writing to indicate a contract for sale of goods including quantity that was signed by Valero, notwithstanding the fact that certain terms of the 954 Draft submitted by Valero also materially deviated from the Delivered Agreement.  *Id*. at ¶ 55.

CPR immediately contacted Valero through Olson to express CPR's concerns that the 953 Draft and the 954 Draft did not conform to the parties' agreements and did not contain all of the terms upon which the parties had agreed.  *Id*. at ¶ 56.  Olson indicated that Valero would address the problems when its injured employee returned to work.  *Id*. at ¶ 57.  Pursuant to Olson's request, CPR edited the 953 Draft (the "Edited 953") and edited the 954 Draft (the "Edited 954") and sent those written drafts back to Valero.  *Id*. at ¶ 58.  These documents were transmitted to Valero within a reasonable time after the agreements were made.  *Id*.  Valero, since it authored the 953 Draft and the 954 Draft, had reason to know the contents of the Edited 953 and the Edited 954.  *Id*.  Valero did not respond to the Edited 953 and the Edited 954 within ten days or otherwise.  *Id*. at ¶ 59.  Valero also issued numerous additional writings, *i.e.* Valero's revisions to the 953s and 954s, e-mails, confirmations of sales, invoices, and other documents sufficient to indicate a contract for sale had been made between Valero and CPR and which were signed by Valero.  *Id*. at ¶ 60.

In addition, Valero acknowledged the existence of a written memorialization of the agreements between the parties on numerous occasions including, but not limited to, its threat of termination of the agreements, its rescission of its termination of the agreements for noncompliance with the written memorialization's own written terms, subsequent 90-day notice

of termination as provided for in the agreements, and final termination of the agreements.  *Id.* at ¶ 61.

During the summer of 2008, the price of crude oil was at historic highs, and Valero repeatedly requested that CPR lift the No. 6 Fuel Oil from the Memphis refinery regularly so that Valero could continue to run the Memphis refinery at full capacity.  *Id.* at ¶ 62.  In turn, CPR continued to lift No. 6 Fuel Oil from the Memphis refinery.  Throughout CPR's performance, on numerous occasions the No. 6 Fuel Oil that Valero asked CPR to lift did not comply with the specifications that CPR and Valero had agreed upon.  *Id.* at ¶ 63.  For example, the very first load under the agreements was significantly outside the agreed upon specifications and the metal content remained consistently too high throughout Valero's performance.  *Id.*  High metal content in the oil caused a number of problems.  *Id.* at ¶ 64.  For example, CPR was intending to blend and sell the No. 6 Fuel Oil to third parties.  *Id.*  Such parties would not take oil with excessive metal content.  *Id.*  Thus, CPR was forced to lower its prices to its customers to compensate for the poor quality of the oil.  *Id.*  Moreover, high metal content caused a problem for the barges due to a product, called "catalyst", from the refinery settling in the barges and causing high ash content.  *Id.*  This residue fills up the storage facilities on the barges and thus, CPR could not load as much oil as was otherwise possible and incurred increased fuel consumption to drag this dead weight back up the Mississippi river to reload in Memphis.  *Id.*  To address this problem, CPR is being forced to incur the cost of cleaning the barges to remove the excess residue.  *Id.*

Valero demanded certain changes to the agreements throughout the Summer and Fall of 2008 to which, at times, CPR agreed.  *Id.* at ¶ 65.  Valero memorialized its changes, but refused

to adopt those terms agreed to in the Edited 953 and Edited 954 in a series of revisions of the 953 and 954.  *Id*. at ¶ 66.  These changes are reflected in documents issued by Valero, which Plaintiff has attached to the Amended Complaint.  *Id*.  Certain revisions, including those on or after December 22, 2008, were never agreed to by CPR.  *Id*.

In September 2008, Valero and CPR met at Valero's headquarters in San Antonio.  *Id*. at ¶ 67.  Present at the meeting were Olson, Tryon, Mike Kimbrell, and Greg Sheldon for Valero and Jones and Hayes for CPR.  *Id*.  At that meeting, CPR raised a number of issues with regard to Valero's No. 6 Fuel Oil.  *Id*. at ¶ 68. CPR inquired why the revised 953s and 954s that Valero issued in the Summer and Fall did not reflect the terms agreed to in December 2007 and which were made in the Edited 953 and Edited 954.  *Id*.  Further, at that meeting, the parties discussed, *inter alia,* the fact that the latest revisions to the 953 and 954 did not contain the "evergreen" provision or the two-year agreement that was the basis for the parties' dealings.  *Id*.  Valero through Olson told CPR to "come back out in the fourth quarter," and the "evergreen" or second year would be put into writing.  *Id*. at ¶ 69.  Specifically, Olson said "I will add another year." *Id*.

At that meeting, CPR also raised questions as to why numerous batches of No. 6 Fuel Oil contained very high metals content, making the product outside of the agreed upon specifications.  *Id*. at ¶ 70.  Until October 2008, CPR had performed under the agreements without any complaints from Valero.  *Id*. at ¶ 71.  Valero had also performed, at least partially, under the agreements.  *Id*.  In October 2008, the price of crude oil began to drop significantly. *Id*. at ¶ 72.  Valero notified CPR that it no longer needed to operate its refineries at peak capacity.  *Id*.

The parties had another meeting on October 30, 2008, at the Westin La Cantera Hotel in San Antonio, Texas. *Id.* at ¶ 73. Present were Olson for Valero and Jones and Hayes for CPR. *Id.* At this meeting, Valero through Olson again confirmed their agreements, the two-year term, and the other business points set forth in Paragraph 44 of the First Amended Complaint, and that these revisions would be put in writing. *Id.* at ¶ 74. Also at this meeting, Olson raised the fact that oil prices were now outside of the price bands contained in the 953 Draft and 954 Draft, notwithstanding the fact that the parties had never agreed to the price bands. *Id.* at ¶ 75. CPR reminded Olson that the price bands were never part of the agreements and, if they had been, CPR could not have taken the first load that Valero delivered within specification because the price of oil was outside of the purported band at that time. *Id.* at ¶ 76. Olson admitted that CPR was correct by saying that such a situation was "tit for tat," and recognized that even if such a term was reflected in the 953 Draft and the 954 Draft, it was unenforceable since Valero had already violated the term when oil prices exceeded the band. *Id.*

On December 11, 2008, the parties had another meeting in San Antonio, Texas with Olson, Tryon, Jones and Hayes present. *Id.* at ¶ 77. At this meeting, Valero told CPR that if it did not agree to adopt new pricing terms and the "price bands," Valero would terminate the agreements. *Id.* Immediately, CPR objected and reminded Valero that it had no right to terminate the two-year agreements to which it had previously agreed. *Id.* In December 2008 and January 2009, Valero, through Olson and Craig Stanish (Olson's superior), changed its position again telling CPR that if CPR did not agree to its new pricing terms and the "price bands", then these terms would be imposed unilaterally for the remainder of the agreements, and the agreements would be terminated on their one-year anniversary. *Id.* at ¶ 78. Valero issued the

12/22/2008  953 which contained its new pricing terms.  *Id*.  Upon receipt of the 12/22/2008 953,

CPR rejected the 12/22/2008 953 in writing.  *Id*.  In a further e-mail, Valero modified its position

yet again and told CPR that the contract would be terminated "immediately" if CPR did not

agree to Valero's new pricing terms and the "price bands."  *Id*. at ¶ 79.  CPR refused to accede to

Valero's demands.  *Id*. at ¶ 80.

Despite the fact that Valero promised to sell all of its No. 6 Fuel Oil from the Memphis

refinery to CPR under the agreements, in fact, since the inception of the agreements, Valero has

been secretly selling No. 6 Fuel Oil from the Memphis refinery to third parties, by both barge

and truck, including, but not limited to, companies known as Davison and Westport.  *Id*. at ¶ 81.

