# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

|  |  |  |
|---|---|---|
| **CARBON PROCESSING AND** | ) | |
| **RECLAMATION, LLC, and** | ) | |
| **CPR MARINE, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 09-2127-STA** |
| | ) | |
| **VALERO MARKETING AND SUPPLY** | ) | |
| **CO. and  VALERO REFINING CO. –** | ) | |
| **TENNESSEE, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WILLIAM L. JONES** | ) | |
| | ) | |
| **Third-Party Defendant.** | ) | |

## ORDER ON THE PARTIES' MOTIONS FOR SUMMARY JUDGMENT

Before the Court is Defendants Valero Marketing and Supply Co. and Valero Refining

Co. – Tennessee, LLC's (hereinafter "Valero") Motion for Summary Judgment (D.E. # 120)

filed on December 29, 2010, as to all claims asserted against them.  Plaintiffs Carbon Processing

and Reclamation, LLC, and CPR Marine, LLC (hereinafter "CPR") have filed a response in

opposition, to which Valero has replied.  For the reasons set forth below, Valero's Motion for

Summary Judgment is **GRANTED IN PART, DENIED IN PART**.

Also before the Court is Valero's Motion for Summary Judgment (D.E. # 126) filed on

January 31, 2011, as to all claims asserted against it by CPR Marine.  CPR has filed a response

1

in opposition, to which Valero has replied.  For the reasons set forth below, Valero's Motion for Summary Judgment on CPR Marine's claims is **GRANTED IN PART, DENIED IN PART**.

Finally, before the Court is CPR's Motion for Partial Summary Judgment (D.E. # 131) filed on January 31, 2011, as to its claim for breach of contract.  Valero has filed a response in opposition, to which CPR has replied.  For the reasons set forth below, CPR's Motion for Partial Summary Judgment is **GRANTED IN PART, DENIED IN PART**.

## BACKGROUND

The following material facts are not in dispute for purposes of these Motions unless otherwise noted: slurry is a by-product of the process by which crude oil is refined and, while lower in value than, for instance, gasoline or diesel, is sold and used for numerous industrial applications, including fuel for power plants, steel mills, and ocean-going vessels. (Pls.' Statement of Facts ¶ 1, D.E. # 131-45.)  CPR is engaged in the business of purchasing and selling petroleum products, including slurry and fuel oils. (*Id*. ¶ 2.)  Valero produces petroleum products of various grades, including conventional gasoline, diesel fuel, other fuel oils, and slurry. (*Id*.)

William Jones ("Jones") is the owner and sole member of CPR. (Defs.' Statement of Facts ¶ 1, D.E. # 120-2.)  In August 2007, Jones approached Chris Haycraft at L&R Midland, a marine charter brokerage company, about the possibility of leasing barges. (*Id*. ¶ 2.)  CPR and L&R Midland met on August 15, 2007, and after that meeting, L&R Midland began looking for barge equipment for CPR. (*Id*. ¶ 3.)  CPR does not deny this meeting but does state that L&R Midland was looking for barges for CPR prior to August 15, 2007. (Pls.' Resp. to Defs.' Statement of Facts ¶ 3, D.E. # 136-4.)

I.      **The Parties' Meetings and Negotiations**[1]

The parties began to negotiate a term contract for the sale of Valero's slurry to CPR.  At many of these meetings, CPR was represented by Jones and Steve Mis ("Mis"); Valero was represented by Hal Tryon ("Tryon"), Valero's trader in charge of selling Memphis slurry, and David Olson ("Olson"), Valero's director of heavy products and fuel oil and Tryon's direct supervisor. On August 16, 2007, CPR had its first meeting with Valero to discuss the possibility of CPR purchasing slurry from Valero. (Defs.' Statement of Facts ¶ 4, D.E. # 120-2.)[2] CPR indicated its interest in doing "term business" with Valero. (*Id.* ¶ 5.)  Valero informed CPR that its term contracts could not exceed a year without involving upper management. (*Id.* ¶ 6.)  Mis, a CPR employee attending the meeting, wrote in his notes that the parties discussed a "term date with Valero one year, Evergreen." (*Id.* ¶ 7.)  Mis's notes contained the following statements as well: "Valero would support a 3 yr barge deal based on economics" and "Evergreen – no definite ending point.  Put into contract."  (Pls.' Resp. to Defs. Statement of Facts ¶ 7, D.E. # 136-4.)  An

---

[1] The Court notes that the temporal scope of the parties' negotiations is disputed.  Valero insists that the parties never had a term contract and that their negotiations lasted from August 2007 through December 2008 and January 2009.  Valero characterizes any transactions for the sale of slurry during that period as "spot deals." In the case at bar, Valero denies that these sales occurred as part of a term contract with CPR.

On the other hand, CPR maintains that the parties had concluded their negotiations by the end of 2007.  CPR claims that the parties had an oral agreement by December 2007 but not a finalized writing to memorialize the agreement.  Nevertheless, the parties began performance of a term contract in February 2008.  In the mean time, they continued to exchange writings that would memorialize their oral agreement.

[2] Plaintiffs respond that CPR had purchased slurry from Valero on occasions prior to this date. (Pls.' Resp. to Defs. Statement of Facts ¶ 4.)  Plaintiffs go on to add a number of additional statements concerning why time was of the essence for Valero's operations that slurry be removed promptly.

"evergreen provision" would allow either party to terminate the contract at the end of a year or allow the contract to be renewed for an additional year. (Defs.' Statement of Facts ¶ 8, D.E. # 120-2.)  CPR disputes this assertion and states that Valero explained that the "evergreen provision" would effectively act to extend any agreement between the parties for a second year. (Pls.' Resp. to Defs. Statement of Facts ¶ 8, D.E. # 136-4.)  CPR adds that the evergreen provision was added so that a contract could go forward without the delay of waiting for upper management approval at Valero. (*Id.*)  Valero told CPR that Valero could offer 50 to 75 percent of its Memphis slurry business. (Defs.' Statement of Facts ¶ 9, D.E. # 120-2.)  While admitting that Valero made this offer at the August 17, 2007 meeting, CPR adds that Valero later agreed to sell CPR all of its Memphis slurry. (Pls.' Resp. to Defs. Statement of Facts ¶ 9, D.E. # 136-4.)

Meanwhile, on October 4, 2007, L&R Midland contacted CPR about an offer for barge equipment from Martin Marine ("Martin"). (Defs.' Statement of Facts ¶ 10, D.E. # 120-2.)  CPR entered into negotiations with Martin; however, the parties did not reach an agreement at that time. (*Id.* ¶ 11.)  Martin sought a barge contract for three years or more; CPR bargained for a one-year term. (Defs.' Statement of Facts ¶ 12, D.E. # 120-2.)  CPR emphasizes that the duration of the barge lease was driven by Valero's needs, not CPR. (Pls.' Resp. to Defs. Statement of Facts ¶ 12, D.E. # 136-4).  As a result of Martin's demands, CPR endeavored to secure a longer term with Valero. (Defs.' Statement of Facts ¶ 13, D.E. # 120-2; Pls.' Resp. to Defs. Statement of Facts ¶ 13, D.E. # 136-4).

On October 18, 2007, CPR again met with Valero to discuss the sale of slurry from the

Memphis refinery. (Defs.' Statement of Facts ¶ 14, D.E. # 120-2.)[3]  According to Steve Mis's notes, Valero and CPR again discussed a "term deal 1 year (evergreen deal)" during this meeting. (*Id*. ¶ 15.)[4]  Following the meeting, on November 7, 2007, CPR resumed its barge negotiations with Martin. (*Id*. ¶ 16.)  Martin had commenced construction of the barges and proposed a barge lease with a two-year term. (*Id*.)  CPR still did not execute a final barge contract with Martin at that time.

Later in November 2007, Valero sent CPR a draft contract containing a one-year term, from January 1, 2008 to December 31, 2008. (*Id*. ¶ 17.)  This writing incorporated Valero's Marketing and Supply Company's General Terms and Conditions For Petroleum Product Purchases/Sales ("GT&C's"). (*Id*. ¶ 18.)  The GT&C's included a paragraph prohibiting the giving or receipt of any gifts or entertainment of "significant value." (*Id*. ¶ 19.)  Specifically, it stated,  "Commissions and Gifts: No director, officer, employee or agent of either party shall give or receive any commission, fee, rebate, gift or entertainment of significant value or cost in connection with this Agreement." (*Id*.)  Neither party ever signed the November 2007 draft contract. (*Id*. ¶ 28.)

Near the end of November, Valero and CPR resumed negotiations. (*Id*. ¶ 20.)  The parties again discussed an "evergreen" provision, the specifications of the slurry, and the price of the

---

[3] CPR disputes this statement because the parties first met in August 2007, and Valero has otherwise failed to define what "formal" means. (Pls.' Resp. to Defs. Statement of Facts ¶ 14, D.E. # 136-4.)

[4] CPR cites other notes taken by Mis at other meetings during the negotiations. (Pls.' Resp. to Defs. Statement of Facts ¶ 15, D.E. # 136-4.)

slurry as well as a "contract from February to February." (*Id.* ¶¶ 21, 22.)[5] CPR indicated that it

needed a "copy of General Terms of Agreement," which Valero provided later that day. (*Id.* ¶¶

23, 24.)  During this meeting, Valero again informed CPR that it could not agree to a two-year

contract and keep approval of the contract at the level of the trading floor. (*Id.* ¶ 25.)  Although

CPR expressed interest in obtaining slurry from various refineries owned by Valero, Valero

never promised to supply product to CPR from other refineries. (Defs.' Statement of Facts ¶ 27,

D.E. # 120-2.)

The parties continued their negotiations on December 15, 2007. (*Id.* ¶ 29.)  Among other

things, the parties discussed the quality specifications of the slurry to be purchased under the

proposed contract. (*Id.* ¶ 31.)  However, there is no record of the parties discussing the length of

the contract. (*Id.* ¶ 32.)  Neither party signed a contract at the end of the December meeting. (*Id.*

¶ 33.)  As of December 28, 2007, attorneys for both CPR and Martin Marine continued to

discuss a potential barge contract. (*Id.* ¶ 34.)

Although the parties dispute whether CPR had a finalized barge lease with Martin by

mid-January (*Id.* ¶ 35; Pls.' Resp. to Defs. Statement of Facts ¶ 35, D.E. # 136-4.), they agree

that on February 5, 2008, Jones signed a two-year barge lease with Martin. (Defs.' Statement of

Facts ¶ 36, D.E. # 120-2.)  At that time CPR did not have a signed contract with Valero. (*Id.* ¶

38.)[6]  The only writing exchanged by Valero and CPR up to that point was Valero's November

---

[5] CPR has disputed this statement because the record actually states "contract February to February" and Valero has altered it to read "contract from February to February." (Pls.' Resp. to Defs. Statement of Facts ¶ 22, D.E. # 136-4.)  CPR argues that the altered statement is ambiguous.

[6] CPR disputes this statement insofar as Valero has asserted that the parties did not have a "final" contract. (Pls.' Resp. to Defs. Statement of Facts ¶ 38, D.E. # 136-4.)  CPR contends that

draft contract, which neither party had signed. (Defs.' Statement of Facts ¶ 39, D.E. # 120-2.)

On February 22, 2008, CPR again met with Valero. (Defs.' Statement of Facts ¶ 41, D.E. # 120-2.)[7]  Prior to this meeting, CPR's Mis wrote "notes for [himself] to know what to talk about the next day" with Valero. (*Id*. ¶ 42.)  These points included: "Length of Contract; Auto Renewals; Monetary Terms & Discounts; Make-Up Barges During T/A; Barge Usage when Lo OutPut [sic]; Start Contract After T/A." (*Id*. ¶ 43.)  At the meeting the following day, Mis recorded that the parties discussed the applicable pricing discount: "Valero wants $6.50. CPR wants $7.00." (*Id*. ¶ 44.)[8]  Next to Olson's name in the margin, Mis wrote "Looking at a 6 month deal – will push for 12 months." (*Id*. ¶ 45.)  Mis also documented the pricing discussion: "3/1 – 8/31/08 $7.00 FOB $3.00 delivered + fuel 9/1 – 2/23/09 $9.00 FOB $5.00 delivered + fuel 1 Year 200,000 barrel +/-10% per month." (*Id*. ¶ 47.)[9]  Valero claims that at no time during the February meeting did CPR inform Valero of its belief that the parties had made an oral contract in December 2007. (*Id*. ¶ 48.)  CPR responds that Jones testified that he did not know whether this topic was discussed at the February 2008 meeting. (Pls.' Resp. to Defs. Statement of Facts ¶ 48, D.E. # 136-4.)

---

the parties had an agreement as of December 14, 2007, on which CPR relied in entering into the barge lease. (*Id*.)  The Court has already noted the parties' dispute over whether they had an oral agreement by the end of December 2007.

[7] Elsewhere, the parties agree that they met on February 21, 2008. (Pls.' Statement of Facts ¶ 10, D.E. # 131-45.)  It is not clear to the Court whether the parties met on both days or on only one of them.  In any event, the Court finds that this ambiguity is not material to the legal issues presented at this stage of the case.

[8] CPR disputes that the evidence showed these figures related to the applicable pricing discount. (Pls.' Resp. to Defs. Statement of Facts ¶ 44, D.E. # 136-4.)

[9] While admitting that Mis made these notes, CPR disputes that the notes documented the parties' pricing discussion. (Pls.' Resp. to Defs. Statement of Facts ¶ 47, D.E. # 136-4.)

## II.     The Parties' Writings[10]

On February 25, 2008, Olson sent the following email to Stacey Kotara, Valero's contracts administrator: "Stacey, we have signed the following term deals with Carbon Processing [CPR] for Memphis Slurry." (Pls.' Statement of Facts ¶ 12, D.E. # 131-45.)  Olson's email went on to outline the terms of both a FOB agreement and a "delivered" agreement. (*Id.*) Those terms included specific volumes, pricing, chemical specifications of the product, delivery location, and duration (i.e., February 28, 2008 through March 1, 2009). (*Id.*)[11]  Valero entered the contracts into its computer system and generated a document called "Valero Online Deal Sheet – Sales Contract" for both the FOB and the delivered contracts. (Id. ¶ 13.)  Each deal sheet referred to the "deal" as a "term contract." (*Id.*)  Thereafter, Valero prepared revised deal sheets for each load purchased by CPR when the product specifications did not conform to those outlined in the writings and consequently the parties agreed to a quality-related discount. (*Id.*) Each of these revised deals sheet referred to a "Term Contract" with CPR. (*Id.*)

_____

[10] In its summary judgment briefing, Valero consistently refers to the writings as "drafts." (e.g. Defs.' Statement of Facts ¶ 49, D.E. # 120-2.); whereas, CPR refers to the parties' "agreements" and emphasizes that the parties performed under the material terms of the writings as if they were operative. (e.g. Pls.' Resp. to Defs. Statement of Facts ¶ 49, D.E. # 136-4.)  CPR repeats its objection to Valero's description of the writings as "drafts" throughout its briefing.

For purposes of the parties' Motions for Summary Judgment, the Court will refer to the documents as "writings," which is the terminology of the UCC.  *See* Tenn. Code. Ann. § 47-2-207(3) ("In such case the terms of the particular contract consist of those terms on which *the writings* of the parties agree . . . .") (emphasis added).

[11] In response to CPR's statement of fact, Valero posits, "The proposed terms Valero offered to CPR were reflected in the February 26, 2008 draft 953 and 954 contracts that Valero sent CPR" and "on April 11, 2008, CPR rejected the terms set forth in the draft 953 and 954 contracts and provided Valero with proposed modifications to the product specifications, quantity, and duration provisions of the draft contracts." (Defs.' Resp. to Statement of Facts ¶ 12, D.E. # 169.)  It is not clear to the Court how Valero's assertions dispute CPR's statement of fact.