Specifically, Valero has already sold more than 800,000 barrels of No. 6 Fuel Oil from the

Memphis refinery to other companies during the period of the agreements without notifying

CPR.  *Id*. at ¶ 82.  Throughout the term of the Parties' agreements, CPR made timely demands

on Valero for the agreed upon monthly quantity of No. 6 Fuel Oil, which Valero had not been

providing.  *Id*. at ¶ 83.  Valero acknowledged that CPR was not getting all of the No. 6 Fuel Oil

which had been agreed upon and further represented that the Memphis refinery had some

production problems, which Valero described as a "hiccup", which limited the amount of No. 6

Fuel Oil produced.  *Id*. at ¶ 84.  Plaintiff has attached a February 20, 2009 email from Olsen to

Hayes and Jones to this effect.  *Id*.  In fact, the limitations on the amount of No. 6 Fuel Oil were

not caused by production problems at the Memphis refinery, but rather were the result of the

deliberate actions on the part of Valero to divert large quantities of No. 6 Fuel Oil that Valero

had agreed to provide to CPR.  *Id*.  Had Valero supplied these 800,000 or more barrels of No. 6

Fuel Oil already diverted from CPR, this alone would have generated over $7 million in profit to

15

CPR.  *Id*. at ¶ 85.

In March 2008, one of CPR's existing customers contacted CPR and offered to buy three loads of No. 6 Fuel Oil per month.  *Id*. at ¶ 86.  Due to Valero diverting oil from CPR, CPR could not supply this customer with the No. 6 Fuel Oil requested.  *Id*. at ¶ 87.

Plaintiff has alleged six causes of action in its First Amended Complaint: (1) fraud in the inducement, (2) fraud/promissory fraud, (3) promissory estoppel and equitable estoppel, (4) violation of the Tennessee Consumer Protection Act ("TCPA"), breach of contract, and conversion.  In its Motion to Dismiss the Amended Complaint, Defendant argues that all of Plaintiff's claims should be dismissed for failure to state a claim.  First, Defendant contends that Plaintiff cannot state a claim for breach of contract because there was no enforceable contract between the parties.  More specifically, the alleged contract does not comport with the Statute of Frauds.  This case involves an alleged contract for the sale of goods in excess of $500. However, the Plaintiff has alleged that it entered into an oral agreement with Defendant in December 2007.  The only writings between the parties were the 953/954 drafts exchanged in February 2008.  The 953/954 drafts reflect conversations from February 2008, not December 2007, and indicate that Defendant intended to be bound only to agreed-upon, written terms. Defendant further argues that the alleged oral agreement of December 2007 differs substantially from the 953/954 writings and even from Plaintiff's edits of the 953/954 drafts.  Thus, the 953/954 writings could not memorialize the alleged oral agreement of December 2007.

Additionally, Defendant argues that pursuant to UCC § 2-207, conduct of the parties recognizing the existence of a contract is sufficient to establish a contract for the sale of goods. The terms of the agreement consist of those parts of the writings between the parties which do

agree and other gap-fillers supplied by the UCC.  In this case, however, Plaintiff alleges that Defendant breached the terms of the agreement with respect to quantity, duration, and product specification, and the writings do not evidence an agreement on these specific terms.  As a result, even under UCC § 2-207, these terms are not enforceable against Defendant.  Therefore, Plaintiff has failed to state a claim for breach of contract in Count I.

Next Defendant contends that Plaintiff's tort claims for promissory estoppel and fraud in the inducement must be dismissed in light of the economic loss doctrine.  Under Tennessee law, the rights and obligations of the buyer and seller are governed exclusively by the contract where the contract is for the sale of goods and the only damages alleged come under the heading of economic losses.  According to Defendant, Plaintiff's claims of promissory estoppel and fraud in the inducement are breach of contract claims masquerading as tort claims.  Plaintiff's claim of promissory estoppel is disfavored for the additional reason that promissory estoppel is permitted under Tennessee law in only exceptional cases.  Moreover, "CPR cannot use promissory estoppel to recover on an oral promise that is unenforceable under the UCC's Statute of Frauds because it would undermine the provisions of the UCC and thwart the carefully considered policies embodied therein."  Defendant argues further that Plaintiff cannot make out claims of promissory fraud and/or promissory estoppel for missed business opportunities because Plaintiff cannot show reasonable reliance.

With respect to Plaintiff's TCPA claim, Defendant argues that the one-year statute of limitations had run prior to the filing of Plaintiff's original complaint on March 2, 2009.  Any acts which Plaintiff discovered or should have reasonably discovered prior to March 2, 2008 are now time-barred.  According to Defendant, Plaintiff should have known by February 26, 2008,

the date on which Defendant submitted its proposed writings on the parties' alleged agreement, about Defendant's alleged misrepresentations.  As for the actions that are alleged to have occurred within the one-year limitations period, Defendant argues that Plaintiff has failed to plead them with particularity required under Rule 9(b).

Finally, Plaintiffs' claim for conversion should be dismissed due to the fact that CPR had no vested property interest in the No. 6 Fuel Oil until the oil was delivered.

Plaintiff has filed a response in opposition to Defendant's Motion.  First, Plaintiff contends that the allegations of the Amended Complaint satisfy the requirements of the UCC. Plaintiff argues that UCC 2-201's bare requirement for "some writing" is met in this case. Plaintiff has alleged multiple negotiation sessions and writings which show that "a contract for sale has been made between the parties" and "signed by the party against whom enforcement is sought."  Next Plaintiff argues that an exception to the UCC's Statute of Fraud applies in this case because Defendant has repeatedly admitted in its course of dealing that a contract for sale was made.  Plaintiff also asserts that it has stated a claim for breach of contract and that a factual dispute exists as to whether the 953/954 writings are additional terms that supplemented the alleged oral agreement between the parties.

Concerning its claims for fraud and fraud in the inducement, Plaintiff argues that the economic loss doctrine does not apply in this case.  Under Tennessee law, claims for fraud and fraud in the inducement are exceptions to the economic loss doctrine.  According to Plaintiff, its claims for promissory and equitable estoppel are viable.  Plaintiff argues that it had properly pled reasonable reliance on the alleged misrepresentations of Defendant.  The reasonableness of Plaintiff's reliance including the relative sophistication of the parties or the value of the alleged

contract are issues of fact and should not be considered at this stage of the case.  Plaintiff further

contests Defendant's assertion that Plaintiff could not reasonably rely on statements made by

Defendant's agents knowing that all agreements had to receive approval from other corporate

officers.

      With respect to its TCPA claim, Plaintiff contends that each time Plaintiff took delivery

of a load which did not conform to the quality standards allegedly agreed to by the parties, a new

cause of action with a one-year statute of limitations accrued.  Furthermore, Plaintiff asserts that

it could not have known whether a load conformed to the proper standards without conducting

its own chemical analysis.  Additionally, Plaintiff argues that it has alleged its TCPA claim with

sufficient particularlity.  Finally, Plaintiff claims that its conversion count is properly pled.

      Defendant has filed a reply to Plaintiff's brief.  Defendant reiterates its argument that the

Statute of Frauds precludes Plaintiff's breach of contract claim.  More specifically, the exception

to UCC § 2-201(3)(b) is inapposite here because Defendant has not admitted the existence of the

contract in a pleading or other filing with the Court.  Defendant goes on to contend that the

economic loss doctrine should apply in this case to bar Plaintiff's claims of fraud and fraud in

the inducement.  Defendant claims that the exceptions argued by Plaintiff do no apply here

because the alleged misrepresentation concerns the terms of the alleged contract itself.