8

On February 26, 2008, Valero faxed two written documents to CPR: contract numbers 40190953 ("the FOB agreement" or "the 953 writing"); and 40190954, ("the delivered agreement" or "the 954 writing"). (Pls.' Statement of Facts ¶ 14, D.E. # 131-45.)[12]  Valero characterizes the 953 and 954 writings as the "documents that reflected the terms under which Valero was willing to sell 'Slurry High Sulfur' to CPR for a term of one year." (Defs.' Resp. to Statement of Facts ¶ 14, D.E. # 169.)[13]  While the 953 and 954 writings contained many of the terms that CPR and Valero had discussed at the face-to-face meetings between the parties, the writings also included several material differences or omissions, including the following pricing provision: "Price will be based on WTI priced between $85.00 and $115.00 per barrel." (Pls.' Statement of Facts ¶ 21, D.E. # 131-45.)  Valero adds that this term meant that the prices set forth in the 953 and 954 writings were effective only so long as WTI (a measure of crude oil pricing) was between $85 and $115 a barrel. (Defs.' Resp. to Statement of Facts ¶ 21, D.E. # 169.)  According to Valero, if the price of WTI went above $115 per barrel or below $85 per barrel, either party would have been at liberty to renegotiate prices. (*Id.*)[14]  Kotara, Valero's contracts administrator, considered the "price band" or "crude band" to be atypical of Valero

---

[12] The Court has noted in its previous orders that a FOB (or free on board) contract is one that is characterized by the buyer nominating the vessel to be used for delivery, and the goods become the buyer's once the seller moves the goods to a position over the rail or flange of the vessel being used.  In contrast, a delivered contract is one in which the seller nominates the vessel to be used and pays for such vessel to transport the goods to the buyer's designated delivery point and the goods become the buyer's when the seller discharges product over the rail or flange into the buyer's tank.

[13] The Court will not set out all of the material terms of the 953 and 954 writings here because the parties ultimately exchanged a number of writings, all of which the Court will consider in its analysis of the breach of contract claims.

[14] The Court notes that Valero has not denied that the parties had not discussed the pricing band term prior to Valero preparing the 953 and 954 writings in February 2008.

9

contracts. (Pls.' Statement of Facts ¶ 22, D.E. # 131-45.)[15]

Upon receipt of the 953 and 954 writings, CPR's Jones contacted Olson at Valero to raises issues about the writings, particularly his concern that the writings did not contain all of the terms previously discussed or agreed to by the parties. (*Id.* ¶ 25.) Olson told Jones that Tryon would address these concerns after Tryon returned to work following a minor surgery. (*Id.*)[16] In the mean time, CPR sent the 953 and 954 writings to its attorneys for review. (Defs.' Statement of Facts ¶ 56, D.E. # 120-2.)

On April 11, 2008, CPR sent Valero copies of the writings with CPR's edits, noting the terms CPR believed to be inconsistent with the parties' previous discussions and agreement. (Pls.' Statement of Facts ¶ 28, D.E. # 131-45.)[17] According to CPR, at the time it returned its edits of the 953 and 954 writings to Valero, the parties had already been performing for over a month. (*Id.* ¶ 31.) Valero insists that these transactions were "spot" sales completed under the pricing terms set out in the 953 and 954 writings. (Defs.' Resp. to Statement of Facts ¶ 31, D.E. # 169.) In its mark-up of the writings,[18] CPR made several revisions, including but not limited to

---

[15] CPR has also stated the writings do not further define the term or how it is to be applied to which Valero responds that the term is straightforward and obvious. The parties also dispute whether Valero typically used "pricing bands" in its contracts. The Court finds that these issues, even if disputed, are not material to the legal issues presented.

[16] Valero has asserted additional facts in response to CPR's statement; however, none of the additional assertions actually dispute CPR's claim about Jones' telephone call to Olson or Olson's statement about Tryon.

[17] Valero maintains that the parties did not have an oral agreement in December 2007 and characterizes CPR's mark-up as a rejection of Valero's terms in the February 2008 writings. (Defs.' Resp. to Statement of Facts ¶ 28, D.E. # 169.)

[18] Valero states that CPR apologized about the delay in returning the edited writings; however, it is not clear to the Court that this delay is relevant.

changes in the product specifications, clarifications regarding price calculation, and the addition of three riders. (Pls.' Statement of Facts ¶ 29, D.E. # 131-45.)[19]  According to CPR, the additional terms were necessary to make the draft contract consistent with the parties' alleged December 2007 oral discussions. (Defs.' Statement of Facts ¶¶ 57, 58, D.E. # 120-2.)  Even so, CPR did not revise or comment on the price band in the draft contract, even though Jones testified that he "would never agree" to this term. (Defs.' Statement of Facts ¶ 63, D.E. # 120-2.)

Neither Valero's February writings nor CPR's April mark-up contained a two-year term. (*Id*. ¶ 64.)  CPR maintains that its April mark-up contained a term provision that in effect provided a two-year term. (Pls.' Resp. to Defs. Statement of Facts ¶ 64, D.E. # 136-4.)  According to Valero, CPR proposed language that the contract automatically renew for two one-year terms. (Defs.' Statement of Facts ¶ 65, D.E. # 120-2.)  CPR claims that the parties had already agreed to this term during their negotiations. (Pls.' Resp. to Defs. Statement of Facts ¶ 65, D.E. # 136-4.)  The provision in question, Rider B, stated that the agreement would renew automatically for two one-year terms unless either party gave 90-days notice prior to the expiration of the initial term. (Pls.' Resp. to Defs. Statement of Facts ¶ 66, D.E. # 136-4.)

On May 27, 2008, CPR sent Valero another copy of its mark-up of the 953 and 954 writings. (Pls.' Statement of Facts ¶ 28, D.E. # 131-45.)  According to Valero, by May 2008, the parties had still not reached a final agreement on a term contract. (Defs.' Statement of Facts ¶ 71,

---

[19] Valero adds that it did not revise the draft contract and never drafted a written contract incorporating CPR's proposed modifications. (Defs.' Resp. to Statement of Facts ¶ 29, D.E. # 169.)  The Court will consider the relevant terms of the parties' writings below.

D.E. # 120-2.)[20]   On June 3, 2008, Brian Hayes, a CPR employee, noted that CPR needed to

"finalize" the contract with Valero and "memorialize" the alleged December 2007 oral

agreement. (Defs.' Statement of Facts ¶ 72, D.E. # 120-2.)  CPR emphasizes that Hayes testified

in his deposition that the parties had an agreement but had not "formally memorialized" it. (Pls.'

Resp. to Defs. Statement of Facts ¶ 72, D.E. # 136-4.)  Despite the absence of a signed writing,

CPR performed without any complaint of any sort from Valero until some time in October 2008.

(Pls.' Statement of Facts ¶ 40, D.E. # 131-45.)  Both sides were buying and selling the Memphis

slurry on the assumption that the 953 and 954 writings, at least as they related to product, price,

and duration, controlled their dealings, which Valero Vice-President Craig Stanich himself

acknowledged in his deposition. (*Id.*)[21]

Valero did not respond to CPR's mark-up of the writings until December 22, 2008, when

Valero faxed its own edits of the 953 writing to CPR. (Pls.' Statement of Facts ¶ 32, D.E. # 131-

45.)[22]  While Valero did agree to some of CPR's revisions, Valero did not accept all of them.

(Defs.' Statement of Facts ¶¶ 74, 75, D.E. # 120-2.)  In response, on December 23, 2008, CPR

faxed more edits of the 953 writing back to Valero. (Defs.' Resp. to Statement of Facts ¶ 32,

D.E. # 169.)  CPR's fax cover sheet read as follows: "A detailed markup containing our required

corrections to reflect the originally promised deal is attached.  Most of these points have been

---

[20] As previously discussed, CPR insists that the parties had an agreement by the end of 2007. (Pls.' Resp. to Defs. Statement of Facts ¶ 71, D.E. # 136-4.)

[21] As previously discussed, Valero contends that these transactions were nothing more than "spot deals." (Defs.' Resp. to Statement of Facts ¶ 40, D.E. # 169.)

[22] Valero disputes this fact and states that its edits were rejections of the modifications proposed by CPR in April 2008.  Valero sent CPR edits of the 954 writing on December 24, 2008.

submitted to Valero previously, but yet never incorporated, discussed or explained." (*Id.*; *see also* Defs.' Statement of Facts ¶ 80, D.E. # 120-2.)  CPR also points out that the same cover sheet message refers to the parties' contract. (Pls.' Resp. to Defs. Statement of Facts ¶ 80, D.E. # 136-4.)  The parties ultimately stopped exchanging writings, and CPR filed suit in early March 2009. (Defs.' Statement of Facts ¶ 84, D.E. # 120-2.)[23]

Throughout all of the negotiations, the exchange of writings, emails discussing the deal going forward, and even after the lawsuit was filed, Valero sold CPR slurry which CPR accepted. (Defs.' Statement of Facts ¶ 85, D.E. # 120-2.)  Between the first load taken by CPR from Memphis and Valero's last FOB sale to CPR on May 28, 2009, CPR purchased 35 loads of Valero Memphis slurry FOB and delivered, totaling over 1.35 million barrels. (Pls.' Statement of Facts ¶ 38, D.E. # 131-45.)  Every single one of those 35 loads was sold to CPR under the terms of the 953 and 954 agreements although Valero characterizes each load and transaction as a "spot deal." (*Id.*)  During this time, both parties acted and performed as if there was a binding, enforceable agreement for the sale of slurry from Memphis. (*Id.* ¶ 39.)  Tryon referred to a term contract with CPR in numerous monthly reports to Olson during 2008. (*Id.*)  For example, Tryon's March 2008 report states, "We [Valero] have entered into the term deal with Carbon Processing.  They will continue to send their barges up to load FOB barrels, thus allowing Valero to use the limited spot barges to move the ATBS." (*Id.*)

Valero adds that from February 26, 2008 through June 1, 2009, Valero performed all of its obligations under the terms of the 953 and 954 writings even though Valero believes that it

---

[23] CPR here emphasizes that the parties had already reached agreement on the material terms and were not negotiating in March 2009. (Pls.' Resp. to Defs. Statement of Facts ¶ 84, D.E. # 136-4.)

never reached an agreement with CPR on those terms. (Defs.' Resp. to Statement of Facts ¶ 39, D.E. # 169.)  Furthermore, the terms that applied to each load did not match CPR's April edits to Valero's writings. (Defs.' Statement of Facts ¶ 86, D.E. # 120-2.)  For example, the specifications of the slurry CPR accepted from Valero did not meet the proposed minimum and maximum specifications that were set forth in CPR's edits, and the quantity did not met the quantity CPR proposed in its markup of the February 2008 draft contract. (*Id*.)  While admitting that the specifications of the slurry frequently did not conform to the promises Valero made, CPR maintains that the parties performed under the terms of the 953 and 954 writings for each sale of slurry. (Pls.' Resp. to Defs. Statement of Facts ¶ 86, D.E. # 136-4.)[24]

Between February 26, 2008 and September 30, 2008, the WTI for crude oil remained above $100 per barrel for all but nine days. (Pls.' Mot. Summ. J. , ex. 19, Hayes Aff., Fig. 1.) Between October 1, 2008 and June 1, 2009, the WTI never exceeded $100 and fell as low $33.87 per barrel on December 19 and 20, 2008. (*Id*.)  By December 2008, Tryon acknowledged in his monthly report that "Memphis is a problem for us right now. We are currently under term contract with CPR, but we are convinced that the oil is worth much more in the spot market. We have not been able to make much progress with changing the price on the CPR contract." (Pls.'

---

[24] In its Statements of Fact at ¶¶ 87-112, Valero has made a number of assertions that the parties never had final, written agreements containing the material terms CPR seeks to enforce. The Court finds that some of these proposed statements are actually legal conclusions.  For example, Valero asserts "Because the parties never agreed to a term contract to govern the sales, these sales were all spot sales." (Defs.' Statement of Facts ¶ 87, D.E. # 120-2.)  Other statements emphasize that the parties had no written document that memorialized the material terms of the alleged December 2007 agreement. (*Id*. ¶ 88.)  Elsewhere Valero contends that the parties never had a contract with a two-year term. (*Id*. ¶ 92-101.)  For the reasons explained in this Order, the Court finds that many of these assertions, even if true, are not dispositive of CPR's claims. Therefore, the Court does not include these statements here among the undisputed facts of the case.

Statement of Facts ¶ 44, D.E. # 131-45.)  This same statement appears in several other monthly reports from Tryon thereafter. (*Id.*)[25]

Through December 2008 and January 2009, the parties attempted to resolve the price issue and in doing so repeatedly referred to their contract.  Olson described the parties' relationship as a "term contract" when he directed an email to Jones on December 3, 2008, stating "Bill, I appreciated your economic commitment to our term contract through June 1, 2009." (*Id.* ¶ 46.)  On December 4, 2008, Olson sent an email to Jones "proposing a price for all forward sales through February 28, 2009." (Pls.' Mot. Summ. J. , ex. 38, Olson Email, Dec. 4, 2008.)  Olson began by stating that "[s]ince October 10, 2008, the price of WTI has quoted below the contractual band of $85.00 to $115.00 per barrel.  On December 3, 2008, WTI closed at $46.79 per barrel." (*Id.*)  After offering a new price term, Olson went on to state

> If this price is unacceptable, we are providing our 90 day notice for cancellation. If we have not received a response by December 8, 2008, we will consider our contract cancelled effective December 9, 2008.  We would be more than happy to discuss extending this contract at a fair market value.
> (*Id.*)

CPR's Jones requested a face-to-face meeting with Olson and Stanich in San Antonio, and the parties agreed to meet on December 11, 2008, in order "to discuss our current Memphis slurry contract." (Pls.' Statement of Facts ¶ 49, D.E. # 131-45.)  Subsequently, on January 12, 2011,

---

[25] Valero does not deny this statement of fact.  Rather, Valero asserts that it undertook an investigation into "some of the very low priced sales coming out of the Midwest region" and concluded that "Tryon had an incentive to issue reports that would justify the excessive discounts that he provided to CPR from March 2008 to October 2008." (Defs.' Resp. to Statement of Facts ¶ 44, D.E. # 169.)  It is not clear to the Court how Tryon's statements that "Memphis is a problem for us right now" and "we are currently under term contract with CPR" have any relationship to the investigation or otherwise "justify the excessive discounts," particularly as Tryon's statements appear in reports prepared after October 2008.

Olson sent an email to several individuals including Jones, in which he wrote, "Valero gives notice of cancellation on Contract 40190954 and Contract 40190953." (Pls.' Mot. Summ. J. , ex. 46, Olson Email, Jan. 12, 2008.)  On January 22, 2009, Stanich emailed Jones, indicating that he had "met with David and Hal to review the term sale of slurry from the Memphis refinery" and explaining that the "purpose of the pricing clause in our contract that allows for renegotiation when the price of crude dramatically rises or falls is to ensure a reasonable market value for the product." (Pls.' Mot. Summ. J. , ex. 41, Stanich Email, Jan. 22, 2009.)  Finally, in his January 26, 2009 email to Jones, Stanich restated Valero's pricing offer and added "I am willing to extend that offer through the remainder of the contract period (6/1/2009).  Valero considers the contract cancelled as of 6/1/2009." (Pls.' Mot. Summ. J. , ex. 42, Stanich Email, Jan. 26, 2009.)

In an effort to mitigate its damages, CPR ultimately agreed to Valero's new pricing on loads taken on and after January 12, 2009. (Pls.' Statement of Facts ¶ 57, D.E. # 131-45.)[26]  CPR also gave Valero notice of the damages it was incurring as a result of "bottoms" forming on the barges due to the poor quality and high metals found in the slurry Valero had sold CPR. (*Id*.)  In a February 20, 2009 email, Olson wrote that the parties' "agreements for Slurry High Sulfur FOB, Memphis conclude on June 1, 2009 and Slurry High Sulfur Delivered, New Orleans concludes on February 28, 2009.  Valero considers these contracts cancelled at the conclusion of the contract terms." (Pls.' Statement of Facts ¶ 58, D.E. # 131-45.)  In the same email, Olson also stated that Valero had "under delivered" 750,000 barrels of oil to CPR under delivered agreement and proposed two possible remedies, both of which priced the oil at the new pricing.

---

[26] Valero describes the price as revised because the price of crude was below the pricing band contained in the writings.