Defendant also argues that Plaintiff cannot rely on equitable estoppel to defeat the Statute of

Frauds because that defense does not apply in UCC cases and because Plaintiff failed to allege

any factual misrepresentation.  The only misrepresentations alleged by Plaintiff relate to

promises of future conduct, not existing facts.  Defendant also repeat its contention that Plaintiff

could not have reasonably relied on any alleged representations about a contract after February

2008 when the parties exchanged proposed writings which differed in material respects from the alleged terms forming the alleged oral agreement of December 2007.  With respect to the TCPA claims, Defendant argues that Plaintiff had notice that Defendant did not intend to honor any alleged representations made in December 2007 after Plaintiff received Defendant's contrary writings in February 2008.  Thus, any claim based on those events arose outside of the TCPA's one-year statute of limitations.  As for each delivery of the oil, Defendant cites attachments to the Amended Complaint indicating that reports with the specification of the oil in each load were provided upon delivery to Plaintiff.  It could not be said then that Defendant had deceived Plaintiff.  Plaintiff's TCPA claims also fail because Plaintiff has not alleged any misrepresentation within the one-year limitations period, that is, after March 2, 2008.  Defendant also argues that Plaintiff has failed to allege a plausible claim for conversion.

## STANDARD OF REVIEW

A defendant may move to dismiss a claim "for failure to state a claim upon which relief can be granted" under Federal Rule of Civil Procedure 12(b)(6).  When considering a Rule 12(b)(6) motion, the Court must treat all of the well-pleaded allegations of the complaint as true and construe all of the allegations in the light most favorable to the non-moving party.[1] However, legal conclusions or unwarranted factual inferences need not be accepted as true.[2]  "To avoid dismissal under Rule 12(b)(6), a complaint must contain either direct or inferential allegations with respect to all material elements of the claim."[3]  "The Federal Rules of Civil

---

[1] *Scheuer v. Rhodes*, 416 U.S. 232, 236 (1974); *Saylor v. Parker Seal Co.*, 975 F.2d 252, 254 (6th Cir. 1992).

[2] *Morgan v. Church's Fried Chicken*, 829 F.2d 10, 12 (6th Cir. 1987).

[3] *Wittstock v. Mark a Van Sile, Inc.*, 330 F.3d 889, 902 (6th Cir. 2003).

Procedure do not require a claimant to set out in detail all the facts upon which he bases his claim."[4]

The Supreme Court has more recently stated that the Federal Rules "do not require a heightened fact pleading of specifics, but only enough facts to state a claim that is plausible on its face."[5]  The Sixth Circuit has subsequently acknowledged "[s]ignificant uncertainty" as to the intended scope of *Twombly*.[6]  Consequently, the Sixth Circuit has articulated the following as the standard of review for 12(b)(6) motions: on a motion to dismiss, the Court must construe the complaint in the light most favorable to the plaintiff, accept all factual allegations as true, and determine whether the complaint contains "enough facts to state a claim to relief that is plausible on its face."[7]  Thus, although the factual allegations in a complaint need not be detailed, they "must do more than create speculation or suspicion of a legally cognizable cause of action; they must show entitlement to relief."[8]

---

[4] *Conley v. Gibson*, 355 U.S. 41, 47 (1957).

[5] *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007) ("retiring" the "no set of facts" standard first announced in *Conley v. Gibson*, 355 U.S. 41, 78 S.Ct. 99, 2 L.Ed.2d 80 (1957)).

[6] *Weisbarth v. Geauga Park Dist.,* 499 F.3d 538, 541 (6th Cir.2007); *see also Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.,* 508 F.3d 327, 337 (6th Cir.2007) ("We have noted some uncertainty concerning the scope of *Bell Atlantic Corp. v. Twombly,* ... in which the Supreme Court 'retired' the 'no set of facts' formulation of the Rule 12(b)(6) standard ....").

[7] *United States ex rel. Bledsoe v. Cmty. Health Sys., Inc.,* 501 F.3d 493, 502 (6th Cir. 2007) (quoting *Twombly,* 127 S.Ct. at 1974 (2007)).

[8] *League of United Latin Am. Citizens v. Bredesen,* 500 F.3d 523, 527 (6th Cir.2007) (emphasis in original) (citing *Twombly,* 127 S.Ct. at 1964-65).

## ANALYSIS

The Court has jurisdiction in this case by virtue of the diversity of the parties pursuant to 28 U.S.C. § 1332.  Plaintiff has alleged all its claims pursuant to state common law, and so the Court must first determine which state's law should apply.  Plaintiff has attached several writings exchanged between the parties and purporting to memorialize the contracts at issue in this case.[9]  One of the terms contained in all of writings titled "Governing and Jurisdiction" reads as follows:

> Any controversy, cause of action, dispute, or claim arising out of, relating to, or in connection with this agreement, or the breach, termination or validity thereof, shall be governed by the substantive and procedural laws. . . of the state of Texas.  The parties specifically agree that the sole jurisdiction for any claims shall be in state or federal courts located in Harris County, Texas.[10]

Neither party has invoked this term or raised any objection as to venue or personal jurisdiction in this Court.  On the contrary, Defendant argues that there are no material differences between the substantive law of Tennessee and the substantive law of Texas, and so the Court should apply Tennessee law, as Tennessee is the forum state.  Although Plaintiff does not concede that its claims are governed solely or exclusively by Tennessee law, Plaintiff does concede that the applicable law of Tennessee and Texas are "substantially similar."  Therefore, for purposes of the Motion, the Court will apply the substantive law of Tennessee.

Having determined that the substantive law of Tennessee should apply in this diversity case, the Court is bound to apply the substantive law of Tennessee as if the action had been

---

[9] *See* Am. Compl. exs. A, B, C, and D.

[10] *Id.*

brought in the courts of that state.[11]  Under the *Erie* doctrine, a federal court must apply the substantive law of a state as it has been determined by the highest court of the state.[12]  When the highest court of the state has not answered a particular question of law, the federal court must discern or predict how the state courts would respond if confronted with the same question.[13]  The federal court must ascertain from all available data what the law is and apply it.[14]  In the absence of any indication that the state's highest court would adopt a rule contrary to the rule announced in an intermediate appellate court, a federal court is not free to ignore the announcement of a state appellate court on matters of state law.[15]  Under Tennessee law, issues of contract interpretation are questions of law.[16]

## I.  Breach of Contract

### A. The December 2007 Oral Agreement

In the Amended Complaint, Plaintiff alleges that the parties had formed an oral contract

---

[11] *Erie R.R. v. Tompkins,* 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938); *Corrigan v. U.S. Steel Corp.*, 478 F.3d 718, 723 (6th Cir. 2007).

[12] *Gahafer v. Ford Motor Co.,* 328 F.3d 859, 861 (6th Cir. 2003).

[13] *Hartford Fire Ins. Co. v. Lawrence, Dykes, Goodenberger, Bower & Clancy,* 740 F.2d 1362, 1365 (6th Cir. 1984); *Clutter v. Johns-Manville Sales Corp.,* 646 F.2d 1151, 1153 (6th Cir. 1981).

[14] *Bailey v. V & O Press Co., Inc.*, 770 F.2d 601 (6th Cir. 1985).

[15] *Central States, Southeast & Southwest Areas Pension Fund v. Howell*, 227 F.3d 672, 676 (6th Cir. 2000).