(*Id.*)

CPR has alleged that Valero was not selling CPR all of the slurry produced in Memphis as promised.  On October 22, 2008, Tryon emailed Stanich, writing

> The problem as I see it with Memphis is not the spot sells, but the term deal. The spot sells of the last couple of months for the most part have been for much less of a discount then [sic] the term deal. I actually thought I was doing the right thing by taking barrels from the term contract and attempting to increase net back to Valero. The term contract has metals min and max's, as well as a flash min.  As far as offering the Memphis oil out to the market, we must be very careful since we contracted with CPR to supple [sic] them with all the oil Memphis produces."
> (Pls.' Mot. Summ. J. , ex. 51, Tryon Email, Oct. 28, 2008.)

Then, on November 7, 2008, Tryon emailed Olson, "We are going to load a spot tow over the weekend at Memphis.  At this time CPR does not know about this oil.  I can sell it to the guys I have talked to in the past, or we can deliver it to CPR."  (Pls.' Statement of Facts ¶ 61, D.E. # 131-45.)  Again, on December 1, 2008, Tryon emailed Olson, regarding another sale of Memphis slurry to a third party, noting that the third party would pay $4.25 per barrel more than the contract with CPR provided, and stating "[w]e are loading a barge of slurry from Memphis today. CPR is not aware of this oil movement." (*Id.* ¶ 62.)

## STANDARD OF REVIEW

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[27]  In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[28]

---

[27] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[28] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[29]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[30]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[31]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[32]

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[33]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[34]  Finally, the "judge may not make credibility determinations or weigh the evidence."[35]

## ANALYSIS

---

[29] *Celotex*, 477 U.S. at 324.

[30] *Matsushita*, 475 U.S. at 586.

[31] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[32] *Id.* at 251-52.

[33] *Celotex*, 477 U.S. at 322.

[34] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[35] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

# I.     Breach of Contract

## A.     Choice of Law

A federal court sitting in diversity applies the law of the forum state, including the forum's choice-of-law rules.[36]  Generally, Tennessee follows the rule of *lex loci contractus*, meaning that "a contract is presumed to be governed by the law of the jurisdiction in which it was executed absent a contrary intent," including a valid choice of law provision in the parties' contract.[37]  The Court will honor the parties' choice to apply the laws of another jurisdiction if certain conditions are met: (1) their choice-of-law provision must be executed in good faith; (2) their chosen jurisdiction must bear a material connection to the transaction; (3) the basis for their choice of jurisdiction must be reasonable and not a sham; and (4) the choice of the jurisdiction must not be contrary to the fundamental policy of a state having a materially greater interest and whose law would otherwise govern.[38]

In a contract for the sale of goods, Tennessee's Uniform Commercial Code ("UCC") deviates from the traditional *lex loci* rule.  Tenn. Code Ann. § 47-1-301 states, "when a transaction bears a reasonable relation to this state and also to another state or nation the parties may agree that the law either of this state or of such other state or nation shall govern their rights

---

[36] *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009).

[37] *Se. Texas Inns, Inc. v. Prime Hospitality Corp.*, 462 F.3d 666, 672 (6 th Cir. 2006) (applying Tennessee law); *Ohio Cas. Ins. Co. v. Travelers Indem. Co.*, 493 S.W.2d 465, 467 (Tenn. 1973).

[38] *Goodwin Bros. Leasing, Inc. v. H & B, Inc.,* 597 S.W.2d 303, 306 (Tenn. 1980).

and duties."[39]  In the absence of such an agreement, Tennessee's UCC applies "to transactions bearing an appropriate relation to" the state of Tennessee.[40]  Because the parties' contract dispute concerns a transaction for the sale of goods, the Court holds that the Tennessee UCC's appropriate relationship test governs the choice of law in this case.

It is undisputed that the parties' transactions had some relationship to more than one state.  The record shows that the parties' negotiations took place in the state of Texas.  Valero produced and CPR took delivery of the slurry under the FOB or 953 writing in the state of Tennessee.  Valero provided CPR with slurry under the delivered or 954 writing in the state of Louisiana.   Based on the fact that the slurry was produced in Tennessee and CPR took delivery of the goods in Tennessee, it is clear that the transaction bears a reasonable and appropriate relationship to the state of Tennessee.  Therefore, the Court will apply Tennessee law to the contract claims in this case, unless the parties agreed that the law of one of the other states to which their transaction bore a reasonable relation should govern their rights and duties.

The Court holds that for purposes of this Motion, it need not reach the issue of whether the parties' had such an agreement.  The parties' contract for the sale of slurry was not governed by a single writing.  If the parties had a contract at all, they had, as more fully discussed below, a contract by operation of UCC § 2-207(3) based on their conduct and their exchange of the 953 and 954 writings.  The 953 and 954 writings contained a choice of law provision stating that

---

[39] Tenn. Code Ann. § 47-1-301(a).  *See also Carefree Vacations v. Brunner*, 615 F. Supp. 211 (W.D. Tenn. 1985).

[40] § 47-1-301(b).

Texas law would govern any dispute arising under the contract.[41]  Assuming then that the choice

of law provision became part of the parties' contract under UCC § 2-207(3), the parties agreed

that Texas law would govern.  It is also undeniable that the parties' transaction had a reasonable

relationship to the state of Texas: Valero has its principal place of business in San Antonio and

much if not all of the negotiations took place in Texas.  As such, Texas law would apply under

Tenn. Code Ann. § 47-1-301(a)'s choice of law rule.

On the other hand, despite the language in the writings, neither party has raised the

choice of law provision much less argued that Texas law should apply to the contract claims.[42]

In briefing its motion to dismiss, Valero asserted that there were no material differences between

the substantive law of Tennessee and the substantive law of Texas, and so the Court should

apply the law of Tennessee, as the forum state.  While not conceding that its claims were

governed solely or exclusively by Tennessee law, CPR admitted that the applicable law of

Tennessee and Texas were "substantially similar."  On summary judgment, the parties have

again briefed Tennessee contract law.  Notably, there is no evidence that the parties ever agreed

on a choice of law provision during their negotiations.  In the final analysis, the Uniform

Commercial Code, adopted in all relevant respects in both Tennessee and Texas, governs the

parties' contract claims.  Therefore, for purposes of this Motion, the Court finds good cause to

--------

[41] The same paragraph also stated that the state or federal courts of Harris County, Texas would have "sole jurisdiction" over any claims.  Just as the parties have not invoked the choice of law provision, the parties have never invoked the forum selection clause found in the 953 and 954 writings.

[42] In its response brief, CPR has stated that it cites and discusses Tennessee substantive law at the summary judgment stage because the Court had applied Tennessee law in ruling on Valero's Rule 12(b)(6) motion. CPR's Mem. in Opp'n Valero's Mot. Summ J. 15 n.9, D.E. # 136.

apply the substantive law of Tennessee pursuant to Tenn. Code Ann. § 47-1-301.

**B.**   **The Parties' Arguments**

Valero seeks summary judgment on CPR's breach of contract claim.  First, Valero argues that the alleged oral contract made in December 2007 violates the statute of frauds.  None of the writings subsequently exchanged between the parties included all of the terms of the alleged oral contracts.  The writings contained terms different from the terms allegedly agreed to in the December 2007 deal.  As such the writings cannot be construed as written confirmations of the oral contract.  Second, Valero contends that the conduct of the parties did not establish a contract as a matter of law.  Even if the Court conducted a "battle of the forms" analysis of the parties' writings, the writings do not agree on material terms like duration, price, quantity, and quality. The conflicting terms, thus, knock each other out.  According to Valero, "as a matter of law, no contract was, or can be, formed without these essential terms."  Valero posits that the record reveals only a series of spot transactions between the parties, and not a course of performance pursuant to a perceived contract.  Both parties continued to negotiate and revise drafts of the agreements demonstrating that "an agreement had not yet been reached."  For these reasons, Valero argues that it is entitled to summary judgment on CPR's breach of contract claims.

In its Cross-Motion for Partial Summary Judgment, CPR seeks summary judgment on the issues of (1) whether the parties had a binding, enforceable agreement as to the material terms of product, location, price, quantity, and duration; and (2) whether Valero breached the agreement by refusing to honor its material terms through March 1, 2010.  CPR begins by emphasizing the Tennessee UCC's "low bar" for the enforceability of agreements for the sale of goods, particularly the requirement of a writing confirming an agreement.  CPR points to the 953 and

954 writings as evidence of the parties' contract.  Next, CPR argues that the parties' conduct recognized the existence of a contract.  The parties exchanged writings and performed according to the terms of the writings for more than a year.  As such, UCC 2-207(3) provides that the terms of the contract are those on which the writings of the parties agree along with the UCC's gap-filling provisions.  CPR points to many instances where Valero referred to the writings as the "term contract" and even sought to enforce its terms against CPR.  When the parties reached an impasse in later 2008, Valero even gave CPR notice of its termination of the contract.  Thus, CPR contends that Valero's own conduct recognized the existence of a contract and any suggestion by Valero that the parties only engaged in a series of spot transactions is without support in the record.   The writings exchanged between the parties and their course of performance demonstrates agreement on product, quantity, price, and duration.  Therefore, CPR claims that it is entitled to summary judgment on the existence of a contract between the parties and Valero's breach of the contract by refusing to honor it through March 1, 2010.

Under Tennessee law, a plaintiff alleging breach of contract must prove (1) the existence of a contract, (2) breach of the contract, and (3) damages which flow from the breach.[43]  The Court begins by reaffirming its holding at the pleadings stage that CPR failed to state a claim for breach of the oral contract allegedly made in December 2007.  Valero has raised a number of arguments in its Motion for Summary Judgment about the statute of frauds and UCC 2-207(1).  The Court has already addressed similar arguments and ruled in Valero's favor in dismissing any

---

[43] *Life Care Ctrs. of Am., Inc. v. Charles Town Assocs. Ltd. P'ship*, 79 F.3d 496, 514 (6th Cir. 1996) (applying Tennessee law).

claim for breach of the December 2007 oral agreement.[44]  The Court finds no reason to re-state those holdings here.  The Court also reserved ruling on Plaintiff's claim for breach of the agreement created by the parties course of conduct until a more complete record was developed.[45]  The dispositive issue presented in the parties' cross-Motions for Summary Judgment then is whether UCC 2-207(3) applies and creates a contract by the parties' conduct.

Tennessee has adopted UCC 2-207(3) at Tenn. Code Ann. § 47-2-207(3), which provides, "Conduct by both parties which recognizes the existence of a contract is sufficient to establish a contract for sale although the writings of the parties do not otherwise establish a contract."[46]  Under subsection 2-207(3), "performance by both parties under what they apparently believe to be a contract" may be "sufficient to establish a contract, notwithstanding the fact that no contract would have been recognized on the basis of their writings alone."[47]  The rationale for such a rule is easy to apprehend.  "Sellers usually do not ship and Buyers do not receive goods unless they think they have struck a deal."[48]  Under such circumstances, the terms

---

[44] *See* Order Granting in Part, Denying in Part Def.'s Mot. Dismiss, Mar. 10, 2010, 24-25 ("Therefore, the Court holds that Plaintiff has failed to state a claim for breach of the December 2007 oral contract.").

[45] *Id.* at 29-30.  Valero argues that CPR has turned to 2-207(3) in a "sudden reversal of tactics" at the summary judgment stage.  The Court, however, explicitly held at the pleadings stage that CPR had pled the existence of a contract by the parties' conduct.  Therefore, Valero's argument now is without merit.

[46] Tenn. Code Ann. § 47-2-207(3); *McJunkin Corp. v. Mechanicals, Inc.*, 888 F.2d 481, 488 (6th Cir. 1989).

[47] *Dorton v. Collins & Aikman Corp.*, 453 F.2d 1161,1165 (6th Cir. 1972).

[48] *United Foods, Inc. v. Hadley-Peoples Mfg. Co.*, 1994 WL 228773, at *5 (Tenn. Ct. App. May 20, 1994) (quoting *Quaker State Mushroom v. Dominick's Finer Foods,* 635 F. Supp. 1281, 1285 (N.D. Ill. 1986).  *See also* Tenn. Code Ann. § 47-2-207(3), cmt. 7 ("In many cases,

24

of the agreement between the parties are the "terms on which the writings of the parties agree" as well as the UCC's gap filling provisions.[49]  The Sixth Circuit long ago described UCC 2-207 as "a murky bit of prose" and "one of the most important, subtle, and difficult in the entire [UCC], and well it may be said that the product as it finally reads is not altogether satisfactory."[50] Nevertheless, the Sixth Circuit has held that UCC 2-207 "establishes important legal principles to be employed to resolve complex contract disputes arising from the exchange of business forms" and "was intended to provide some degree of certainty in this otherwise ambiguous area of contract law."[51]  As such, the formation of a contract by operation of UCC 2-207(3) is a question of law for the Court, unless state law dictates a contrary result.[52]

---

as where goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made.").

[49] Tenn. Code Ann. § 47-2-207(3).  *See also United Foods*, 1994 WL 228773, at *5; *Gage Prods. Co. v. Henkel Corp.*, 393 F.3d 629, 641 (6th Cir. 2004) (applying Mich.'s UCC 2-207(3); *Dorton*, 453 F.2d at 1166 (applying Tenn.'s UCC 2-207(3)).  *Accord* Tenn. Code Ann. § 47-2-204(1) ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.").

[50] *Dorton*, 453 F.2d at 1165 (citations omitted).  *See also* 1 White & Summers, Uniform Commercial Code, § 1-3 (5th ed.) ("Unfortunately the section is like an amphibious tank that was originally designed to fight in the swamps, but was sent to fight in the desert.").

[51] *Mead Corp. v. McNally-Pittsburg Mfg. Corp.*, 654 F.2d 1197, 1206 (6th Cir. 1981) (citations omitted).

[52] *Id.* ("In our view, it is unreasonable and contrary to the policy behind the Code [i.e. the UCC] merely to turn the issue over to the uninformed speculation of the jury left to apply its own particular sense of equity.") (applying Ohio law).  *See also* 2 Anderson U.C.C. § 2-207:25 (3d ed.) ("The question of the operation of UCC § 2-207 should not be submitted to a jury.").  *But see Ralph Shrader, Inc. v. Diamond Intern. Corp.*, 833 F.2d 1210, 1215 (6th Cir. 1987) (concluding that under Michigan law, questions of contract formation under UCC 2-207 are to be resolved by the trier of fact) ("We note merely that *Mead Corp.* involves a diversity action applying *Ohio* law.  In the present case we are bound to apply the law of Michigan as we find it.").

The Court holds that the conduct of both parties in this case recognized the existence of a contract.  Between February 2008 and May 2009, CPR purchased from Valero over 35 loads of slurry totaling 1.35 million barrels.  These transactions commenced after numerous meetings between the parties to discuss, not spot sales, but a term contract for the purchase of Valero's Memphis slurry.  Following their meeting on February 21/22, 2008, CPR directed barges to Memphis to take the first load of slurry and regularly continued to do so in the months following.  At the same time, Valero in internal communications began to refer to the existence of a term contract with CPR.  For example, on February 25, 2008, David Olson gave Valero's contracts administrator detailed instructions for the preparation of the 953 and 954 writings, what he called "term deals with Carbon Processing for Memphis Slurry."  From that time on, Valero's writings consistently referred to a "term contract" with CPR.  The record further shows that upon receipt of the 953 and 954 writings, Jones on behalf of CPR contacted Olson and voiced concerns that the writings did not memorialize the contract he believed the parties had struck during their negotiations.  In other words, Jones assumed the prior existence of a contract between the parties.  In response to Jones' claim that the writings did not conform to the oral agreements, Olson only stated that Jones's concerns would be addressed later.  Olson did not deny that the parties had a contract or otherwise challenge Jones' claim that they did.  Therefore, the Court finds that by late February 2008 the parties' actions admitted the existence of an agreement.

---

Although the Tennessee courts have never addressed this issue under the UCC, the Court finds the Sixth Circuit's reasoning in *Mead* more persuasive and not inconsistent with Tennessee law.  *See Jones v. LeMoyne-Owen Coll.*, 308 S.W.3d 894, 904 (Tenn. Ct. App. 2009) ("Issues relating to contract formation are questions of law."); Tenn. Code Ann. § 47-2-207, cmt. 7 ("In many cases, as where goods are shipped, accepted and paid for before any dispute arises, there is no question whether a contract has been made . . . . The only question is what terms are included in the contract, and subsection (3) furnishes the governing rule.")