[16] *Doe v. HCA Health Servs. of Tenn., Inc.*, 46 S.W.3d 191, 196 (Tenn. 2001) ("The ascertainment of the intention of the parties to a written contract is a question of law, rather than a question of fact.").

in December 2007 for the sale of Defendant's fuel oil.  More specifically, Plaintiff alleges that at a meeting on December 14, 2007, Defendant's representatives reached agreement with Plaintiff's representatives to sell Plaintiff all of the No. 6 Fuel Oil stored with specified pricing discounts and manufactured at Defendant's Memphis refinery for a two-year term.  According to the Amended Complaint, the agreement's two-year term matched the two-year term of a barge lease that Plaintiff was to enter into with a third party.  As a result of these allegations, the Court finds that the transaction for the sale of the No. 6 Fuel Oil falls under Tennessee's Uniform Commercial Code, Tenn. Code Ann. § 47-2-101 *et seq*.  Furthermore, the dealings between the parties were dealings between merchants as defined in Tenn. Code Ann. § 47-2-104.

While Plaintiff alleges that the parties had formed an oral contract in December 2007, there is no allegation that the terms of the oral contract, including the sale of all of Defendant's No. 6 Fuel Oil, the pricing discounts, and the two-year term of the contract, were ever reduced to writing.  Under the UCC's Statute of Frauds, any contract for the sale of goods in excess of $500 "is not enforceable by way of action or defense unless there is some writing or record sufficient to indicate that a contract for sale has been made between the parties and signed by the party against whom enforcement is sought or by his authorized agent or broker."[17]  The parties do not dispute that the alleged contract was for the sale of goods in excess of $500.  "[T]he statute of frauds' main purpose is not to let people escape from commitments that they have made, but rather to prevent people from becoming bound to agreements they have not made."[18]  Under

---

[17] Tenn. Code Ann. § 47-2-201.

[18] *Triangle Marketing, Inc. v. Action Indus., Inc.*, 630 F. Supp. 1578, 1581 (N.D. Ill. 1986).

Tennessee law, any complaint for the enforcement of such a contract is "subject to being dismissed on motion."[19]  Therefore, the Court holds that Plaintiff has failed to state a claim for breach of the December 2007 oral contract.

A complaint may still bring the alleged oral contract within an exception to the Statute of Frauds.[20]  Plaintiff has argued that one of those exceptions applies in this case because the Amended Complaint alleges that Defendant acknowledged the existence of a contract with Plaintiff.  UCC § 2-201(3)(b) provides an exception to the statute of frauds, "if the party against whom enforcement is sought admits in his pleading, testimony or otherwise in court that a contract for sale was made, but the contract is not enforceable under this provision beyond the quantity of goods admitted."[21]  The Court finds Plaintiff's argument to be without merit.  The plain language of the UCC section upon which Plaintiff relies is clear that the party against whom enforcement is sought must admit the existence of the contract in a pleading, testimony, or in court.  A party's reference to a contract in an extrajudicial communication is not enough.[22]  Defendant has yet to file a responsive pleading of any kind in this case or appear in court.  Therefore, the Court holds that this exception does not apply to save Plaintiff's breach of contract claim from the Statute of Frauds.

Plaintiff has further alleged the existence and exchange of writings containing other contractual terms between the parties, which memorialized their December 2007 oral

---

[19] *Anthony v. Tidwell*, 560 S.W.2d 908, 909-10 (Tenn. 1977).

[20] *Id*.

[21] Tenn. Code Ann. § 47-2-201(3)(b).

[22] *See also Id*., Comment 7 ("If the making of a contract is admitted in court, either in a written pleading, by stipulation, or by oral statement before the court. . . .").

agreement.[23]   The first of these writings was the 953 draft sent on February 28, 2008, more than two months after the parties allegedly reached their oral agreement.  Defendant argues that the 953 draft could not confirm the alleged December contract because of the two-month delay between the two agreements as well as the material differences in their purported terms. Tennessee's UCC provides that a "written confirmation which is sent within a reasonable time operates as an acceptance even though it states terms additional to or different from those offered or agreed upon, unless acceptance is expressly made conditional on assent to the additional or different terms."[24]  Although it is true that more than two months passed between the alleged December oral agreement and the 953 draft, the Court need not decide whether the 953 was sent within such a "reasonable time" as to constitute a confirmation of the December agreement.[25] The 953 draft speaks for itself; it was a confirmation of "the telephone conversation on February 25, 2008 between Hal Tryon of Valero Marketing and Supply ('Seller') and Bill Jones of Carbon Processing & Reclamation LLC ('Buyer')."  Without denying that they took place, the 953 never refers to any of the parties' prior negotiations including the December 2007 session.

More problematic for Plaintiff is the fact that the 953 draft contained terms "different" from those making up the alleged oral contract.  In this instance, Tenn. Code Ann. § 42-2-207

---

[23] Plaintiff has attached these writings to the Amended Complaint, and so pursuant to Fed. R. Civ. P. 10(c), the Court may consider them as part of the pleadings.  Fed. R. Civ. P. 10(c) ("[a] copy of any written instrument which is an exhibit to a pleading is a part thereof for all purposes.").

[24] Tenn. Code Ann. § 47-2-207(1).

[25] The Court notes that the Amended Complaint alleges that the parties followed up the December 2007 meeting with another session on February 21, 2008, at which time they reaffirmed the terms of their oral agreement and agreed that they should be reduced to writing. Am. Compl. ¶ 44.

26

guides the Court's analysis and provides that "additional terms are to be construed as proposals for addition to the contract."[26]   The Tennessee courts have held that the same cannot be said for "different" terms included in a written confirmation, reasoning that "[i]t would be more than a little difficult to view a different term in an acceptance as a proposal for addition to the contract where the offer already includes a contrary term."[27]   In fact, a confirmation containing "different" terms cannot constitute an acceptance at all.[28]   The result is that "no contract is formed when the acceptance diverges significantly as to a material term."[29]

Applying these principles to the allegations in Plaintiffs' Amended Complaint, the 953 draft did not memorialize or confirm the December 2007 oral agreement because the 953 contained different terms than those allegedly included in the oral agreement.   Plaintiff acknowledges that the 953 draft included pricing bands and lower than promised discounts to Plaintiff and omitted the one- year "evergreen" provision and the original two-year term.   Pricing and length of agreement are material terms.   Such different terms preclude the 953 draft from

---

[26] *See* Tenn. Code Ann. § 47-2-207(2).  The Sixth Circuit has described UCC 2-207, which Tennessee has codified at § 47-2-202, as "a murky bit of prose" and "one of the most important, subtle, and difficult in the entire [UCC], and well it may be said that the product as it finally reads is not altogether satisfactory." *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161,1165 (6th Cir. 1972) (citations omitted).

[27] *United Foods, Inc. v. Hadley-Peoples Mfg. Co.*, 1994 WL 228773, at *4 (Tenn. Ct. App. May 20, 1994) ("The price change on Seller's invoice is a different term, not an additional term and, therefore, T.C.A. § 47-2-207(2) is inapplicable to the facts of our case.").  *See also Gage Products Co. v. Henkel Corp.*, 393 F.3d 629, 641 (6th Cir. 2004) (applying Michigan's UCC 2-207 and interpreting Comment 3 to prohibit materially different terms, such as price, in a written confirmation from becoming part of a contract).

[28] *United Foods*, 1994 WL 228773, at *5.

[29] *Id.* (quoting *Howard Const. Co. v. Jeff-Cole Quarries, Inc.,* 669 S.W.2d 221, 229 (Mo. Ct. App. 1983).

being a confirmation of the December agreement.  Nor is it clear from the Amended Complaint

that the specific quantities listed in the 953/954 writings represented all of Defendant's No. 6

Fuel Oil at the Memphis refinery.  Therefore, the 953 draft and subsequent writings based on it

cannot support Plaintiff's claim for breach of the December 2007 oral agreement.