In the months that followed, it is clear that the parties conducted themselves as though they had a term contract.  The record shows that up until Valero terminated the contract in early 2009, both parties transacted business as though the 953 and 954 writings controlled their dealings.  Although Valero argues that each of its transactions with CPR was an individual "spot deal," Valero does not deny that it conformed to the requirements of the 953 and 954 writings and that Valero's own sales paperwork at all times referred to a term contract with CPR.  Perhaps most tellingly, when the parties' relationship deteriorated, Valero terminated the "contract" in accordance with Rider B, a provision the parties had incorporated into the 953 and 954 writings.  In fact, Valero gave notice of termination in accordance with this provision on three separate occasions, twice by Olson and once by Stanich.  For each notice of termination, Valero referred variously to the contract or "extending the contract" or "Contract 40190954 and Contract 40190953" or "the remainder of the contract period (6/1/2009)."  Had Valero not believed that it had a term agreement with CPR, its three notices of termination would have been unnecessary.  Ultimately, when their attempts to renegotiate the pricing term failed, Valero informed CPR that the "agreements for Slurry High Sulfur FOB, Memphis conclude on June 1, 2009 and Slurry High Sulfur Delivered, New Orleans concludes on February 28, 2009.  Valero considers these contracts cancelled at the conclusion of the contract terms."  In the same message, Olson also stated that Valero had "under delivered" 750,000 barrels of oil to CPR under the delivered agreement, another recognition of a binding contractual obligation.

Based on the parties' acknowledgments that they had a deal, their repeated references to their contract, and the numerous statements made about the termination of a contract, the parties clearly recognized the existence of an agreement.  Therefore, the Court concludes that the parties

27

had a contract based on their conduct pursuant to Tenn. Code Ann. § 47-2-207(3).

## D.      *Terms of the Contracts*

Because the Court holds that the parties had a contract by virtue of their conduct,

Valero's Motion for Summary Judgment on the non-existence of a contract must be **DENIED**,

and CPR's Motion for Partial Summary Judgment on the existence of a contract is **GRANTED**.

The Court now must determine what the terms of the parties' contract by conduct were.

Pursuant to Tenn. Code Ann. § 47-2-207(3), the terms of the agreement between the parties are

the "terms on which the writings of the parties agree" as well as the UCC's gap filling

provisions.[53]

The Court begins its analysis by addressing the following initial matters.  First, the

parties in this case had two separate agreements, the FOB contract governed by the 953 writings

and the delivered contract governed by the 954 writings.  As a result, the Court will consider

each group of writings separately, analyzing the 953 writings to arrive at the terms of the FOB

contract and the 954 writings to identify the terms of the delivered contract.  Second, CPR has

pled the breach of a number of terms in the contracts, specifically, the quantity, the price, fuel

specifications, the duration, damages to the barges, and demurrage fees.[54]  However, in its

---

[53] Tenn. Code Ann. § 47-2-207(3).  *See also United Foods*, 1994 WL 228773, at *5; *Gage Prods.*, 393 F.3d at 641; *Dorton*, 453 F.2d at 1166.  Valero argues that a battle of the forms analysis will show that the parties' writings did not agree as to essential terms and that "no contract was, or can be, formed without these essential terms."  Valero fails to cite any controlling authority for this conclusion and fails to deal with the plain language of UCC 2-207(3).  Furthermore, the Court finds that for purposes of CPR's Motion, the Court can resolve the duration term of the contracts without resort to the UCC gap-filling provisions.

[54] Am. Compl. ¶¶ 155-160.  The Court would add that CPR's Amended Complaint alleges that Valero breached the terms of an oral agreement the parties reached in December

Motion for Partial Summary Judgment, CPR seeks summary judgment only on its claim that

Valero breached the FOB and delivered contracts' two-year term provisions.  The Court will,

therefore, focus its battle of the forms analysis on this single term for both contracts.  Finally, the

Court finds that the parties exchanged various writings containing different duration terms.  In

all, the record contains the following 953 and 954 writings: (1) Valero's February 26, 2008

writings; (2) CPR's April 11, 2008 revisions; (3) Valero's December 22, 2008 revisions to the

953 writing; (4) Valero's December 24, 2008 revisions to the 954 writing; and (5) CPR's

December 24, 2008 combined revisions to the 953 and 954 writings.[55]  The Court will confine its

analysis to these writings for purposes of these Motions[56] and determine whether the writings

agreed as to the duration of each contract.

### 1.  The FOB Contract

The Court holds that the term of the FOB contract included "a period beginning February

28, 2008 up to and including June1, 2009" and that the agreement would "automatically renew

---

2007, not the terms of a contract arising from UCC 2-207(3).

[55] The record also contains another writing Valero submitted to CPR on November 14,
2007.  The Court holds that this writing is not relevant to the 2-207(3) analysis for several
reasons.  The writing is not an iteration of the 953 or 954 but rather is stamped as "Contract
Number 40180569."  The writing also bears a handwritten note reading "<u>Draft Only!!</u>."  Most
importantly, the writing predates any of the conduct by the parties that recognized the existence
of a contract.  As previously discussed, that conduct began in late February 2008; whereas, this
document is dated November 14, 2007.  For these reasons, the Court finds that the document is
not properly part of the battle of the forms analysis.

[56] The record also contains other sales documents, for example, "Valero Online Deal
Sheet Contracts" (*see* D.E. # 130-8 and 130-9) and "Valero Marketing and Supply Co. Invoices"
(D.E. # 129-11).  Upon inspection, the Court finds that these writings do not refer to the term of
the contracts.  Therefore, they are not relevant to the Court's analysis for purposes of these
Motions.

for two additional one year terms, unless either party gives the other party at least ninety (90) days advance written notice prior to the expiration of the initial term or any renewal term hereunder of its intention not to renew the agreement."  Both CPR's April 11, 2008 writings and Valero's December 22, 2008 writings contained the term about automatic renewal for two additional one-year terms, the so-called "evergreen" provision.  The term first appeared in CPR's April 11, 2008 revisions, in Rider B, which stated, "The provisions of this Agreement shall automatically renew for two additional one year terms, unless either party gives the other party at least ninety (90) days advance written notice prior to the expiration of the initial term or any renewal term hereunder of its intention not to renew the Agreement."  Valero then added the language to its 953 writing in the December 22, 2008 version.  Therefore, the Court holds that under Tenn. Code Ann. § 47-2-207(3), this term became part of the parties' FOB contract by conduct.

As for "the initial term" of the contract, the Court holds that the initial term of the FOB contract ran from February 28, 2008, through June 1, 2009.  The parties' first writings, CPR's April mark-up and  Valero's February 953 writing, contain the following term: "This agreement shall remain in effect for a period beginning on February 28, 2008 up to and including March 1, 2009."  Based on the agreement of these writings, the initial term of the FOB contract was to run through March 1, 2009.  However, the record shows that the "initial term" was subsequently extended by the parties.  CPR concedes in its briefs that "while performing under the 953 and 954 agreements, Valero extended the term [from March 1, 2009] through June 1[, 2009] on the 953 agreement," presumably without objection from CPR.[57]  CPR does not state when Valero

_____

[57] Pls.' Mem. in Support Mot. Partial Summ. J., 11 n.10 (D.E. # 131-1).

agreed to the extension, and the only iteration of the 953 writing in which the extension appears is Valero's December 22, 2008 revision to the 953 writing. That document incorporated CPR's Rider B and extended the initial term of the contract from March 1, 2009 to June 1, 2009. Based on the agreement of their writings and CPR's concession about the extension during the course of their performance, the Court concludes that the parties agreed to an extension of the "initial term" from March 1 to June 1.

CPR argues without elaboration that the end of the "initial term" of the FOB contract continued to be March 1, 2009, even after the parties agreed to the extension through June 1. The Court finds CPR's argument unpersuasive. As a general matter, CPR's position is not supported in the record. There is no evidence that the parties intended anything other than a three-month extension of the "initial term" of the FOB contract, from March 1 to June 1, 2009. CPR's construction of "initial term" is also inconsistent with the writings themselves. CPR first proposed the language in Rider B, which refers to only two types of contract terms: the "initial term" and "any renewal term." It follows that the additional three months the parties agreed to must either be part of the "initial term" or "any renewal term." Based on the clear and unambiguous language of the writings, the "initial term" was defined by dates certain, beginning on February 28, 2008, and ending on March 1. At some point during their course of performance, the parties agreed to extend the FOB contract from March 1 to June 1. The renewal terms were the "two additional one year terms" that would automatically go into effect unless one party gave the other 90 days notice of an intent not to renew "prior to the expiration of the initial term." It is clear that the extension of three months was not a "renewal term" as the 953 writing defined it: the extension was not for one year and did not occur automatically but by

31

the mutual assent of the parties.  Therefore, the Court concludes that the additional three months could have only been part of the "initial term."  It is undisputed that the parties simply agreed to add three months from March 1, the original date on which the "initial term" was to conclude. The three months, following the original conclusion of the "initial term" and ending on a date certain, were consistent with an extension of the "initial term."  Once the parties agreed to the extension, the "initial term" of the FOB contract ended on June 1, 2009, and March 1 ceased to be the last day of the "initial term."[58]  Therefore, the Court declines to accept CPR's theory that the "initial term" ended on March 1, 2009, and not June 1, 2009.[59]

Having held that the "initial term" of the FOB contract ended on June 1, 2009, and that either party had the right to give 90 days advance written notice of nonrenewal prior to the expiration of the initial term, the Court holds that Valero did not breach the term provision of the FOB agreement.  The record shows that Valero gave multiple notices of its intention not to renew the FOB agreement, all of which occurred more than 90 days prior to June 1, 2009.  In the

---

[58] The Court notes that CPR's December 24, 2008 revisions to the 953 writings stated that the term was to end on June 1, 2010.  However, there is no evidence that Valero ever agreed to that extension or adopted CPR's writing.  Therefore, the new term did not become part of the FOB contract.

[59] CPR makes much of the fact that in an earlier brief at the pleadings stage, Valero stated, "'initial term' must be read as meaning the contract term—one year from Feb. 28, 2008 to Mar. 1, 2009."  *See* Defs.' Resp. Opp'n Mot. Reconsider, 7 n.3 (D.E. # 80).  CPR contends that in making this assertion, Valero has conceded that the "initial term" of the FOB contract ended on March 1, 2009.  The Court finds that Valero's statement was made in response to CPR's theory that the "initial term" of the contract was perhaps two years, and not one year.  *See* Pls.' Mot. Reconsider 8 (D.E. # 79) ("There is a question as to the proposed meaning of 'initial term.' However, even if initial term meant one year as opposed to two years, this clause in and of itself should not be sufficient to dismiss CPR's tort claims at the motion to dismiss stage."). Therefore, the Court finds that under the circumstances Valero's argument on this issue does not amount to a concession that the "initial term" ended on March 1, 2009, as CPR suggests.

last of these written notices, a February 20, 2009 email from Olson to Jones, Olson wrote that Valero considered the FOB contract cancelled as of June 1, 2009, "the conclusion of the contract term[]." The Court finds that the email came more than 90 days prior to June 1, 2009. Therefore, CPR's Motion for Partial Summary Judgment on the issue of whether Valero breached the term provision of the FOB contract must be **DENIED**.

### 2. The Delivered Contract

The Court holds that the term of the delivered contract ran from "a period beginning February 28, 2008 up to and including March 1, 2009" and that the agreement would "automatically renew for two additional one year terms, unless either party gives the other party at least ninety (90) days advance written notice prior to the expiration of the initial term or any renewal term hereunder of its intention not to renew the agreement." Both CPR's April 11, 2008 954 writing and Valero's December 24, 2008 954 writing stated that the delivered "agreement shall remain in effect for a period beginning February 28, 2008 up to and including March 1, 2009." Likewise, the same writings agreed "[t]he provisions of this agreement shall automatically renew for two additional one year terms, unless either party gives the other party at least ninety (90) days advance written notice prior to the expiration of the initial term or any renewal term hereunder of its intention not to renew the agreement." Therefore, the Court holds that under Tenn. Code Ann. § 47-2-207(3), these terms became part of the parties' delivered contract by conduct.

Based on the Court's construction of the 954 writings, the Court holds that Valero breached the term provision of the delivered contract. As previously discussed, Valero terminated both contracts with CPR on three different occasions. In each instance, Valero failed

33

to notify CPR within at least 90 days of the expiration of the initial term of its intention not to renew for another year.  In order to provide timely notice of non-renewal beyond the initial term, Valero had to give CPR written notice no later than December 1, 2008.  Valero first purported to give notice in a December 4, 2008 email from Olson to Jones in which Jones proposed a new price term.  Not only was Valero's notice untimely, Olson added, "If this price is unacceptable, we are providing our 90 day notice for cancellation.  If we have not received a response by December 8, 2008, we will consider our contract cancelled effective December 9, 2008."  The Court holds that this notice was ineffective not only as untimely but also because it asserted that the contracts would be cancelled on December 9, 2008, and not at the end of the initial term.

Valero's other cancellations are equally problematic.  Valero gave its next "notice of cancellation on Contract 40190954" on January 12, 2009, and its final notice of the conclusion of the delivered contract on February 20, 2009, stating that the "Slurry High Sulfur Delivered, New Orleans concludes on February 28, 2009."  The Court holds that these subsequent notices were clearly given less than 90 days prior to the expiration of the initial term.  Under the terms of the 954 writings on which the parties agreed, the delivered contract automatically renewed for one year once Valero failed to give timely notice of its intentions.  The Court concludes that the initial term of the delivered contract ended on March 1, 2009, and a one-year automatic "renewal term" extended the delivered contract through March 1, 2010.  Therefore, CPR's Motion for Partial Summary Judgment on the issue of whether Valero breached the term provision of the delivered contract is **GRANTED**.

## II.    Promissory Torts

## A.      Choice of Law

With respect to CPR's promissory tort claims, the Court again turns to Tennessee's choice-of-law rules.  Tennessee has adopted the "most significant relationship" test of the Restatement (Second) of Conflict of Laws to choice-of-law questions for tort claims.[60]  Under this approach, "the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation."[61]  The Restatement's most significant relationship test "provides a 'default' rule whereby trial courts can apply the law of the place where the injury occurred when each state has an almost equal relationship to the litigation."[62]  The Tennessee Supreme Court has concluded that "generally the law of the state where the injury occurred will have the most significant relationship to the litigation."[63]  The Court should consider the following principles: (a) the needs of the interstate and international systems; (b) the relevant policies of the forum; (c) the relevant policies of other interested states and the relative interests of those states in the determination of the particular issue; (d) the protection of justified expectations; (e) the basic policies underlying the particular field of law; (f) certainty, predictability, and uniformity of result; and (g) ease in the determination and application of the law to be applied.[64]  The Court should weigh the parties' contacts to determine which state has the most significant relationship to the action, including (1) the place where the injury occurred;

---

[60] *Montgomery*, 580 F.3d at 459 (citing *Hataway v. McKinley,* 830 S.W.2d 53, 59 (Tenn. 1992)).

[61] *Hataway*, 830 S.W.2d at 59 (citing Restatement (Second) of Conflict of Laws § 145 (1971)).

[62] *Id.*

[63] *Id.*

[64] *Id.* at 59 n. 3 (quoting Restatement (Second) of Conflict of Laws § 6(2) (1971)).

(2) the place where the conduct causing the injury occurred; (3) the domicile, residence, nationality, place of incorporation and place of business of the parties; and (4) the place where the relationship, if any, between the parties is centered.[65]

Applying Tennessee's most significant relationship test, the Court holds that Tennessee law governs CPR's promissory tort claims.  Neither party has argued that the Court should apply the laws of any state other than Tennessee to CPR's promissory torts even though several other states have a connection to these claims.  CPR is an Alabama limited liability company whose sole member, Jones, is a citizen of Florida.[66]  CPR Marine is a Delaware limited liability company, whose sole member is also Jones.[67]  Valero is a Delaware corporation with its principal place of business in the state of Texas.[68]  According to the record, some of the alleged misrepresentations occurred during meetings in Texas and others occurred during telephone conversations between the principals.  It follows that the injuries in this case occurred in multiple states.  What is clear is that the parties' relationship is centered in the state of Tennessee.  The parties contracted for the sale of slurry which was to be produced, stored, and made available (under the FOB agreement) at Valero's Memphis refinery.  The Court concludes that on balance the factors suggest that Tennessee has the most significant relationship to the promissory torts.  Therefore, Tennessee law should govern these claims.