Although Plaintiff has failed to state a claim for breach of the alleged oral contract,

Plaintiff argues that the parties undoubtedly had some type of agreement based on their course of

dealings.  The Court notes that Tenn. Code Ann. § 47-2-207(3) provides, "Conduct by both

parties which recognizes the existence of a contract is sufficient to establish a contract for sale

although the writings of the parties do not otherwise establish a contract."[30]  The rationale for

such a rule is easy to apprehend.  "Sellers usually do not ship and Buyers do not receive goods

unless they think they have struck a deal."[31]  Under such circumstances, the terms of the

agreement between the parties are the "terms on which the writings of the parties agree" as well

as the UCC's gap filling provisions.[32]

The Court finds that the Amended Complaint has plausibly alleged that the parties'

course of conduct, which recognized the existence of a contract, is sufficient to establish a

contract by operation of law, specifically by Tenn. Code Ann. 47-2-207(3).  The Amended

---

[30] Tenn. Code Ann. § 47-2-207(3).

[31] *United Foods*, 1994 WL 228773, at *5 (quoting *Quaker State Mushroom v. Dominick's Finer Foods,* 635 F. Supp. 1281, 1285 (N.D. Ill. 1986).  *See also* Tenn. Code Ann. § 47-2-207(3), Comment 7 ("In many cases, as where goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made.").

[32] Tenn. Code Ann. § 47-2-207(3).  *See also United Foods*, 1994 WL 228773, at *5; *Gage Products*, 393 F.3d at 641 (6th Cir. 2004) (applying Mich.'s UCC 2-207(3); *Dorton*, 453 F.2d at 1166 (applying Tenn.'s UCC 2-207(3)).  *Accord* Tenn. Code Ann. § 47-2-204(1) ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.").

Complaint has alleged the exchange of the 953/954 writings between the parties followed by months of transactions for Defendant's No. 6 Fuel Oil and the exchange of additional writings.[33] Based on these allegations, Plaintiff has pled the existence of contract by virtue of the parties' course of conduct under Tennessee law.  The terms of this agreement included all of the terms on which the parties' writings agreed as well as terms supplied by the UCC.

The remaining issue is what those terms were.  The Court believes that it would be inappropriate to conduct a "battle of the forms" analysis and determine what the enforceable terms of a possible agreement were at this stage of the case.  Plaintiff has attached some of the writings the parties exchanged as exhibits to the Amended Complaint including Defendant's 953/954 drafts and Plaintiff's 953/954 edits.[34]  However, Plaintiff admits that these are not all of the parties' writings and admits in its brief that "the Court will need to examine the various documents exchanged between the parties."[35]  To resolve a battle of the forms, the Court will necessarily rely on a more complete record than the pleadings here provide.  Because the Court is not well situated to determine what enforceable terms there were between the parties, the Court cannot yet rule on a possible breach of those terms.

Therefore, Defendant's Motion to Dismiss is granted as to Plaintiff's claim for breach of the December 2007 oral agreement.  The Court reserves ruling on Plaintiff's claim for breach of the agreement created by the parties course of conduct until a more complete record is developed.

---

[33] *E.g.* Am. Compl. ¶¶ 53-62.

[34] Am. Compl., ex. A-D.

[35] *See* Am. Compl. ¶ 61.  *See also* Pl.'s Resp. to Def.'s Mot. Dismiss, 6.

II.     **Tort Claims**

      A.     ***The Economic Loss Doctrine***

The economic loss doctrine provides that "[i]n a contract for the sale of goods where the only damages alleged come under the heading of economic losses, the rights and obligations of the buyer and seller are governed exclusively by the contract."[36]  The Tennessee Court of Appeals has defined "economic loss" to include damages for inadequate value, cost of repair, and replacement of defective goods or consequential loss of profits.[37]  The economic loss doctrine arose in the specific context of defective products to prohibit purchasers of products from recovering purely economic damages under negligence or products liability theories where the product's failure caused no personal injuries to the consumer and damaged no property other than the "product itself."[38]  The courts have reasoned that, in the absence of personal injuries or property damage, a defective product has simply "not performed as expected" and "the buyer's remedy should be governed by the rules of contract, which traditionally protect expectation interests."[39]  In this way, the Tennessee courts have applied the economic loss doctrine "to avoid

---

[36] *Trinity Industries v. McKinnon Bridge Co.,* 77 S.W.3d 159 (Tenn. Ct. App. 2001) (noting Tenn.'s lack of a "definitive body of law on the economic loss doctrine").  *See also Ritter v. Custom Chemicides, Inc.,* 912 S.W.2d 128, 133 (Tenn. 1995)

[37] *Memphis-Shelby County Airport Authority v. Illinois Valley Paving Co. et al.*, No. 01-3041, 2006 WL 3041492, at *3 (W.D. Tenn. Oct. 26, 2006) (citing *Messer Griesheim Indus., Inc. v. Cryotech of Kingsport, Inc.*, 131 S.W.3d 457, 465 (Tenn. Ct. App. 2003)).

[38] *East River S.S. Corp. v. Transamerica Delaval, Inc.,* 476 U.S. 858, 870, 106 S.Ct. 2295, 2302, 90 L.Ed.2d 865 (1986).  *See also Trinity Indus.*, 77 S.W.3d at 173 ("[A] breach of a contract for the sale of goods resulting in consequential damages is governed by the U.C.C. despite the fact that the pleadings allege the seller negligently performed the contract.").

[39] *Americoach Tours, Inc. v. Detroit Diesel Corp.*, No. 04-2016, 2005 WL 2335369, at *2 (W.D. Tenn. Sept. 23, 2005) (citations omitted).

the 'coming collision between warranty and contract on the one hand and the torts of strict liability, negligence, fraud, and misrepresentation on the other.'"[40]

The Tennessee courts have not applied the economic loss doctrine to preclude all tort claims involving the sale of goods.  One district court applying Tennessee law has observed that other jurisdictions have not barred claims for intentional torts generally under the economic loss doctrine.[41]  More specifically, courts have held that Tennessee's economic loss doctrine would not prevent claims for conversion[42] or fraud in the inducement[43] or claims under the TCPA.[44] With respect to a claim for fraud in the inducement, the Middle District of Tennessee explained,

> Given that a fraud in the inducement claim presents a special situation where parties to a contract appear to negotiate freely - which normally would constitute grounds for invoking the economic loss doctrine - but where in fact the ability of one party to negotiate fair terms and make an informed decision is undermined by the other party's fraudulent behavior, the Court concludes that the economic loss doctrine would not bar [a] misrepresentation claim.[45]

Some jurisdictions, most notably Michigan, have adopted an exception that would bar fraud-type

---

[40] *Trinity Indus.*, 77 S.W.3d at 171 (quoting James J. White & Robert S. Summers, *Uniform Commercial Code* § 10-5, 580 (4th ed.1995)).

[41] *Hansen v. Liberty Partners, LLC*, No. 04-1099, 2005 WL 3527162, at *11 (M.D. Tenn. Dec. 22, 2005) (collecting cases from other jurisdictions).

[42] *Id.*

[43] *Exprezit Convenience Stores, LLC v. Transaction Tracking Technologies, Inc.*, No. 05-0945, 2007 WL 307237, T *10 (M.D. Tenn. Jan. 29, 2007) (collecting cases including *Alternative Aviation Serv. Inc. v. Meggit (UK) Ltd.,* 207 F. App'x 506 (6th Cir. 2006) (applying Michigan law)).

[44] *Tungate v. Volvo Trucks of North America, LLC*, No. 09-0579, 2009 WL 4249200, at *2 (M.D. Tenn. Nov. 24, 2009).