**B.      The Parties' Arguments**

---

[65] *Id.* at 59 (quoting Restatement (Second) of Conflict of Laws § 145(2)).

[66] Am. Compl. ¶ 1.

[67] *Id.* ¶ 2.

[68] *Id.* ¶ 3.

Valero seeks summary judgment on all of CPR's various promissory tort claims. As a general matter, Valero has made two arguments for judgment as a matter of law on all of CPR's tort claims. First, Valero argues that there is no evidence that it ever misrepresented any material fact to CPR, specifically, that Valero would enter into a two-year term contract with CPR for the sale of slurry. Valero asserts that Jones has submitted an affidavit for purposes of summary judgment that contradicts his deposition testimony. Thus, the Court should disregard any facts asserted in the "sham" affidavit. Second, Valero argues that there is no evidence that CPR reasonably relied on such misrepresentation. Valero calls attention to the evidence that CPR was already negotiating a barge lease before Valero made its alleged promise to sell its slurry for a two-year term. Because CPR cannot make these showings, both of which are essential elements of its promissory tort claims, Valero is entitled to summary judgment.

In response, CPR contends that factual disputes remain that should preclude summary judgment. CPR emphasizes that its claims are based on Valero's promise of a two-year term and CPR's reliance on that promise in signing a two-year barge lease with a third party. Prior to signing the barge lease on February 5, 2008, Jones believed that Valero had agreed to a two-year term for the sale of its Memphis slurry in December 2007. CPR argues that there is also evidence that Valero confirmed that understanding in February 2008, just before Jones signed the barge lease. The existence of Valero's misrepresentation and CPR' reasonable reliance on the misrepresentation are questions of fact, about which reasonable minds could differ. Therefore, CPR contends that Valero is not entitled to summary judgment on these claims.

Having dismissed CPR's claim for conversion at the pleadings stage, the following tort claims remain: (1) fraud in the inducement/promissory fraud/fraud, (2) promissory estoppel and,

(3) equitable estoppel.[69]  The Court will consider the merits of each claim in turn.

## C.    Jones' Summary Judgment Affidavit

As an initial question, the Court will determine whether it should disregard Jones's summary judgment affidavit.  In its response to Valero's Motion for Summary Judgment on the promissory tort claims, CPR has produced the affidavit of William Jones.  Valero has argued in its reply brief that Jones's summary judgment affidavit contradicts his previous deposition testimony, and therefore, the Court should disregard it.  A party cannot create a genuine issue of material fact for purposes of summary judgment by presenting an affidavit that contradicts prior deposition testimony.[70]  This rule is "grounded on the sound proposition that a party should not be able to create a disputed issue of material fact where earlier testimony on that issue by the same party indicates that no such dispute exists."[71]  The deponent has a duty to respond fully when directly questioned about facts of which a deponent has knowledge.  For example, if a deponent is asked about a particular statement made during a conversation, the Sixth Circuit has held that the deponent "was required to bring it out at the deposition and could not contradict

_____

[69] Both parties have briefed CPR's original claim for conversion.  However, that claim was dismissed at the pleadings stage. *See* Order Granting in Part, Denying in Part Def.'s Mot. Dismiss, Mar. 10, 2010, 40-41.  The dismissal of CPR's conversion claim was in no way altered by the Court's decision to reconsider its previous order.  CPR did not seek reconsideration of the dismissal of its conversion claim, and the Court did not address it in its order granting reconsideration.  Therefore, CPR's conversion claim is no longer before the Court.

[70] *Cleveland v. Policy Mgmt. Sys. Corp.*, 526 U.S. 795, 806 (1999); *Lanier v. Bryant*, 332 F.3d 999, 1004 (6th Cir. 2003); *Penny v. UPS*, 128 F.3d 408, 415 (6th Cir. 1997); *Reid v. Sears, Roebuck & Co.*, 790 F.2d 453, 460 (6th Cir. 1986).

[71] *Aerel v. PCC Airfoils*, 448 F.3d 899, 907 (6th Cir. 2006).

[his] deposition testimony in a subsequent affidavit."[72]  On the other hand, a party may use an affidavit to provide information that the questioner failed to ask the party about during the deposition.  Thus, the Sixth Circuit has allowed a post-deposition affidavit where "[the deponent] was not expressly asked what [a named individual] said to [the deponent] during that conversation."[73]  A reviewing court must first determine whether a post-deposition affidavit submitted at the summary judgment stage directly contradicts the non-moving party's prior sworn testimony.[74]  If it does, the court should strike the affidavit.[75]

Here Valero argues not that the Jones affidavit contradicts prior testimony but that the affidavit contains statements that expound on Jones's answers given at his deposition.  First, Valero requests that the Court strike Jones' affidavit statement that he signed a two-year barge lease in reliance on David Olson's assurances that the parties had a two-year contract for the sale of Valero's slurry.  According to Valero, Jones did not testify to this fact when questioned about it at his deposition.  Counsel for Valero asked Jones why he was concerned that he "did not have a signed, written agreement with Valero at the time you were committing CPR Marine to this deal with Martin Marine."  Jones answered that he had received a petroleum industry report in January 2008 that Valero's Memphis refinery might be up for sale.  Jones telephoned Olson to inquire about the report to which Olson responded "don't worry about it; you've got your two years; everything's fine."  Valero contends that Jones had the opportunity to provide the

---

[72] *Reid*, 790 F.3d at 459.

[73] *Briggs v. Potter*, 463 F.3d 507, 513-14 (6th Cir. 2006).

[74] *Aerel*, 448 F.3d at 908.

[75] *Id.*

information given in his affidavit during his deposition and failed to do so.  The Court disagrees.

Valero has not shown that the statements in the Jones affidavit contradict or improperly expound

upon his prior deposition testimony.  On the contrary, the testimony Valero cites from Jones'

deposition is consistent with Jones' affidavit that he signed the barge lease in reliance on

Valero's representations about the parties' two-year term contract.

Second, Valero objects that Jones had the opportunity to testify to the facts set forth in

paragraphs 14 and 15 of his summary judgment affidavit but failed to do so.  In paragraph 14 of

the affidavit, Jones avers that the initial 953 and 954 writings did not conform to the parties' oral

agreements, specifically because the writings only provided for a one-year contract.[76]  In

paragraph 15 of the affidavit, Jones states that he immediately called David Olson about the

inconsistencies, and Olson assured Jones that the issues would be addressed.[77]  Jones adds in the

affidavit that "Mr. Olson did *not* say to me that the versions of the 953 and 954 agreements that

Valero had faxed were the only acceptable terms and/or that Valero would not revise those

writings to conform to the parties' oral agreement."[78]  Valero argues that Jones did not provide

these details during his deposition when asked about his conversation with Olson.  However, in

support of this argument, Valero has cited Jones's deposition testimony about what was said at

the parties' December 14, 2007 meeting, not what Jones and Olson discussed when Jones

---

[76] Jones Summ. J. Aff. ¶ 14.

[77] *Id.* ¶ 15.

[78] *Id.*

received the initial 953 and 954 writings in February 2008.[79]  Therefore, Valero has failed to show that the Jones affidavit contained additional facts that Jones was questioned on but failed to provide at his deposition.

Nevertheless, even if Valero had cited to the correct portion of the transcript, Valero could not show that Jones has used his summary judgment affidavit to impermissibly expound upon his prior testimony.[80]  The Court finds Jones' testimony at 84:3-85:2 to be largely consistent with paragraphs 14 and 15 of his affidavit.  In both instances, Jones recounted his February 2008 conversation with Olson in which Jones raised his objections to Valero's initial 953 and 954 writings.  It is true that the Jones affidavit adds new details about what Olson did not say.  However, at least in the portion of the deposition before the Court, Jones was never asked about what Olson did not say to him during the February 2008 conversation.  Because counsel for Valero did not pose the question to Jones directly, the Court finds that Jones was free to expound on the conversation in his affidavit.[81]  As such, the Court has no basis to exclude the Jones summary judgment affidavit.

---

[79] Valero has cited Jones Dep., May 5, 2010, 88:1-89:25.  The Court finds that this portion of Jones's deposition addressed the December 14, 2007 meeting.  *See* Jones Dep. 87:21-24 ("Q. So one of things that David Olson told you on December the 14th was that he would send you a document?"); *Id.* at 88:8-12 ("Q. And then another thing that Mr. Olson said to you in that meeting was you would have a chance to comment on it . . .?"); and *Id.* at 89:9-13 ("Q. Is there anything else that you remember Mr. Olson saying at this meeting regarding the drafting process of a written contract?").

[80] The Court emphasizes that the parties have produced only excerpts and not the full transcript of Jones' deposition.  Among the excerpts available to the Court, Jones did testify to his February 2008 conversation with Olson.  *See* Jones Dep. 84:3-85:2.

[81] *See Briggs*, 463 F.3d at 513 ("As Briggs was not under any obligation to volunteer everything Pickard said during that conversation, he should not be prevented from providing greater detail in a later affidavit.").

**D.      Fraud in the Inducement/Fraud/Promissory Fraud**

CPR has alleged separate claims for fraud in the inducement and fraud/promissory fraud. In Count I of its Amended Complaint, CPR claims that Valero fraudulently induced CPR to enter into the barge lease by promising to sell CPR all of the slurry produced at Valero's Memphis refinery for a period of two years.[82]  In Count II of its Amended Complaint, CPR claims that Valero committed promissory fraud by failing to sell CPR all of the slurry produced at the Memphis refinery, as promised, and subsequently selling quantities of slurry to other purchasers.[83]

Courts applying Tennessee law have analyzed claims for fraud in the inducement and fraud/promissory fraud under essentially the same tests.  The Tennessee Supreme Court has recently held that in order to recover on a claim for fraudulent inducement, also known as fraud in the inducement, a plaintiff must prove the following: (1) the defendant made a false statement concerning a fact material to the transaction (2) with knowledge of the statement's falsity or utter disregard for its truth and (3) with the intent of inducing reliance on the statement; (4) the statement was reasonably relied upon; and (5) an injury resulted from this reliance.[84]

Likewise, the Sixth Circuit has held that under Tennessee law the elements of fraud or promissory fraud are as follows: (1) an intentional misrepresentation with regard to a material fact; (2) knowledge of the misrepresentation's falsity-that the representation was made

---

[82] Am. Compl. ¶¶ 88-99.

[83] *Id.* ¶¶ 100-112.

[84] *Baugh v. Novak*, 340 S.W.3d 372, 388 (Tenn. 2011).

"knowingly" or "without belief in its truth," or "recklessly" without regard to its truth or falsity; (3) that the plaintiff reasonably relied on the misrepresentation and suffered damage; and (4) that the misrepresentation relates to an existing or past fact, or if the claim is based on promissory fraud, then the misrepresentation must embody a promise of future action without the present intention to carry out the promise.[85]  With respect to both fraud in the inducement and promissory fraud, the plaintiff must show that the false statement concerned past or present facts or a false promise of future conduct without the present intent to perform.[86]

The Court would add that CPR's claims are premised on false promises of future conduct without the present intent to perform.  CPR has asserted that in December 2007 Valero promised to sell CPR all of the slurry produced at the Memphis refinery for a period of two years beginning in early 2008.  It is clear then that Valero's alleged promises concerned future conduct, and not a past or present fact.  Under the circumstances, the Court will analyze CPR's claims for fraud in the inducement as claims for promissory fraud.[87]

Valero argues that it is entitled to summary judgment because CPR cannot establish that Valero promised a two-year contract for the sale of slurry.  The Court finds Valero's arguments

_____

[85] *Shah v. Racetrac Petroleoum Co.*, 338 F.3d 557, 566-67 (6th Cir. 2003) (citing *Stacks v. Saunders,* 812 S.W.2d 587 (Tenn. Ct. App. 1990)).

[86] *Kelly v. Int'l Capital Res., Inc.*, 231 F.R.D. 502, 517-18 (M.D. Tenn. 2005) (quoting *Lowe v. Gulf Coast Dev., Inc.*, No. 01-A-019010CH00374, 1991 WL 220576, at *7 (Tenn. Ct. App. Nov. 1, 1991)).

[87] *Id.* ("Here, the plaintiff has asserted separate claims for promissory fraud and fraudulent inducement to contract. However, the fraudulent inducement claimed by the plaintiff rests on 'promissory fraud,' because the plaintiff alleges that defendants induced him to enter into the agreement by making promises to engage in future conduct, despite the fact that the defendant had no intention of doing so.").  *See also Fowler v. Happy Goodman Family,* 575 S.W.2d 496, 499 (Tenn. 1978); 21 Tenn. Ten. Prac. Contract Law & Practice § 6.33 (2011).

to be without merit.  CPR has adduced proof through Jones and Mis that Valero's agents promised to sell CPR its Memphis slurry for a period of two years.[88]  Additionally, Valero asserts that CPR's reliance on its negotiations with Valero was unreasonable as a matter of law. "Whether a person's reliance on a representation is reasonable generally is a question of fact requiring the consideration of a number of factors."[89]  The Court holds that CPR has created a fact issue about whether it reasonably relied on Valero's promises when it entered into the two-year barge lease.  Therefore, Valero has failed to show that it is entitled to summary judgment for CPR's failure to establish these elements.

Although there is evidence that Valero promised to sell CPR all of its slurry for a period of two years, the Court holds that CPR has not adduced evidence that Valero did so with fraudulent intent.  Specifically, CPR has not come forward with any direct evidence,[90] or other

---

[88] *E.g.* Jones Summ. J. Aff. ¶¶ 4,7; Jones Dep. 69:21-70:4; 82:3-9; 83:24-84:15; 87:2-20; 103:9-16;181:22-182:5;185:16-186:3; Mis Dep. Oct. 12, 2010, 102:8-10, 110:23-111:7.

[89] *Davis v. McGuigan*, 325 S.W.3d 149, 158 (Tenn. 2010) (citations omitted). The Tennessee Supreme Court has defined those factors to include (1) the plaintiff's sophistication and expertise in the subject matter of the representation, (2) the type of relationship—fiduciary or otherwise—between the parties, (3) the availability of relevant information about the representation, (4) any concealment of the misrepresentation, (5) any opportunity to discover the misrepresentation, (6) which party initiated the transaction, and (7) the specificity of the misrepresentation.  *Id.* (citations omitted).

[90] In a series of unpublished decisions, the Tennessee Court of Appeals has divided over whether a plaintiff may maintain a cause of action for promissory fraud in the absence of direct proof of the promisor's bad intent.  *See Kandel v. Ctr. for Urological Treatment & Research, P.C.*, No. M2000-02128-COA-R3-CV, 2002 WL 598567, at *8 (Tenn. Ct. App. Apr. 17, 2002) ("The Tennessee Supreme Court is unwilling to apply the doctrine "except in those cases where there is direct proof of a misrepresentation of actual present intention."); *Noblin v. Christiansen,* No. M2005-01316-COA-R3-CV, 2007 WL 1574273, at *6 (Tenn. Ct. App. May 30, 2007) ("In order to determine intent, we find that it can be deduced from a promisor's actions and other circumstantial evidence.  If we took an opposite position, it is difficult to imagine direct proof of intent unless there was on outright admission that the promise was made without intent to comply.").  *See also Eddings v. Sears Roebuck & Co.*, No. W2001-01107-COA-R3CV, 2002

evidence from which a reasonable juror could infer, that Valero made a false promise of future conduct without the present intent to perform.  As a result, CPR cannot establish all of the elements of its fraud in the inducement/fraud/promissory fraud claims.[91]

"Where a claim for fraudulent inducement rests on false promises made without the present intent to perform, or promissory fraud, the plaintiff must prove more than a subsequent failure to keep the promise."[92]  Instead, CPR must adduce proof that at the time the promise was made, Valero had no intention to carry it out.  The Tennessee Supreme Court has stated that the promisor's "intention may be shown by any other evidence that sufficiently indicates its existence as, for example, the certainty that [the promisor] would not be in funds to carry out his

_____

WL 1592540, at *4-5 (Tenn. Ct. App. Dec. 16, 2002) (requiring direct proof); *Am. Cable Corp.v. ACI Mgmt. Inc.*, No. M1997-00280-COA-R3-CV, 2000 WL 1291265, at *5-6 (Tenn. Ct. App. Sept. 14, 2000) (permitting direct or circumstantial evidence).  Absent a final statement of the law from the Tennessee Supreme Court, this Court is not well-situated to predict how a Tennessee court would rule on this issue. More to the point, the Court holds that CPR, as the non-moving party, bears the burden to come forward with evidence, direct or otherwise, of Valero's bad intent and has failed to do so.