[45] *Exprezit*, 2007 WL 307237, at * 10.

claims under the economic loss doctrine where the fraud concerns the quality of the goods sold.[46]

Applying these principles to Plaintiff's claims, the Court holds that Tennessee's law on the economic loss doctrine would not bar as a matter of pleading the specific tort claims Plaintiff has alleged in the Amended Complaint. Although the parties never reduced their proposed transactions to a single writing, as it were, they do not dispute that their agreement was for the sale of goods.[47] Therefore, the UCC governs their transaction. In addition to its breach of contract claims, Plaintiff has alleged (1) fraud in the inducement, (2) fraud/promissory fraud, (3) promissory estoppel and equitable estoppel, (4) conversion, and (5) violation of the Tennessee Consumer Protection Act ("TCPA"). Defendant argues that the Court should dismiss Plaintiff's tort claims largely because they are breach of contract claims in disguise attempting an "end run" around Tennessee principles of contract law. It is true that Plaintiff's tort claims essentially seek redress for Defendant's alleged oral promises, which the Court has already held were unenforceable under the Statute of Frauds. However, this does not bar Plaintiff from alleging its related tort claims. First, courts applying Tennessee law have never dismissed intentional torts, like those Plaintiff alleges, pursuant to the economic loss doctrine even where the parties have a written agreement. Second, the Court has held that the parties in this case did not have a single

---

[46] *Huron Tool & Eng'g Co. v. Precision Consulting Servs., Inc.*, 532 N.W.2d 541, 544 (Mich. Ct. App. 1995).

[47] In determining whether a contract is governed by the UCC, Tennessee employs the "predominant factor" test. *Hudson v. Town and Country True Value Hardware,* 666 S.W.2d 51, 53-54 (Tenn.1984); *Corso Enterprises, Inc. v. Shop at Home Network, Inc.*, No. 04-0260, 2005 WL 2346986, at *6 (M.D. Tenn. Sept. 26, 2005) ("Under this test, if the essential bulk of the assets to be transferred qualifies as 'goods,' then it is appropriate to characterize the transaction as one for the sale of goods, and the UCC governs; if the predominant assets are non-goods, then the UCC has no application.").

writing that constituted an enforceable contract.  Thus, the policy reasons justifying the

economic loss doctrine, particularly the need to clearly demarcate the lines between contract and

tort, do not control in this case.  At the pleadings stage, it is not clear what contract the parties

had.  As a result, the economic loss doctrine should not preclude Plaintiff from alleging fraud

claims sounding in tort as a matter of pleading.  Third, the Tennessee courts have held that the

Statute of Frauds "has no application to a case involving a fraudulent misrepresentation that

induces the formation of a contract."[48]  For these reasons, the Court holds that the economic loss

doctrine is not a per se bar to Plaintiff's tort claims.  Therefore, the Court will analyze the

sufficiency of Plaintiff's pleading as to each count.

### B. Fraud in the Inducement/Promissory Fraud

In Count I of the Amended Complaint, Plaintiff alleges that Defendant acted fraudulently

inducing Plaintiff to enter into a two-year lease with Martin Marine for the lease of barges to

transport the No. 6 Fuel Oil from Memphis.  In Count II, Plaintiff charged Defendant with

promissory fraud by virtue of the fact that Defendant failed to sell Plaintiff with all of its No. 6

Fuel Oil and instead diverted its supply to other buyers.  As a result, Plaintiff was unable to meet

its commitments to its customers for the quantities of fuel oil it had promised.  Plaintiff alleges

that Defendant's actions resulted in damages in excess of $30 million.

Each of these separate claims requires essentially proof of the same elements.  Under

Tennessee law, an action for fraud in the inducement of a contract, also called promissory fraud,

has four elements: (1) an intentional misrepresentation of a material fact; (2) knowledge of the

---

[48] *Haynes v. Cumberland Builders, Inc.*, 546 S.W.2d 228, 231 (Tenn. Ct. App. 1976).  *See also Jarrett v. Epperly*, 96 F.2d 1013, 1019 (6th Cir. 1990) (applying Tenn. law).

falsity of that representation; (3) an injury caused by reasonable reliance on the representation; and (4) involvement of a promise of future action with no present intent to perform.[49]  As with any claim of fraud, the plaintiff must state with particularity the circumstances constituting fraud.[50]

The Court holds that Plaintiff has failed to state a plausible claim for fraud in the inducement as to Count I.  Plaintiff has alleged that Defendant induced Plaintiff to enter into the two-year Martin lease by promising that it would enter into an agreement to sell Plaintiff all of its No. 6 Fuel Oil for a two-year term.  The Amended Complaint alleges that prior to agreeing to the Martin lease, Plaintiff notified Defendant that it would not commit to the lease unless Defendant agreed to sell Plaintiff all of the oil in question.  Defendant also had knowledge that Plaintiff would incur expenses of $9,500 per day by leasing the barges from Martin.  Plaintiff relied on Defendant's promise to sell the oil for the two-year term.  Plaintiff has alleged that Defendant had no intention of performing for the two-year term to which it had agreed.  Plaintiff would not have entered into the Martin lease if it had known of Defendant's intention not to sell Plaintiff all of its fuel oil.  Plaintiff contends that it has incurred more than $30 million in damages.  Plaintiff pleads these facts with the sufficient particularity going so far as to identify specific conversations, the dates of the conversations, and the parties involved.

Nevertheless, the basis for Plaintiff's fraud in the inducement claim is the two-year term Defendant promised for the sale of all its No. 6 Fuel Oil at the Memphis refinery.  That term was

---

[49] *Taylor v. Butler*, No. W2002-01275, 2003 WL 21026938, at *3 (Tenn. Ct. App. Apr. 24, 2003) (citations omitted).

[50] *Id.*

never reduced to writing or otherwise made enforceable by a written agreement of the parties expressing their mutual intent to be bound.  In fact, Plaintiff pleads in the Amended Complaint that the parties further agreed that either party could terminate the agreement with ninety-days notice.[51]  While it is true that this term appeared in later writings the parties exchanged, Plaintiff was the party to first propose the term in its 953/954 edits, specifically in Rider B.[52]  The Court concludes that Plaintiff has failed to state its claim for fraud in the inducement because Plaintiff has failed to plead reasonable reliance.  The Tennessee courts have held that a court need not accept as true a plaintiff's allegation that it acted in reasonable reliance on a promise for purposes of Rule 12(b)(6).[53]  More importantly, a party cannot show reasonable reliance as a matter of law where the agreement between the parties is conditional or expressly non-binding.[54] The Court finds that Plaintiff has failed to allege that Defendant promised future action with no intention to perform where the parties agreed that either party could terminate the contract before the two-year term of the Martin lease actually expired without any apparent conditions. Therefore, Plaintiff has failed to state its claim for fraud in the inducement as to the two-year term of the agreement.

---

[51] Am. Compl. ¶¶ 61, 152.

[52] Am. Compl., ex. C&D.  Rider B stated, "The provisions of this Agreement shall automatically renew for two additional one year terms, unless either party gives the other party at least 90 days notice prior to the expiration of the initial term or any renewal term hereunder of its intention not to renew the Agreement."

[53] *Barnes & Robinson Co., Inc. v. OneSource Facility Serv., Inc.*, 195 S.W.3d 637, 644 (Tenn. Ct. App. 2006) (citations omitted).

[54] *Id.* at 645-46 (dismissing claim for promissory estoppel for failure to plead reasonable reliance where plaintiff had relied on non-binding letter of intent, the express terms of which made the parties' preliminary agreement unenforceable).