[91] Valero argues in its memorandum that CPR has no evidence of an intentional misrepresentation, the first element of CPR's promissory fraud claim.  Valero did not, however, specifically argue that CPR lacked evidence of Valero's present intent not to perform, the fourth element of the promissory fraud claim.  Even though Valero did not make this specific argument, the Court finds good cause to consider it here.  The Court finds that the two elements appear to be closely related in that both concern the promisor's fraudulent intent.  Moreover, CPR had notice that the Court was considering summary judgment on its fraud in the inducement and fraud/promissory fraud claims.  *See Aubin Indus., Inc. v. Smith*, 321 F. App'x 422, 423 (6th Cir. 2008) (citing *Employers Ins. of Wausau v. Petroleum Specialties, Inc.*, 69 F.3d 98, 105 (6th Cir.1995)).  CPR has also had a reasonable opportunity to present its arguments and evidence on the claim.  *Id.*  Notice and opportunity are determined from the totality of the proceedings, including whether any party filed a motion for summary judgment on the claim and whether the losing party addressed the claim in its arguments. *Excel Energy, Inc. v. Cannelton Sales Co.,* 246 F. App'x 953, 959-60 (6th Cir. 2007).  Because Valero has filed a motion for summary judgment on the claim and CPR has addressed the claim in its briefing, the Court will consider the merits of the claim in light of the extensive evidentiary record before the Court.

[92] *Id.* (citations and quotation omitted).

promise."[93]  The plaintiff has the burden to offer "competent and material evidence of an intent to defraud [in order] to state successfully a claim for promissory fraud."[94]  Generally, present intent to defraud is a question of fact.[95]  Courts applying Tennessee law have opined that "[t]he most difficult element of this tort concerns the intent not to perform."[96]

Moreover, "[i]n no case may fraud ever be presumed or an inference of fraud made from circumstances that equally permit reasonable inferences of non-fraudulent conduct."[97]  Although "it is rare for summary judgment to be appropriate when considering an issue of fraud,"[98] courts applying Tennessee law have granted summary judgment on promissory fraud claims where the promisee has failed to adduce proof of the promisor's present intent not to perform.[99]

---

[93] *Fowler*, 575 S.W.2d at 499 n.3 (quoting Restatement (Second) of Torts, § 530, Comment (d) (1977)).

[94] *Hudson v. Insteel Indus., Inc.*, 5 F. App'x 378, 385 (6th Cir. 2001) (citing *Fowler*, 575 S.W.2d at 499).

[95] *Id.* (citing *Keith v. Murfreesboro Livestock Mkt., Inc.,* 780 S.W.2d 751, 754 (Tenn. Ct. App.1989)).  *See also Noblin*, 2007 WL 1574273, at *10 (citations omitted).

[96] *WYCQ, Inc. v. Nat'l Music Mktg., Inc.*, No. 3:05-cv-0979, 2008 WL 56027, at *6 (M.D. Tenn. Jan 3., 2008) (quoting *Noblin*, 2007 WL 1574273, at *6 )).

[97] *Id.* (quoting *Am. Cable Corp.*, 2000 WL 1291265, at *4).

[98] *Blackburn & McCune, PLLC v. Pre-Paid Legal Servs., Inc.*, No. M2009-01584-COA-R3-CV, 2010 WL 2670816, at *14 (Tenn. Ct. App. June 30, 2010) (quoting *Efird v. Clinic of Plastic and Reconstructive Surgery, P.A.,* 147 S.W.3d 208, 222 (Tenn. Ct. App. 2003)).

[99] *See Jackson v. Alstom Power, Inc.*, 193 F. App'x 505, 509 (6th Cir. 2006) (applying Tennessee law on promissory fraud); *Alston v. Nat'l Safety Incentives, Inc.*, No.06-2141-JPM, 2008 WL 4831215, at *5-6 (W.D. Tenn. Nov. 3, 2008); *WYCQ*, 2008 WL 56027, at *6; *Stacks*, 812 S.W.2d at 592-93; *Hood Land Trust v. Hastings*, No. M2009-02625-COA-R3-CV, 2010 WL 3928647, at *8 (Tenn. Ct. App. Oct. 5, 2010); *Eddings v. Sears Roebuck & Co.*, No. W2001-01107-COA-R3CV, 2002 WL 1592540, at *4-5 (Tenn. Ct. App. Dec. 16, 2002); *Am. Cable Corp.*, 2000 WL 1291265, at *5-6; *Bishof v. Yarbrough Constr. Co.*, No. 02A01-9411-CH-00256, 1996 WL 490629, at *11 (Tenn. Ct. App. Aug. 29, 1996).

Viewing the record in the light most favorable to CPR, the Court holds that there is no evidence from which a reasonable juror could find that Valero made a false promise without the present intent to perform.  CPR has the burden to show that Valero had no intention of honoring its promise in December 2007 to sell all of its Memphis slurry to CPR for two years, a promise Valero reaffirmed in February 2008.  The evidence, however, shows that the parties transacted business under the terms of the 953 and 954 writings for some months and did so without any signs of breach until late 2008.[100]  The parties do not dispute that Valero only insisted on renegotiating the price term after the drop in the price of crude oil beginning in October 2008.[101] According to the record before the Court, between February 26, 2008 and September 30, 2008, the WTI for crude oil remained above $100 per barrel for all but nine days.[102]  In contrast, between October 1, 2008 and June 1, 2009, the WTI declined, never to exceed $100 and falling as low $33.87 per barrel by December 19 and 20, 2008.[103]  The evidence shows that in response to the changing market, Valero endeavored to renegotiate the contract price for its slurry.  Tryon stated in his December 2008 report that "Memphis is a problem for us right now.  We are currently under term contract with CPR, but we are convinced that the oil is worth much more in

---

[100] *Accord Coleman Logistics, Inc. v. Breed Safety Restraint Sys., Inc.*, No. 3:03-cv-677, 2007 WL 173842, at *10 (E.D. Tenn. Jan. 19, 2007) ("More significantly, the proof indicates that the parties operated under this agreement without dispute from August 2001 through March 2003.  In fact, Breed undertook an enormous amount of business with CTF. Under those circumstances, CTF would be hardpressed to prove that Breed did not intend to honor its commitment to CTF as set forth in the freight contract.").

[101] *Id*. (granting judgment to promisor on promissory fraud claim where evidence showed parties only stopped doing business after one party was sold to new ownership).

[102] Pls.' Mot. Summ. J. , ex. 19, Hayes Aff., Fig. 1.

[103] *Id.*

47

the spot market. We have not been able to make much progress with changing the price on the CPR contract."[104]

Even as it was looking for ways to renegotiate the pricing for its slurry, Valero continued to recognize the existence of a binding contract.  When the parties could not reach an agreement on a new price model, Valero gave notice that it was cancelling the FOB agreement effective June 1, 2009, and the delivered agreement effective March 1, 2009.  Construing these facts in a light most favorable to CPR, a reasonable juror could infer that the parties performed until such time as the market price for crude sharply declined.  CPR has not shown, however, that Valero's decision to cancel the agreements after months of transactions proves Valero's bad intent at the time the promises were made in late December 2007 and February 2008.  Therefore, the Court concludes that there is no proof Valero made its promises without a present intention of carrying them out.

The Court further holds that CPR has not adduced "any other evidence that sufficiently indicates" Valero's intention not to perform as promised at the time it made its promises. Viewing the record in the light most favorable to CPR, there is simply no evidence from which an inference can be drawn of Valero's bad intent at the time it made promises to CPR.  It is true that on February 26, 2008, less than a week after reaffirming the oral agreement,[105] Valero

---

[104] Pls.' Statement of Facts ¶ 44, D.E. # 131-45.

[105] The Tennessee Court of Appeals has stated in an unpublished decision that probative evidence of a promisor's intent might include acts occurring "before or contemporaneous with" its promises, particularly if the acts tended to show that the promisor was "looking for ways to avoid" its promises of future conduct. *See Am. Cable*, 2000 WL 1291265, at *5.  Accepting as true CPR's evidence about Valero's promises of a two-year contract, the fact remains that Valero's proposed writings were prepared after the promises were made.

prepared and sent to CPR initial drafts of the 953 and 954 writings, which did not contain the

two-year duration term and added the so-called pricing band.  The Court holds that the contents

of Valero's writings are not probative of Valero's present intention not to perform at the time

Valero made its promises.  The parties' subsequent course of conduct "equally permits

reasonable inferences of non-fraudulent conduct" as well as any bad intent on Valero's part.

With respect to the duration provision, Valero initially drafted the agreements to include a one-

year term.  However, during the course of performance, Valero later adopted CPR's Rider B, the

provision that contained the evergreen clause and triggered the "renewal terms" extending the

contract up to three years.  Because Valero subsequently agreed to the automatic renewal term

proposed by CPR, the Court finds that this evidence "equally permits reasonable inferences of

non-fraudulent conduct" on Valero's part.

Furthermore, no reasonable juror could conclude that Valero's addition of the "price

band" term in the initial 953 and 954 writings implied a present intent not to perform as

promised.  This term stated that "[p]rice will be based on WTI priced between $85.00 and

$115.00 per barrel."  Valero does not dispute that the parties had not previously agreed to such a

term during their earlier negotiations.  The parties disagree over what the term actually meant or

how it affected their agreements: CPR maintains that the term is ambiguous and Valero asserts

that it speaks for itself.  The record shows that Valero invoked the term when it approached CPR

about renegotiating the contract price in December 2008.  In one email, Olson proposed a new

price "for all forward sales" due in part to the fact that "[s]ince October 10, 2008, the price of

WTI has quoted below the contractual band of $85.00 to $115.00 per barrel" and "[o]n

December 3, 2008, WTI closed at $46.79 per barrel."[106]  Thereafter the parties exchanged emails

and met to discuss the price.  In a January 22, 2009 email to Jones, Stanich explained Valero's

position that "the pricing clause in our contract that allows for renegotiation when the price of

crude dramatically rises or falls is to ensure a reasonable market value for the product."[107]  Even

accepting Valero's understanding of the "price band," Valero's decision to insert the term in its

writings only gives rise to an inference that Valero wanted to revisit the price issue in the future

should the price of crude change "dramatically."  It does not necessarily follow that Valero had

no intention of performing for the two-year period which it had promised CPR.  In fact, the

evidence shows that Valero continued to sell CPR slurry even after October 10, 2008, the date on

which the price of crude fell outside of the band.  Therefore, the Court holds that Valero's "price

band" is not probative of Valero's intent not to perform in December 2007 and February 2008,

when it promised the sale of its Memphis slurry for two years.

Although a party's fraudulent intent is generally a question of fact, the Court holds that

CPR has failed to come forward with evidence creating an issue of material fact with regard to

Valero's present intent not to undertake its promised conduct.  The record evidence equally

permits reasonable inferences of non-fraudulent conduct.  Therefore, Valero's Motion for

Summary Judgment is **GRANTED** on CPR's claims for fraud in the inducement and

fraud/promissory fraud.

## E.    Promissory Estoppel

Valero next moves for summary judgment on CPR's claim for promissory estoppel.

---

[106] Pls.' Mot. Summ. J., ex. 38, Olson Email, Dec. 4, 2008.

[107] Pls.' Mot. Summ. J., ex. 41, Stanich Email, Jan. 22, 2009.

Valero argues that under Tennessee law, the doctrine of promissory estoppel is not a defense to the statute of frauds.  Furthermore, Tennessee courts have held that promissory estoppel is only available in exceptional cases where the promisor's actions approach actual fraud.  Valero again denies that it ever made any promise to CPR, and even if it had, such a promise is unenforceable because it was never reduced to writing.  Finally, just as it did with respect to CPR's promissory fraud claims, Valero contends that CPR has failed to adduce evidence of its reasonable reliance. In response, CPR maintains that there is evidence in the record that Valero did make the alleged promises.  CPR also argues that it can prove its reasonable reliance on Valero's alleged promises.  Under the circumstances, CPR intends to show that this is an exceptional case, where Valero's conduct borders on actual fraud.  Thus, CPR believes that triable issues remain, precluding summary judgment on this claim.

The Tennessee Supreme Court has defined promissory estoppel as "a promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce such action or forbearance."[108]  The court has added that the promise "is binding if injustice can be avoided only by enforcement of the promise."[109]  The court in *Alden* defined the following limits of the theory: "(1) the detriment suffered in reliance must be substantial in an economic sense; (2) the substantial loss to the promisee in acting in reliance must have been foreseeable by the promisor; (3) the promisee must have acted

---

[108] *Alden v. Presley*, 637 S.W.2d 862, 864 (Tenn. 1982) (quoting Restatement of Contracts § 90).

[109] *Id.*

reasonably in justifiable reliance on the promise as made."[110]

The Court holds that CPR has met its burden to show that Valero made certain promises and that CPR reasonably relied on those promises. As the Court stated in its analysis of CPR's promissory fraud claims, CPR has adduced evidence that Valero promised to sell CPR its Memphis slurry for a term of two years. CPR has also come forward with evidence that Valero promised to reduce the parties' agreement to writing. Because the reasonableness of CPR's reliance is a question of fact, the Court also holds that CPR has met its burden as to this element. Finally, the Court finds that viewing the facts in a light most favorable to CPR, evidence satisfying the other limiting factors set forth in *Alden* exists. CPR's detriment appears to be substantial in an economic sense. CPR has proof that it suffered losses of $9,500 for every day the barges could not transport slurry Valero had agreed to sell CPR. The Court also concludes that the substantial loss to CPR was foreseeable for Valero in so far as Valero knew of the terms of CPR's barge lease and the costs CPR incurred to service the contract. Therefore, the Court must reject Valero's arguments as to these issues.

Still the Court finds that Valero's argument that the doctrine of promissory estoppel is not an exception to the statute of frauds presents a closer question. Generally speaking, the application of the doctrine of promissory estoppel in cases where the statute of frauds is a defense is unsettled under Tennessee law. To begin with, the Tennessee Supreme Court has never directly addressed whether promissory estoppel is a possible exception to the statute of frauds. In *Steelman v. Ford Motor Credit Co.*, the Tennessee Court of Appeals stated that "[o]ur supreme court . . . refused to apply the doctrine of promissory estoppel as an exception to the

---

[110] *Id.* (quoting Simpson, *Law of Contracts* § 61 (2d ed. 1965)).

statute of frauds" and cited the Tennessee Supreme Court's decision in *Southern Industrial Banking Corp. v. Delta Properties, Inc.*[111]  The Tennessee Court of Appeals has followed *Steelman* and held in a series of subsequent, unreported cases that promissory estoppel is not an exception to the statute of frauds.[112]

However, this Court finds that the Tennessee Supreme Court in *Southern Industrial Banking* did not actually address the issue of whether promissory estoppel is an exception to the statute of frauds.  The court never analyzed the doctrine and simply concluded that "[t]he reasoning and authorities relied upon by plaintiff and the Court of Appeals to establish promissory estoppel and take this case out of the statute of frauds are inapposite" without discussing what those authorities were.[113]  For these reasons, this Court finds that the Tennessee cases citing *Southern Industrial Banking* for the proposition that promissory estoppel is not an exception to the statute of frauds are not entirely persuasive.[114]

Not only are *Steelman* and its progeny not persuasive, but these cases are contradicted by

---

[111] *Steelman v. Ford Motor Credit Co.*, 911 S.W.2d 720 (Tenn. Ct. App. 1995) (citing *Southern Indus. Banking Corp. v. Delta Props., Inc.*, 542 S.W.2d 815 (Tenn. 1976)).