Likewise, the Court holds that Plaintiff has failed to state its claim in Count II for promissory fraud. In addition to the factual allegations above, Plaintiff contends that Defendant's fraudulent conduct prevented Plaintiff from securing other sources of No. 6 Fuel Oil during the relevant period. In fact, Plaintiff claims that it could not have lifted any more oil than the quantity of fuel oil Defendant had promised to sell. The Amended Complaint alleges that Defendant had no intention of selling Plaintiff all of its No. 6 Fuel Oil from the Memphis refinery because Defendant sold supply to other purchasers in violation of its commitment to Plaintiff. However, Plaintiff ignores the 90-day termination provision that Plaintiff actually proposed for inclusion in the agreement. Therefore, the Court holds that Plaintiff has failed to plead reasonable reliance. Based on that provision, Plaintiff cannot state a claim for promissory fraud as to the quantity of oil Defendant had allegedly promised to sell.

### C.      *Promissory Estoppel and Equitable Estoppel*

In Count III of the Amended Complaint, Plaintiff makes similar allegations that Defendant promised to sell Plaintiff all the No. 6 Fuel Oil produced at the Memphis refinery for a two-year term. Defendant further promised to enter into a written agreement with Plaintiff to memorialize the transaction. Plaintiff relied on Defendant's promises to enter into the Martin lease. Plaintiff's reliance was justifiable. Defendant ultimately breached its promise by failing to sell Plaintiff the promised fuel oil. Additionally, not all of the fuel oil it did sell Plaintiff met the specifications the parties had negotiated. Therefore, Plaintiff alleges that Defendant is estopped from disavowing the terms of the agreement.

Plaintiff has alleged that these facts give rise to claims for promissory estoppel and equitable estoppel. Promissory estoppel under Tennessee law requires "a promise which the

promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance; such a promise is binding if injustice can be avoided only by enforcement of the promise."[55]  Tennessee does not liberally apply the doctrine of promissory estoppel.  Rather, the doctrine is available only in exceptional cases where the circumstances border on actual fraud.[56]  The doctrine of promissory estoppel is also known as "detrimental reliance" because the plaintiff must show that a promise was made and that the plaintiff reasonably relied on the promise to his detriment.[57]  Although the claim does not depend on the existence of an express contract between the parties,[58] the promise upon which the promisee relied must be unambiguous and not unenforceably vague.[59]  The Tennessee courts have dismissed claims for promissory estoppel where a promisor simply abandons its plan before entering into enforceable contracts with the promisee and there is no evidence of improper motive or unconscionable advantage to the promisor.[60]

In the alternative, Plaintiff has alleged that the principle of equitable estoppel should force Defendant to honor the same alleged promises.  The Tennessee courts have characterized

---

[55] *Calabro v. Calabro*, 15 S.W.3d 873, 878 (Tenn. Ct. App. 1999)

[56] *Baliles v. Cities Service,* 578 S.W.2d 621 (Tenn. 1979); *Shedd v. Gaylord Entertainment Co.,* 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003) (limiting the application to "exceptional cases where to enforce the statute of frauds would make it an instrument of hardship and oppression, verging on actual fraud").

[57] *Engenius Entertainment, Inc. v. Herenton,* 971 S.W.2d 12, 19-20 (Tenn. Ct. App.1997)

[58] *Id*. at 19.

[59] *Amacher v. Brown-Forman Co.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991).

[60] *Chavez v. Broadway Elec. Service Corp.*, 245 S.W.3d 398, 406-07 (Tenn. Ct. App. 2007) (citing *Shedd*, 118 S.W.3d at 700)) (both employment cases).

37

equitable estoppel as "a distinct and disparate doctrine."[61]  The principle difference between promissory estoppel and equitable estoppel is that equitable estoppel is a recognized exception to the Statute of Frauds.[62]  Equitable estoppel is limited to those cases "where to enforce the Statute of Frauds would make it an instrument of hardship and oppression, verging on actual fraud."[63]  The elements of equitable estoppel are (1) conduct which amounts to a false representation or concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention, or at least expectation that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive of the real facts.[64]  The party claiming the estoppel must show (1) lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.[65]

In light of the applicable Tennessee law, the Court concludes that Plaintiff has failed to plead its claim for promissory estoppel for the same reasons that it could not state its claims for fraud in the inducement and promissory fraud.  Plaintiff cannot establish reasonable reliance on

---

[61] *Nationsbank, N.A. (South) v. Millington Homes Investors, Ltd.*, No. 02A01-9805-CH-00134, 1999 WL 79204, at*3 (Tenn. Ct. App. Feb. 19, 1999).

[62] *Seramur v. Life Care Centers of America, Inc.*, No. E2008-01364-COA-R3-CV, 2009 WL 890885, at *5 (Tenn. Ct. App. Apr. 2, 2009); *Nationsbank*, 1999 WL 79204, at*3 (citing *Baliles*, 578 S.W.2d at 624).

[63] *Nationsbank*, 1999 WL 79204, at*3.

[64] *Id*. at *4.

[65] *Id*.

the alleged promises Defendant made in late 2007.   Plaintiff proposed that the parties would terminate their agreement upon ninety-days notice, which gave each party the right to walk away prior to the expiration of Plaintiff's Martin lease.   Furthermore, the Court does not believe that Plaintiff has plausibly plead that Defendant's conduct borders on fraud.   As a result, Plaintiff should not be able to avail itself of the exceptional relief provided by the doctrine of promissory estoppel or equitable estoppel.   Therefore, Plaintiff's claim for promissory estoppel and equitable estoppel is dismissed.

### D.   *Conversion*

In Count VI of the Amended Complaint, Plaintiff has alleged that Defendant's sale of over 800,000 barrels of No. 6 Fuel Oil to which Plaintiff had immediate right of possession amounts to conversion.   The intentional tort of conversion under Tennessee law is "the appropriation of the thing to the party's own use and benefit, by the exercise of dominion over it, in defiance of the plaintiff's rights."[66]   In order to state claim for conversion, a plaintiff must allege the following elements: (1) the appropriation of another's property to one's own use and benefit, (2) by the intentional exercise of dominion over it, (3) in defiance of the true owner's rights.[67]

The Court holds that Plaintiff has failed to state a claim for conversion as to the No. 6 Fuel Oil.   Plaintiff has not alleged plausible facts from which it could be inferred that Plaintiff had an immediate right to possession of the oil in question.   The Amended Complaint asserts

---

[66] *Hansen*, 2005 WL 3527162, at *10.

[67] *Id.* (citing *State ex el. Flowers v. Tennessee Coordinated Care,* No. M2003-01658-COA-R3-CV, 2005 WL 427990, at *7 (Tenn. Ct. App. Feb. 23, 2005)).

without elaboration that pursuant to the parties' agreements, Plaintiff had "an immediate right to possession and a right to immediate possession of the No. 6 Fuel Oil at the time that it was produced by Valero."[68]  Plaintiff's claim for conversion is predicated on a term of the alleged oral agreement between the parties.  The Court has already held that the Statute of Frauds bars enforcement of that oral agreement.  Therefore, that agreement cannot vest any property interest to the No. 6 Fuel Oil in Plaintiff.[69]

Furthermore, even if the Court considered Plaintiff's allegation of an immediate right to possession as an allegation of fact, other allegations in the Amended Complaint contradict it. According to the Amended Complaint, the parties' oral agreements took two forms: a FOB agreement and a delivered agreement.[70]  The Amended Complaint asserts that an FOB contract is one that is characterized by the buyer nominating the vessel to be used for delivery, and the goods become the buyer's once the seller moves the goods to a position over the rail or flange of the vessel being used.[71]  A delivered contract is one in which the seller nominates the vessel to be used and pays for such vessel to transport the goods to the buyer's designated delivery point and the goods become the buyer's when the seller discharges product over the rail or flange into

---

[68] Am. Compl. ¶ 166.