[112] *Regions Bank v. Lost Cove Cabins and Campgrounds, Inc.*, No. M2009-02389-COA-R3-CV, 2010 WL 4514957, at *7 (Tenn. Ct. App. Nov. 9, 2010); *Hood Land Trust v. Hastings*, No. M2009-02625-COA-R3-CV, 2010 WL 3928647 (Tenn. Ct. App. Oct. 5, 2010); *Seramur v. Life Care Ctrs. of Am., Inc.,* No. E2008-01364-COA-R3-CV, 2009 WL 890885, at *5 (Tenn. Ct. App. Apr. 2, 2009); *Nationsbank, N.A. (S.) v. Millington Homes Investors, Ltd.,* No. 02A01-9805-CH-00134, 1999 WL 79204, at *3 n.7 (Tenn. Ct. App. Feb.19, 1999).

[113] *Southern Indus. Banking*, 542 S.W.2d at 819.  The Court would add that *Steelman* is the only case to cite *Southern Industrial Banking* on the doctrine of promissory estoppel.

[114] Of course, this Court is not free to ignore the holdings of the Court of Appeals on this question. *Cent, States, Se. & Sw. Areas Pension Fund v. Howell*, 227 F.3d 672, 676 (6th Cir. 2000).

another line of cases from the Tennessee courts. The Tennessee Court of Appeals and federal courts applying Tennessee law have held that promissory estoppel is a viable cause of action even where the statute of frauds renders an oral promise unenforceable.[115] In one unpublished decision, the Tennessee Court of Appeals stated only that "[e]stoppel is not favored under our law" and that "[because] the application of promissory estoppel in contract cases creates an exception to the Statute of Frauds, it should not be applied too liberally lest the exception swallow the rule."[116] This Court finds that the implication from holdings like this one is that promissory estoppel may operate as an exception to the statute of frauds under certain circumstances.

For example, the Tennessee Court of Appeals in *Engenius Entertainment, Inc. v. Herenton* held that the statute of frauds would not bar an independent claim for promissory estoppel.[117] In that case the plaintiff was selected by local government to develop an attraction at the publicly-owned Pyramid arena in downtown Memphis. At the conclusion of a request-for-proposal process and after its selection as the developer, the plaintiff incurred additional expenses in reliance on the defendants' promises that the plaintiff would be awarded a long-term

---

[115] *E.g. Chavez v. Broadway Elec. Serv. Corp.*, 245 S.W.3d 398, 406-407 (Tenn. Ct. App. 2007); *Shedd v. Gaylord Entm't Co.,* 118 S.W.3d 695, 700 (Tenn. Ct. App. 2003); *Calabro v. Calabro*, 15 S.W.3d 873, 878 (Tenn. Ct. App. 1999); *Engenius Entm't, Inc. v. Herenton,* 971 S.W.2d 12, 19-20 (Tenn. Ct. App. 1997); *Foster & Creighton Co.v. Wilson Contracting Co., Inc.*, 579 S.W.2d 422 (Tenn. Ct. App. 1978); *Chapman v. S. Natural Gas Co.*, No. 3:09-CV-224, 2011 WL 883918, at *5-7 (E.D. Tenn. Mar. 11, 2011); *Launius v. Wells Fargo Bank, N.A.*, No. 3:09-CV-501, 2010 WL 3429666, at * 6-7 ("While promissory estoppel is not an exception to the Statute of Frauds, it does provide an independent cause of action.").

[116] *Johnson v. Allison*, 2004 WL 2266796, at *8 (Tenn. Ct. App. 2004).

[117] *Engenius Entm't,* 971 S.W.2d at 20-21.

54

contract to develop the Pyramid.  The Tennessee Court of Appeals reversed the trial court's dismissal of the promissory estoppel claim, explaining that "[a]lthough the statute of frauds may prevent the Defendants from seeking enforcement of an alleged oral agreement under these equitable doctrines, the statute does not preclude EnGenius from recovering damages for unjust enrichment or detrimental reliance."[118]  It follows from *Engenius* that the statute of frauds is not an outright bar to a claim for promissory estoppel.

Likewise, the Tennessee Court of Appeals in *Calabro v. Calabro* held that the lower court erred in granting summary judgment on a promissory estoppel claim even though the defendant had argued that the oral promises at issue were not enforceable under the statute of frauds.[119]  The plaintiff, a college student, had alleged that her father, the defendant, had promised to pay her college expenses exceeding the value of her scholarship if she agreed to attend Vanderbilt University.  When the plaintiff enrolled in Vanderbilt and her father reneged, the plaintiff brought suit on a promissory estoppel theory that she had acted in reasonable reliance on her father's oral promises to her detriment.  The Court of Appeals remarked that "Plaintiff also relied upon the doctrine of promissory estoppel as an exception to the Statute of Frauds," went on to analyze Tennessee law on promissory estoppel, and concluded that the plaintiff adduced sufficient evidence to send the claim to a jury.[120]  This Court finds that although the *Calabro* court did not directly rule that promissory estoppel was an exception to the statute of frauds, the court at the very least implied that it was.

---

[118] *Id.*

[119] *Calabro v. Calabro*, 15 S.W.3d 873, 878 (Tenn. Ct. App. 1999).

[120] *Id.* at 878-80.

And in *Launius v. Wells Fargo Bank*, the United States District Court for the Eastern District of Tennessee addressed the issue presented in the case at bar, whether promissory estoppel is an exception to the statute of frauds.[121]  The court in *Launius*, while recognizing that the Tennessee Court of Appeals had held that promissory estoppel was not an exception to the statute of frauds, nevertheless concluded that promissory estoppel was a viable "independent cause of action" even where an oral promise was unenforceable under the statute of frauds.[122] The Eastern District ultimately concluded that the plaintiff in that case could not demonstrate reasonable reliance because the plaintiff had not substantially changed his position in reliance on any statements made by the defendant.

The Court finds that these cases are representative of those holding that a statute of frauds defense will not preclude a claim for promissory estoppel.  It is not clear to the Court how this reasoning squares with other decisions in which the Tennessee Court of Appeals has held that promissory estoppel is not an exception to the statute of frauds.

Even if the Court assumed that a cause of action for promissory estoppel is available where a defendant raises the statute of frauds as a defense, the Tennessee Supreme Court has not defined the limits for applying promissory estoppel to promises that are unenforceable under the statute of frauds.  The court has cited with approval the definition of promissory estoppel set forth in the Restatement of Contracts.[123]  The Restatement (Second) of Contracts § 90 provides

---

[121] *Launius*, 2010 WL 3429666, at * 6-7 ("While promissory estoppel is not an exception to the Statute of Frauds, it does provide an independent cause of action.").

[122] *Id.*

[123] *Bill Brown Constr. Co., Inc. v. Glens Falls Ins. Co.*, 818 S.W.2d 1, 12 (Tenn. 1991) (quoting Restatement of Contracts § 90); *Alden*, 637 S.W.2d at 864 (same).

that

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach may be limited as justice requires.[124]

Generally, the kind of promissory estoppel described in Restatement (Second) § 90 governs the enforcement of promises unsupported by consideration.[125]  Courts applying Tennessee law and recognizing a cause of action for promissory estoppel based on a theory of detrimental reliance have routinely cited § 90 with approval.[126]  In contrast, Restatement (Second) § 139 specifically addresses the availability of promissory estoppel as an exception to the statute of frauds.  That section reads

> A promise which the promisor should reasonably expect to induce action or forbearance on the part of the promisee or a third person and which does induce the action or forbearance is enforceable ***notwithstanding the statute of frauds*** if injustice can be avoided only by enforcement of the promise.  The remedy granted for breach ***is*** limited as justice requires. [127]

Section 139(2) goes on to set forth a list of equitable factors for determining whether injustice

---

[124] Restatement (Second) of Contracts § 90.

[125] *Tel-Treads, a Div. of Teleci, Inc. v. Montgomery Ward & Co., Inc.*, No. 84-5774, 1985 WL 13617, at *5 (6th Cir. Aug. 20, 1985) ("Promissory estoppel, as noted in section 90 of the Restatement, is generally used as a means to circumvent the requirement of consideration.  Reliance as noted in section 139 of the Restatement is used to circumvent the statute of frauds.").

[126] In addition to *Alden v. Presley*, *see Chavez*, 245 S.W.3d at 404; *Engenius Entm't,* 971 S.W.2d at 19-20; *Amacher v. Brown-Forman Corp.*, 826 S.W.2d 480, 482 (Tenn. Ct. App. 1991); *Wilson v. Smythe*,  No. M2003-00645-COA-R3-CV, 2004 WL 2853643, at * 10 (Tenn. Ct. App. Dec. 10, 2004).

[127] Restatement (Second) of Contracts § 139(1) (emphasis added).

57

can be avoided only by enforcing an alleged promise.[128]  The comments to § 139 explain that this section complements § 90 but can also apply to promises supported by consideration.[129]  The comments further suggest that the standard for applying promissory estoppel under § 139 in the absence of a writing satisfying the statute of frauds is higher than the standard under § 90.  This is because "the requirement of consideration is more easily displaced than the requirement of a writing."[130]  Restatement (Second) § 139 is arguably more directly on point with the issues presented in the case at bar.  However, the Tennessee Supreme Court has never adopted § 139 and the Tennessee Court of Appeals has never considered the applicability of § 139 where a plaintiff alleges a promissory estoppel claim and the defendant raises the statute of frauds as a defense.[131]  Therefore, the Court finds that there is no controlling precedent in Tennessee Supreme Court decisions.

Apart from the recognition that promissory estoppel should not apply "too liberally," the Tennessee courts have not agreed on what quantum of proof is required to recover under a theory

---

[128] Those factors include (a) the availability and adequacy of other remedies, particularly cancellation and restitution; (b) the definite and substantial character of the action or forbearance in relation to the remedy sought; (c) the extent to which the action or forbearance corroborates evidence of the making and terms of the promise, or the making and terms are otherwise established by clear and convincing evidence; (d) the reasonableness of the action or forbearance; (e) the extent to which the action or forbearance was foreseeable by the promisor. Restatement (Second) of Contracts § 139(2).

[129] Restatement (Second) of Contracts § 139, cmt. a.

[130] *Id.* cmt. b.

[131] Only one case has called attention to both § 90 and § 139 and their subtle differences. *D&S Coal Co., Inc. v. USX Corp.*, 678 F. Supp. 1318, 1323 (E.D. Tenn. 1988).  The Eastern District's analysis also appears to be singular in its use of the equitable factors listed in § 139(2) to determine the "injustice" of not enforcing the promise.  *Id.* at 1324.

of promissory estoppel where the statute of frauds bars enforcement of the promise.  In *Shedd v. Gaylord Entertainment Company*, the Tennessee Court of Appeals held that promissory estoppel was limited to "exceptional cases where to enforce the statute of frauds would make it an instrument of hardship and oppression, verging on actual fraud."[132]  Courts applying Tennessee law on promissory estoppel have repeatedly cited *Shedd* for the proposition that a party asserting promissory estoppel must prove conduct "verging on actual fraud."[133]  However, *Shedd* referred to the doctrines of promissory estoppel and equitable estoppel interchangeably, stating "[o]ur cases sometimes refer to promissory estoppel as equitable estoppel or detrimental reliance."[134]  In other cases, Tennessee courts have actually recognized that the doctrines are "disparate and distinct."[135]  What is more, the *Shedd* court quoted its "verging on fraud" language from *Baliles v. Cities Service Co.*, a case in which the Tennessee Supreme Court analyzed the doctrine of equitable estoppel, and not promissory estoppel, as an exception to the statute of frauds.[136]  In

---

[132] *Shedd,* 118 S.W.3d at 700 (quoting *Baliles v. Cities Serv. Co.*, 578 S.W.2d 621 (Tenn. 1979) (other citations omitted)).

[133] *Holt v. Macy's Retail Holdings, Inc.*, 719 F. Supp. 2d 903, 913-14 (W.D. Tenn. 2010)*; Chavez*, 245 S.W.3d at 406; *Barnes & Robinson Co., Inc. v. OneSource Facility Servs., Inc.*, 195 S.W.3d 637, 645 (Tenn. Ct. App. 2006); *Chapman*, 2011 WL 883918, at *5-6; *Wilson*, 2004 WL 2853643, at * 10.  *See also Sparton Technology, Inc. v. Util-Link, LLC*, 248 F. App'x 684, 689-90 (6th Cir. 2007) ("Such exceptional cases are found only where a defendant's conduct is akin to fraud.") (citing *Shedd*).

[134] *Shedd*, 118 S.W.3d at 699.

[135] *E.g. Millington Homes Investors*, 1999 WL 79204, at*3.  The court in *Launius* explained that "promissory estoppel is a sword, based on the failure to deliver on a promise, while equitable estoppel is a shield a plaintiff can raise against the defense of the statute of frauds when the defendant has knowingly misrepresented a fact."  *Launius*, 2010 WL 3429666, at * 5.

[136] *Baliles*, 578 S.W.2d at 624.  It should be noted that the Court of Appeals held that the facts in *Shedd* were not so exceptional as to justify the operation of promissory estoppel.

fact, the Tennessee Supreme Court has never applied the "verging on actual fraud" standard to a claim for promissory estoppel.  In short, "significant uncertainty surrounds" the doctrine of promissory estoppel under Tennessee law.[137]

Based on the number of unresolved issues concerning promissory estoppel under Tennessee law, the Court finds that the appropriate course is to certify questions to the Tennessee Supreme Court.  Tennessee Supreme Court Rule 23 permits a District Court for the United States in Tennessee to certify questions of law to the Supreme Court of Tennessee.  Under Rule 23, this Court may certify a question of law when the Court determines that (1) there is a question of law that is determinative of the cause, and (2) there is no controlling precedent in Tennessee Supreme Court decisions.[138]  The Sixth Circuit has held that certification "is most appropriate when the question is new and state law is unsettled."[139]  Furthermore, "the federal courts generally will not trouble our sister state courts every time an arguably unsettled question of state law comes across our desks.  When we see a reasonably clear and principled course, we will seek to follow it ourselves."[140]

The Court finds that both criteria of Tennessee Supreme Court Rule 23 are satisfied with respect to this issue.  Whether promissory estoppel is an exception to the statute of frauds and, if so, the quantum of proof required to establish such a claim are determinative of CPR's claim for

---

[137] 21 Steven W. Feldman, *Tenn. Prac.: Contract Law & Prac.* § 2.33 (2011).

[138] Tenn. Sup.Ct. R. 23 § 1.

[139] *Transamerica Ins. Co. v. Duro Bag Mfg. Co.,* 50 F.3d 370, 372 (6th Cir.1995) (citing *Lehman Bros.,* 416 U.S. at 390–91).

[140] *Pennington v. State Farm Mut. Auto. Ins. Co.,* 553 F.3d 447, 450 (6th Cir.2009) (internal quotation marks omitted).

promissory estoppel.  Additionally, the Tennessee Supreme Court has never addressed the issues

presented, and the Tennessee Court of Appeals has issued conflicting decisions.  Therefore, the

Court does not believe that a reasonably clear and principled course on the issue exists.  As a

result, the Court will exercise its discretion to certify these questions to the Tennessee Supreme

Court.  The Court will enter a separate order of certification.  The Court hereby reserves ruling

on CPR's promissory estoppel claim until such time as the Tennessee Supreme Court answers or

otherwise disposes of the certified questions.

**F.       Equitable Estoppel**

In Count III of the Amended Complaint, CPR has alleged a claim for "Promissory

Estoppel and Equitable Estoppel."  In its Motion for Summary Judgment, Valero briefed the

applicable law on the doctrine of promissory estoppel only.  Valero's opening brief does not

refer to the doctrine of equitable estoppel.  In its response to Valero's arguments about CPR's

claim for promissory estoppel, CPR draws attention to this omission and argues that Valero has

moved for summary judgment only on CPR's claims for promissory estoppel.  CPR emphasizes

that equitable estoppel is "a separate doctrine" from promissory estoppel.  CPR states that in

light of Valero's failure to mention equitable estoppel in its Motion for Summary Judgment,

CPR has elected not to brief the merits of such a claim in its response.  In its reply memorandum,

Valero argues that the Amended Complaint alleges a single count for "promissory estoppel and

equitable estoppel" and that it is entitled to summary judgment on the entire count.[141]  Even if

CPR has two separate claims, both claims require proof of a misrepresentation and reasonable

reliance, which Valero believes CPR has failed to adduce.  In any event, Valero argues then that

---

[141] *See* Defs.' Reply, 20 n.42.

it is entitled to summary judgment on the estoppel count under either theory.