[69] To the extent that Plaintiff will be able to prove the existence of a similar term pursuant to the enforceable contract the parties did have, Plaintiff would arguably be entitled to a contract remedy.  The Court has already held that the parties' course of conduct may have given rise to a contract under Tenn. Code Ann. § 47-2-207(3).

[70] Am. Compl. ¶ 23.

[71] *Id.*

the buyer's tank.[72]  These factual allegations contradict Plaintiff's factual allegation that the parties agreed that Plaintiff had an immediate right to possession of the No. 6 Fuel Oil at the time that it was produced.  On the contrary, these other allegations suggest that Plaintiff had no right to possession until the oil was moved over the flange of the barge to transport the oil from Defendant's facility or upon Defendant's delivery to Plaintiff's designated location.  In either situation, Plaintiff did not have an immediate right to the oil as soon as Defendant produced it.  The Court holds that this inherent contradiction also justifies dismissal of Plaintiff's claim for conversion.

## III.   TCPA Claim

Count IV of the Amended Complaint alleges that Defendant's failure to provide Plaintiff with No. 6 Fuel Oil meeting the minimum specifications to which the parties had agreed constitutes a violation of the TCPA, specifically Tenn. Code Ann. § 47-18-104(b)(7), (9), and (27).  Plaintiff first alleges that Defendant sold Plaintiff oil on numerous occasions after March 2, 2008, which did not conform to the minimum standards Plaintiff required.  Additionally, Plaintiff contends that Defendant violated the TCPA by not selling all of its No. 6 Fuel Oil as promised and induced Plaintiff into entering into the Martin lease for a two-year term.  Plaintiff alleges it did not become aware that Defendant had no intention of performing under the oral promises until the fall of 2008.

The TCPA states that "[u]nfair or deceptive acts or practices affecting the conduct of any

---

[72] *Id.*

trade or commerce constitute unlawful acts or practices. . . ."[73]  Among the unfair or deceptive

acts or practices listed in the TCPA are "representing that goods or services are of a particular

standard, quality or grade, or that goods are of a particular style or model, if they are of

another"[74] and "advertising goods or services with intent not to sell them as advertised."[75]  The

TCPA contains a catch-all provision that makes "engaging in any other act or practice which is

deceptive to the consumer or to any other person" unlawful as well.[76]  "In order to be successful

under the [TCPA], it must be proven that there was some deception, misrepresentation or

unfairness, regardless of any breach of contract."[77] A breach of contract is not per se a deception,

misrepresentation or unfairness for purposes of the TCPA.[78]

Plaintiff has alleged that Defendant violated the Act in three distinct ways: (1) by failing

to sell Plaintiff oil at the agreed minimum standards; (2) by failing to sell Plaintiff all of its oil;

and (3) by failing to sell Plaintiff its oil for the two-year term.  Defendant argues that Plaintiff's

TCPA claim should be dismissed as time-barred because the alleged violations occurred outside

of the TCPA's one-year statute of limitations.  The Court is not persuaded that Plaintiff's claims

are untimely.  However, because the Court holds that they should be dismissed on other grounds,

---

[73] Tenn. Code Ann. § 47-18-104(a).

[74] § 47-18-104(b)(7).

[75] § 47-18-104(b)(9).

[76] § 47-18-104(b)(27).

[77] *Hamilton County Emergency Communications Dist. v. Orbacom Communications Integrator Corp.*, 2006 WL 120157, at *8-9 (E.D. Tenn. Jan. 17, 2006) (citing *Office Furniture & Related Servs. Inc. v. United Constr. Corp.*, 2005 WL 378707, at *5 (Tenn. Ct. App. Feb.16, 2005).

[78] *Id.*

the Court will assume without deciding that the claims are timely.

First, the Court concludes that Plaintiff has failed to state claim under paragraph (b)(7), which makes it unlawful to represent that goods are of a particular quality if they are of another, concerning the diminished quality of the fuel oil.  The Tennessee courts have held that a it is not a violation of this section to promise one grade of goods and then deliver another when the goods were not in existence at the time of the promise.[79]  Rather the TCPA makes it unlawful to represent that the goods are of a particular quality when they are not.[80]  For example, in *Hamilton County*, it was not a violation for a merchant to promise computers with a certain central processing unit and then deliver computers with another type of processor.  Instead, the merchant violated the TCPA by delivering the non-conforming machines and then intentionally charging the consumer the price for conforming machines.

In the case at bar, Plaintiff has alleged that Defendant violated the TCPA by delivering oil that did not conform to the standards promised in the oral agreements.  Plaintiff does not allege that Defendant delivered non-conforming goods and represented that they were actually conforming.  In fact, according to the exhibits to the Amended Complaint, the parties agreed that each lift of oil was to include an inspection report on the quality of the fuel oil.  Although it is possible that Defendant delivered non-conforming oil in violation of the parties' agreement or did not certify its quality, Defendant's alleged conduct does not form the basis for a violation of the TCPA.  Based on these allegations, the Court holds that Plaintiff cannot state a claim pursuant to paragraph (b)(7) of the TCPA.

---

[79] *Id.*

[80] *Id.*

43

Next, the Court holds that paragraph (b)(9) has no application to the allegations in this case. That paragraph makes it unlawful to engage in "advertising goods or services with intent not to sell them as advertised." The term "advertised" is not defined in the Act, and the courts construing the TCPA have never considered what conduct amounts to "advertising." The Court finds that the term is commonly-defined and understood to mean "the action of calling something (commodities for sale, a service offered or desired) to the attention of the public especially by paid announcements."[81] Plaintiff has failed to allege that Defendant called the sale of its fuel oil to the attention of the public or otherwise engaged in any activity that might be construed as advertising. Therefore, Plaintiff's claims pursuant to paragraph (b)(9) of the TCPA are dismissed.

Finally, the Court holds that Plaintiff has not stated a plausible claim that Defendant's conduct violated the TCPA's catch-all provision, paragraph (b)(27). The Court has already addressed Plaintiff's claim that the oil did not conform to the standards Defendant had agreed to meet. This leaves Plaintiff's allegations that Defendant violated the TCPA by not selling Plaintiff all of its No. 6 Fuel Oil from the Memphis refinery and failing to sell Plaintiff its oil for a period of two years. Plaintiff has failed to plead that this conduct involved "some deception, misrepresentation or unfairness" as the TCPA contemplates those terms. Plaintiff essentially seeks another route to enforce the oral promises Defendant allegedly made in December 2007 and affirmed up until Defendant transmitted the 953/954 drafts to Plaintiff on February 26, 2008. As Defendant correctly notes, Plaintiff had notice that at that time Defendant did not intend to perform for a two-year period and that Defendant would sell Plaintiff only specified quantities of

---

[81] Meriam-Webster's Third Int'l Dictionary.

oil when Defendant proposed contrary terms in its 953/954 drafts.  The Court fails to see how Defendant deceived Plaintiff or misrepresented its intention with respect to the term of the agreement or the quantity of oil at any time after February 2008 when it submitted the 953/954 drafts.  The Court has already found that Plaintiff had reason to know that the two-year term was not part of the agreement as Plaintiff proposed the 90-day notice of termination provision.  Without some more particular allegation under the TCPA, Plaintiff's TCPA claims under (b)(27) are dismissed.

## CONCLUSION

The Court has granted Defendant's Motion as to Plaintiff's claims for fraud in the inducement (Count I), promissory fraud (Count II), promissory estoppel/equitable estoppel (Count III), violations of the TCPA (Count IV), and conversion (Count VI).  The Court has dismissed claims for breach of the alleged oral agreements between the parties (Count IV) but denied the Motion as to the contract created by operation of Tenn. Code Ann. § 47-2-207(3).  Therefore, Defendant's Motion is **GRANTED IN PART, DENIED IN PART**.

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: March 9th, 2010.