The Court notes that some confusion surrounded Count III of CPR's Amended Complaint at the pleadings stage.  The Amended Complaint does, in fact, include a single count captioned as "Promissory Estoppel and Equitable Estoppel."  In support of this count, CPR alleged that Valero made three distinct promises: (1) to sell CPR all of the No. 6 fuel oil (i.e. slurry) Valero was generating at the Memphis refinery; (2) to do so for a term of two years; and (3) to reduce the parties' December 14, 2007 oral agreement to writing.[142]  The Amended Complaint further alleges that at the time that Valero made these promises, it knew that they were false.[143]  Just as it has on summary judgment, Valero previously argued in its Rule 12(b) motion that under Tennessee law promissory estoppel is not an exception to the statute of frauds.[144]  Just as it has on summary judgment, Valero never attacked, briefed, or addressed the doctrine of equitable estoppel.  For its part, CPR responded to Valero's motion to dismiss by arguing that Count III alleged only a claim for equitable estoppel, and not promissory estoppel.  CPR addressed Count III as a "promissory/equitable estoppel" claim and went on to cite and discuss only cases where the doctrine of equitable estoppel was at issue.[145]

Construing the allegations in the light most favorable to CPR at the pleadings stage, the

---

[142] Am. Compl. ¶¶ 114,115.  The Amended Complaint further alleges that Valero promised to modify the 953 and 954 writings. *Id.* ¶ 121.  The record, however, shows that CPR had already acted to its detriment by entering into the barge lease by the time the initial 953 and 954 writings were exchanged.  As a result, Valero's promise to modify the writings cannot have induced CPR to enter into the barge lease.

[143] *Id.* ¶ 121.

[144] Defs.' Mem. in Support Mot. to Dismiss, 12 (D.E. # 28-1).

[145] Pls.' Resp. in Opp'n Mot. to Dismiss, 9 (D.E. # 32).

Court simply held (on reconsideration) that CPR had alleged sufficient factual material to survive Valero's Rule 12 motion.  The Court stated that each form of estoppel is "a distinct and disparate doctrine" and that the principle difference between the two is "that equitable estoppel is a recognized exception to the Statute of Frauds."[146]  Based on the Court's previous ruling at the pleadings stage, Valero was put on notice that the allegations of the Amended Complaint supported two independent causes of action despite Count III's single heading and CPR's argument suggesting that it had only alleged a claim for promissory estoppel.[147]  For these reasons, Valero should have raised the equitable estoppel claim in its Rule 56 Motion if, in fact, it intended to seek judgment as a matter of law on the issue.

Despite Valero's failure to brief the issue, the Court holds that CPR's claim on this theory must fail for the same reasons as CPR's other claims sounding in fraud.  CPR has failed to adduce evidence from which a reasonable juror might find that Valero acted with fraudulent intent at the time it made its promises.  Unlike promissory estoppel, the Tennessee courts have consistently held that equitable estoppel is a recognized exception to the Statute of Frauds.[148] The elements of equitable estoppel are (1) conduct which amounts to a false representation or

---

[146] *See* Order Granting in Part, Denying in Part Def.'s Mot. Dismiss, Mar. 10, 2010, 37-38.

[147] To the extent that the two doctrines are inconsistent (if at all), Rule 8(d)(3) permits such pleadings and provides that "a party may state as many separate claims or defenses as it has, regardless of consistency."  Fed. R. Civ. P. 8(d)(3).  The Court would add that Valero never filed a motion for a more definite statement pursuant to Rule 12(e).  *See* Fed. R. Civ. P. 12(e) ("A party may move for a more definite statement of a pleading to which a responsive pleading is allowed but which is so vague or ambiguous that the party cannot reasonably prepare a response.").

[148] *Seramur*, 2009 WL 890885, at *5; *Millington Homes Investors*, 1999 WL 79204, at*3 (citing *Baliles*, 578 S.W.2d at 624).

concealment of material facts, or, at least, which is calculated to convey the impression that the facts are otherwise than, and inconsistent with, those which the party subsequently attempts to assert; (2) intention or at least expectation that such conduct shall be acted upon by the other party; (3) knowledge, actual or constructive, of the real facts.[149]  The party claiming the estoppel must show (1) its lack of knowledge and of the means of knowledge of the truth as to the facts in question; (2) its reliance upon the conduct of the party estopped; and (3) action based thereon of such a character as to change his position prejudicially.[150]  As previously discussed, the Tennessee Supreme Court has limited equitable estoppel to those cases "where to enforce the Statute of Frauds would make it an instrument of hardship and oppression, verging on actual fraud."[151]  In one unreported decision, the Tennessee Court of Appeals summarized the difference between promissory estoppel and equitable estoppel in this way: "promissory estoppel is a sword, based on the failure to deliver on a promise, while equitable estoppel is a shield a plaintiff can raise against the defense of the statute of frauds when the defendant has knowingly misrepresented a fact."[152]

The Court holds that even though it did not brief this issue in its opening brief, Valero is entitled to judgment as a matter of law on CPR's equitable estoppel claim.  CPR has failed to adduce evidence of fraud in this case.  For the reasons already discussed, there is no evidence that Valero made with bad intent a false representation to CPR that it would sell CPR all of its

---

[149] *Osborne v. Mountain Life Ins. Co.,* 130 S.W.3d 769, 774 (Tenn. 2004).

[150] *Id.* at 774.

[151] *Millington Homes Investors*, 1999 WL 79204, at*3.

[152] *Seramur*, 2009 WL 890885, at *5.

Memphis slurry for a term of two years and reduce the parties' agreement to a writing.  There is, likewise, no evidence that Valero concealed any material facts in order to convey the impression that the facts were otherwise than what they were.  Therefore, Valero is entitled to summary judgment on this claim, and its Motion is **GRANTED**.

## III.   Tennessee Consumer Protection Act

Valero next argues that it is entitled to summary judgment on CPR's TCPA claim.  In order to recover under the TCPA, a plaintiff must demonstrate "(1) that the defendant engaged in an unfair or deceptive act or practice declared unlawful by the TCPA and (2) that the defendant's conduct caused an 'ascertainable loss of money or property, real, personal, or mixed, or any other article, commodity, or thing of value wherever situated.'"[153]  Although the TCPA "does not define the terms 'unfair' or 'deceptive,' the Tennessee Supreme Court has recognized that a deceptive act or practice is a material representation, practice or omission likely to mislead a reasonable consumer."[154]  Furthermore, the Tennessee Supreme Court has held that whether a particular act is unfair or deceptive is a question of fact.[155]  Finally, the TCPA is remedial in nature and should "be construed to effectuate [its] purposes and intent."[156]

---

[153] *Cloud Nine, LLC v. Whaley,* 650 F. Supp. 2d 789, 797-98 (E.D. Tenn. 2009) (quoting *Tucker v. Sierra Builders,* 180 S.W.3d 109, 115 (Tenn. Ct. App. 2005)).

[154] *Whaley,* 650 F. Supp. 2d at 796 (citing *Ganzevoort v. Russell,* 949 S.W.2d 293, 299 (Tenn. 1997)).

[155] *Fayne v. Vincent,* 301 S.W.3d 162, 170 (Tenn. 2009).

[156] *Killingsworth v. Ted Russell Ford, Inc.*, 205 S.W.3d 406, 409 (Tenn. 2006) (quoting Tenn. Code Ann. § 47–18–115; § 47–18–102(2) (providing that the TCPA shall be interpreted "liberally" for the purpose of protecting "consumers and legitimate business enterprises from those who engage in unfair or deceptive acts or practices in the conduct of any trade or commerce in part or wholly within this state")).

The Court holds that CPR has adduced sufficient evidence to create an issue of material fact as to its TCPA claims.  Questions of fact about Valero's conduct remain, especially, whether Valero's conduct was unfair or deceptive.  CPR has also shown an ascertainable loss of money and presented evidence from which a reasonable juror might conclude that Valero's conduct caused that loss.  Therefore, Valero is not entitled to judgment as a matter of law on CPR's TCPA claim, and Valero's Motion is **DENIED** as to this issue.

Valero has raised a second argument in support of its Motion for Summary Judgment on the TCPA claims, namely, that CPR's claim is time-barred.  Valero contends that CPR's cause of action accrued on February 26, 2008, the date on which Valero sent CPR the initial 953 and 954 writings.  At that time, "CPR had full notice that Valero did not understand any deal between the parties to be two years."  The Court finds Valero's argument unpersuasive.

A TCPA claim must be brought within one year from discovery of the unlawful act or practice.[157]  Tennessee follows the discovery rule, meaning "a cause of action accrues and the statute of limitations begins to run when the injury occurs or is discovered, or when in the exercise of reasonable care and diligence, it should have been discovered."[158]  Because CPR filed its original Complaint on March 2, 2009, the issue is whether CPR knew or should have know prior to March 1, 2008 that Valero had engaged in some unfair or deceptive act that caused CPR an ascertainable loss of money.  While it is true that Valero drafted the initial 953 and 954 writings with only a one-year term, there is evidence that Valero later adopted CPR's proposed

---

[157] *Power & Tel. Supply Co., Inc. v. SunTrust Banks, Inc.*, 447 F.3d 923, 930 (6th Cir. 2006) (citing Tenn. Code Ann. § 47-18-110).

[158] *Id.* (quoting *Potts v. Celotex Corp.*, 796 S.W.2d 678, 680 (Tenn. 1990)).

66

evergreen clause providing up to two additional years on the contract.  It is also undisputed that the parties performed for many months as though they had a binding agreement.  At the very least, this evidence creates a triable issue about when CPR knew or should have known that Valero was engaging in unfair or deceptive practices.  Therefore, Valero's Motion is **DENIED** on this issue.

## IV.   Claims Asserted by CPR Marine

Valero has sought summary judgment as to all claims alleged against it by CPR Marine (D.E. # 126.)  The following facts are not in dispute for purposes of that Motion.  Bill Jones founded CPR Marine in approximately 2008.  (Defs.' Statement of Facts ¶¶ 1, 2, D.E. # 126-2.)  Jones is the sole member and employee of CPR Marine.  (*Id.* ¶ 3.)  Jones alone has the authority to enter into contracts on behalf of CPR Marine.  (*Id.* ¶ 4.)  Jones testified that he created CPR Marine for the purpose of entering into barge contracts, including a barge arrangement with L&R Midland for the barges CPR then used to transport slurry from the Memphis refinery.  (*Id.* ¶ 5.)  CPR Marine entered into a contract with Martin Marine for barges on February 5, 2008.  (*Id.* ¶ 6.)  Jones signed the contract on behalf of CPR Marine.  (*Id.* ¶ 7.)

In addition to the contract and tort claims alleged by CPR against Valero, CPR Marine has pled the same claims: breach of contract, fraud/fraud in the inducement, promissory fraud, promissory estoppel, and equitable estoppel.  Valero argues that it is entitled to summary judgment on CPR Marine's claims because CPR Marine is not a real party in interest.  Valero contends that it was never a party to any dealings with CPR Marine.  Therefore, CPR Marine cannot prove any claims against Valero.  In response, CPR Marine asserts that it can recover for breach of contract.  According to CPR a reasonable juror could infer that CPR Marine was a

third-party beneficiary of the contract between Valero and CPR. With respect to the promissory tort claims, CPR Marine asserts that it relied on Valero's fraudulent misrepresentations and that Valero should have recognized that CPR Marine was in the class of entities that would rely on Valero's representations to CPR. Valero had knowledge that CPR Marine entered into a two-year barge lease for the purpose of servicing CPR's term contract with Valero. CPR Marine further argues that Valero's unfair and deceptive acts proximately caused damages to CPR Marine in violation of the TCPA.

The Court holds that much of its analysis of CPR's claims against Valero largely applies to CPR Marine's identical claims against Valero. First, with respect to CPR Marine's promissory estoppel claim, the Court will reserve its ruling on this claim until the Tennessee Supreme Court has answered or otherwise disposed of the certified questions discussed above. Second, because Valero is entitled to judgment as a matter of law on CPR's fraud-based tort claims, Valero is entitled to judgment as a matter of law on CPR Marine's identical tort claims. Therefore, Valero's Motion for Summary Judgment is **GRANTED** as to these claims. Finally, for the same reasons that the Court denied Valero's Motion for Summary Judgment on CPR's TCPA claims, Valero's Motion on CPR Marine's TCPA claims is **DENIED**.

This leaves only CPR Marine's beach of contract claim. The Court holds that Valero is entitled to judgment as a matter of law on these claims as to both contracts. It is undisputed in this case that CPR Marine was not a party to the contracts at issue. A third party may sue to enforce a contract only "when the contracting parties express an intent that the benefits of the contract flow to a third party."[159] The Tennessee Supreme Court has held that "[t]he evidence of

---

[159] *Owner–Operator Indep. Drivers Ass'n, Inc., v. Concord EFS, Inc.*, 59 S.W.3d 63, 68.

intent to confer a benefit must be clear and direct: It must appear, in order that a third person may derive a benefit from a contract between two other parties, that the contract was made and entered into directly or primarily for the benefit of such third person."[160]

CPR Marine has failed to show that it was a third-party beneficiary of any agreement between CPR and Valero.  First, there is no evidence that CPR intended to confer a benefit on CPR Marine by entering into the delivered contract with Valero.  Under the terms of the delivered contract, Valero promised to deliver slurry to CPR in New Orleans.  There is no evidence that the barges leased by CPR Marine were ever involved in the transportation of this slurry.  As a result, there is no evidence that CPR Marine was an intended beneficiary of this contract.  Therefore, Valero's Motion for Summary Judgment on any claim for breach of this contract is **GRANTED**.

Second, CPR Marine has failed to come forward with sufficient evidence to show that CPR and Valero entered into the FOB agreement for the direct or primary benefit of CPR Marine.  CPR Marine cites only the fact that CPR furnished Valero with copies of unsigned documents showing that CPR Marine, and not CPR, was to be a party to the two-year barge lease.  Based on that evidence, CPR Marine argues that Valero "was well aware of CPR Marine's existence and the fact that it would be entering into a two year barge lease based upon the two year agreement between CPR and Valero."[161]  There is otherwise no evidence that CPR Marine was ever discussed in the parties' negotiations or referenced in the meetings where the oral agreement was allegedly reached.  Moreover, CPR Marine admits in its brief that "the

---

[160] *Id.* at 69 (quotation omitted).

[161] Pls.' Resp. in Opp'n, 15 (D.E. # 161).

69

benefit of Valero's promised performance" was "that Valero would sell to CPR all of its Memphis slurry for a two year term (which would match the two year term of the barge lease that CPR Marine entered into in reliance on Valero's misrepresentations)." It is undisputed then that CPR was to receive the benefit of Valero's promise to sell the slurry for two years, and not CPR Marine.

Even if the Court concluded that CPR Marine was a third-party beneficiary of the FOB contract, Valero would still be entitled to summary judgment on the issue of duration. The Court has already held that Valero did not breach the duration term of the parties' FOB contract. For the same reasons, Valero would be entitled to summary judgment on CPR Marine's claim that Valero breached the two-year term of the FOB contract. Therefore, Valero's Motion is **GRANTED** as to CPR Marine's claim for breach of the FOB contract.

## CONCLUSION

Valero's Motion for Summary Judgment on all of CPR's claims and CPR's Motion for Partial Summary Judgment are **GRANTED IN PART, DENIED IN PART**. Likewise, Valero's Motion for Summary Judgment on the claims of CPR Marine is **GRANTED IN PART, DENIED IN PART**. Because the Court finds it appropriate to certify certain questions of law to the Tennessee Supreme Court, the Court reserves ruling on Valero's Motions for Summary Judgment on the promissory estoppel claims alleged by CPR and CPR Marine. The Court will enter a separate certification order.

**IT IS SO ORDERED.**

s/ S. Thomas Anderson
S. THOMAS ANDERSON

70

UNITED STATES DISTRICT JUDGE

Date: October 17th, 2011.