**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

| | | |
|---|---|---|
| **CARBON PROCESSING AND** | ) | |
| **RECLAMATION, LLC, and** | ) | |
| **CPR MARINE, LLC,** | ) | |
| | ) | |
| **Plaintiffs,** | ) | |
| | ) | |
| **v.** | ) | **No. 09-2127-STA** |
| | ) | |
| **VALERO MARKETING AND SUPPLY** | ) | |
| **CO. and  VALERO REFINING CO. –** | ) | |
| **TENNESSEE, LLC,** | ) | |
| | ) | |
| **Defendants.** | ) | |
| | ) | |
| **v.** | ) | |
| | ) | |
| **WILLIAM L. JONES** | ) | |
| | ) | |
| **Third-Party Defendant.** | ) | |

---

### ORDER GRANTING IN PART, DENYING IN PART COUNTER-DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

---

Before the Court is Counter-Defendants Carbon Processing and Reclamation, LLC, and

CPR Marine, LLC (hereinafter "CPR") and William L. Jones' Motion for Summary Judgment

(D.E. # 129) filed on January 31, 2011.  Counter-Plaintiffs Valero Marketing and Supply Co. and

Valero Refining Co. – Tennessee, LLC's (hereinafter "Valero") have filed a response in

opposition, to which Counter-Defendants have replied.  For the reasons set forth below, the

Motion is **GRANTED IN PART, DENIED IN PART**.

## BACKGROUND

In its Order on the parties' cross-motions for summary judgment, the Court has set out more fully the background facts concerning the parties' negotiation and performance of a term contract for the sale of slurry produced at Valero's Memphis refinery. The following material facts are not in dispute for purposes of this Motion unless otherwise noted.

Regarding purchases of individual loads of slurry, transportation, barge scheduling, product testing, and other matters related to performance, CPR dealt primarily with one of Valero's fuel oil traders, Hal Tryon, and one of Valero's schedulers, Robin Rocha (Counter-Def.'s Statement of Fact ¶ 6, D.E. # 129-3.) Valero adds that Tryon was a trusted employee who exercised authority and discretion on Valero's behalf. (Counter-Pls.' Resp. to Statement of Facts ¶ 6, D.E. # 175.) As for Rocha, Valero adds that she was trusted to act on behalf of Valero in administering Valero's sales to CPR and was accorded considerable authority to direct the loading of barges at the Memphis refinery. (*Id.*) David Olson, and not Tryon nor Rocha, was responsible for the terms of Valero's agreement to sell Memphis slurry to CPR described in the 953 and 954 writings. (Counter-Def.'s Statement of Fact ¶ 7, D.E. # 129-3.)[1] Tryon was responsible for administering sales under the contract and Rocha, whose involvement was much more limited, was responsible for arranging and scheduling transportation/delivery of the slurry after performance began. (*Id.*)

CPR does not deny that, during the time the parties were performing under the agreements, it gave certain gifts, including a rifle and trophies, to Tryon and that Jones took

---

[1] Valero has simply reiterated its response to the previous statement of fact. The Court finds, however, that Valero's asserted facts do not actually dispute the contention that Olson was responsible for the terms of the agreement set out in the writings.

Tryon on several hunting trips, including a safari in South Africa. (*Id.* ¶ 8.) CPR does not deny

that it gave Rocha smaller gifts and that a CPR employee, Brian Hayes, personally loaned Rocha

the sum of $2000, which has not been repaid. (*Id.*) Valero contends that the total amount of the

loan was actually $3500 and adds that Rocha never disclosed the loan to her superiors at Valero.

(Counter-Pls.' Resp. to Statement of Facts ¶ 8, D.E. # 175.)

At no time during CPR's dealings with Valero was CPR or Jones ever provided with a

copy of any written employment agreement of any sort between Valero and either Hal Tryon or

Robin Rocha. (Counter-Def.'s Statement of Fact ¶ 9, D.E. # 129-3.)[2] In fact, there are no

written employment agreements between Valero and Tryon and Rocha. (*Id.* ¶ 10.)[3] While

Valero has internal policies and procedures concerning the acceptance of gifts and items of value

from third parties, these policies and procedures were never provided to CPR or Jones (until they

were produced in this lawsuit during the course of discovery). (*Id.* ¶ 11.) Valero argues that it

did, in fact, provide CPR with a copy of its General Terms and Conditions to sales contracts,

which prohibited vendors from furnishing gifts to Valero employees. (Counter-Pls.' Resp. to

Statement of Facts ¶11, D.E. # 175.)

CPR and Jones understood that it was known at Valero that CPR provided gifts and trips

---

[2] Valero has failed to demonstrate that this fact is disputed for purposes of CPR's Motion. Valero offers a lengthy explanation of how it produced a copy of its General Terms and Conditions for all sales contracts to CPR during the parties' negotiations. Valero then proceeds to explain that its General Terms and Conditions are similar to its Code of Business Conduct for employees in so far as both mention a prohibition on gifts to employees. The Court finds that Valero has not properly disputed CPR's assertion.

[3] Here, despite its circuitous attempt to dispute CPR's previous statement of fact, as discussed in the immediately preceeding footnote, Valero actually admits that it had no written employment agreements with Tryon or Rocha. This admission makes Valero's attempt to dispute the previous statement all the more perplexing.

to Tryon, that Tryon had sought and obtained permission to miss work for any such hunting trips, and that this practice was not prohibited. (Counter-Def.'s Statement of Fact ¶ 12, D.E. # 129-3.)[4] As to hunting specifically, CPR and Jones were aware that many Valero officers and employees went on hunting trips with customers and vendors; indeed, Jones had been on hunting trips with Tryon and other Valero employees well before the deal at issue in this lawsuit. (*Id.* ¶ 13.)[5] CPR also gave gifts to other Valero employees during the relevant period. (*Id.* ¶ 14.) The parties vigorously dispute whether CPR or Jones provided gifts or trips to Tryon and/or Rocha with the intent to have them breach any duty they owed to Valero or to otherwise improperly influence their conduct with respect to Valero. (*Id.* ¶ 15; counter-Pls.' Resp. to Statement of Facts ¶ 15, D.E. # 175.) Valero admits that "there is no specific definition" of the term "significant value or cost" as used in its employee code of conduct. (Counter-Def.'s Statement of Fact ¶ 16, D.E. # 129-3.)

Valero fired Rocha in September 2009 and Tryon in October 2009. (*Id.* ¶ 17.) Valero

---

[4] Valero denies this statement and asserts, "CPR and Jones were well aware of the impropriety of the gifts and trips they provided to Tryon and the payments that were funneled to Rocha," and "CPR carefully hid these gifts and promises of gifts to Tryon from Tryon's superiors." The problem is that Valero's assertions find no support in the record before the Court. Indeed, Valero cites no authority for these statements.

Valero does cite a series of additional facts about the value of the gifts, the unusual nature of the gifts, and the fact that Tryon communicated about his trips on his personal email, and not his business email. None of these facts, however, refutes the statement about Jones's belief that Valero management knew about Tryon's hunting trips and had approved them.

[5] Valero offers many of the same facts in response to this statement that it offered in response to the previous statement, ¶ 12. Once again the Court finds that Valero has not actually disputed the facts asserted with citations to the evidence: (1) that "many Valero officers and employees went on hunting trips with customers and vendors;" and (2) "Jones had been on hunting trips with Tryon and other Valero employees well before the deal at issue in this lawsuit was agreed to."

asserts that Rocha actually resigned rather than be terminated. (Counter-Pls.' Resp. to Statement of Facts ¶ 17, D.E. # 175.) Both Tryon and Rocha were terminated because they accepted gifts from CPR. (*Id.*) To CPR's knowledge, Valero has not filed any lawsuit or any other claim of any sort against either Tryon or Rocha. (*Id.*) Valero's Rule 30(b)(6) representative Lori Francis, an associate trader, testified in her personal capacity that Tryon had openly discussed his South African hunting trip in the presence of other Valero employees. (*Id.* ¶ 18.)[6]

The parties vigorously dispute whether Tryon gave CPR excessive discounts or whether the discounts were based on the specifications of the particular loads of slurry, especially the specifications as to the amount of various metals, viscosity, flash point, and otherwise. CPR maintains that each load of Valero slurry on which Tryon gave CPR a discount was slurry that did not conform to the product specifications set forth in the 953 and 954 writings. (*Id.* ¶ 19.)[7] Valero points out that Tryon actually stated in his deposition that the discounts "were pretty big" and "excessive." (Counter-Pls.' Resp. to Statement of Facts ¶ 19, D.E. # 175.) Valero adds that under industry practice, discounts based on quality specifications are limited to instances where a purchaser of slurry suffers an economic loss on a third-party sale. (*Id.*) For most loads Valero sold CPR, the parties paid for third-party testing at or immediately following each sale, and those

_____

[6] Valero offers many of the same facts in response to this statement that it offered in response to Statements ¶¶ 12 and 13. Once again the Court finds that Valero has not actually cited any evidence to dispute the fact asserted, namely, that Tryon openly talked about his South Africa hunting trip with Valero colleagues.

[7] In support of this assertion, CPR has prepared a spreadsheet identifying contractual specifications alongside the specifications of each individual load on which CPR and Valero, through Tryon, agreed to a discount. The source documents for the spreadsheet – i.e., the individual Reports of Analysis of each load prepared by the testing company and the contractual specifications – are appended to the spreadsheet at Ex. 29 to CPR's Statement of Facts.

tests showed the "metals" in the slurry were significantly higher than the specifications to which the parties had agreed. (Counter-Def.'s Statement of Fact ¶ 20, D.E. # 129-3.)[8]  Valero argues that quality specifications in the 953 writing were typical, rather than guaranteed. (Counter-Pls.' Resp. to Statement of Facts ¶ 20, D.E. # 175.)

In October 2008, Tryon's supervisors Stanich and Olson, relieved Tryon of his duty to decide price discounts on CPR loads. (*Id.* ¶ 26.)  Valero adds that Stanich first noticed "irregularities" in Valero's heavy oil profits and losses. Thereafter Stanich and Olson personally approved all discounts to CPR. (*Id.*)  After October 2008, Stanich and Olson "consulted" with Tryon and each other on market conditions in deciding whether a discount to CPR was appropriate. (*Id.* ¶ 27.)  Stanich and Olson had no formula for calculating the discount and instead considered various factors, including the high metal content in numerous loads. (*Id.*)[9] According to CPR, many of the post-October 2008 discounts authorized by Stanich and Olson were as great as or even greater than those agreed to by Tryon. (*Id.* ¶ 28.)  Valero responds that the post-October 2008 discounts reflected an appropriate application of industry practice by granting discounts for quality specifications only where a purchaser of slurry suffers an economic loss on a sale to a third party. (Counter-Pls.' Resp. to Statement of Facts ¶ 28, D.E. #

---

[8] Tests are routinely performed on slurry incident to its sale. (Counter-Def.'s Statement of Fact ¶ 21, D.E. # 129-3.)  CPR has offered the testimony of Tom Nichols, a fuel oil broker, stating that the factors that make up the market price for slurry include, quality, api, sulfur content, viscosity, and amounts of "metals," notably aluminum and silicon. (*Id.*)  A lower sulfur content and lower amounts of metals command a higher price. (*Id.*)  Simply stated, the specifications of the product must be known to market the slurry effectively, and the better the specifications, the higher the price in the market. (*Id.*)

[9] Valero does not actually dispute CPR's characterization of the deposition testimony but instead emphasizes that the video and transcript of the deposition testimony might lead a jury to draw different inferences.

175.)  At his deposition, Olson could not recall whether he had ever gone back to look at market conditions to determine whether any particular discount agreed to by Tryon was appropriate. (Counter-Def.'s Statement of Fact ¶ 29, D.E. # 129-3.)  Valero adds that Olson did conclude that the discounts Tryon granted "were greater than what he would expect" and "beyond [Tryon's] authority."  (Counter-Pls.' Resp. to Statement of Facts ¶ 29, D.E. # 175.)

Valero's calculation of the entirety of its damages on its Counterclaim is contained in the expert report of Joseph Egan.  (Counter-Def.'s Statement of Fact ¶ 30, D.E. # 129-3.)  Valero's Rule 30(b)(6) witness stated that "Valero is seeking the amount stated in Joseph Egan's report for each counterclaim, for each count."  (*Id.*)[10]  In his expert report, Egan does not distinguish between any of the five separate, individual counts of the Counterclaim in calculating the damages Valero allegedly sustained, nor does he even mention Rocha.  (*Id.* ¶ 31.)

Valero takes the position that all of the discounts agreed to by Tryon and CPR were "excessive" and that its damages on its counterclaims are the total amount of those "excessive" discounts.  (*Id.* ¶ 33.)  Valero states that it suffered approximately $1.98 million in lost profits as a result of the excessive discounts Tryon granted CPR.  (Counter-Pls.' Resp. to Statement of Facts ¶ 33, D.E. # 175.)  Egan's report identifies each and every discount granted by Tryon to CPR between March 2008 and October 2008, as "excessive and unauthorized."  (*Id.* ¶ 34.)[11] Those discounts are listed individually on pages 5 and 6 of the Egan report.  (*Id.*)  Valero cannot state what the proper or acceptable market price for slurry was on any of the dates on which

---

[10] Valero adds that it is seeking punitive damages and "any damages awarded by a judge or jury."

[11] Valero objects that CPR's characterization of Egan's report is not an undisputed fact and that a jury will be able to draw its own inferences from Egan's testimony at trial.

Tryon granted CPR discounts.  (*Id.* ¶ 35.)[12]  Valero does not keep or have access to historical data concerning market prices and cannot tell what the appropriate market price was for any particular quantity or quality of slurry on any particular day in the past.  (*Id.* ¶ 36.)[13]  Valero does not retain data relating to any "economic losses" suffered by companies purchasing slurry from it related to the quality of the slurry.  (*Id.* ¶ 37.)

Egan admits that he cannot exclude the possibility that some pre-October 2008 discounts were, in fact, justified by the quality of the slurry or the fact that it did not conform to specifications.  (*Id.* ¶ 39.)  Valero asserts that "Egan's analysis sought to determine whether the excessive discounts that CPR received from Tryon from October 2008 to March 2008 [sic] were required in order for the slurry to be sold in the marketplace."  (Counter-Pls.' Resp. to Statement of Fact ¶ 39, D.E. # 175.)  Egan's report does not address the existence of some – or any – causal link between the gifts or trips and any damage to Valero in the form of discounts.  (Counter-Def.'s Statement of Fact ¶ 40, D.E. # 129-3.)  Instead, he merely concludes that the discounts Tryon provided were "not marketplace-related."  (*Id.*)  Valero admits that Egan was not asked to determine whether the gifts or trips Tryon received caused him to give CPR excessive discounts.  (Counter-Pls.' Resp. to Statement of Fact ¶ 40, D.E. # 175.)

Valero alleges that for her part Rocha shared "confidential Valero information relating to slurry, barges and other information" and previously suggested in its Rule 26 disclosures that Rocha

---

[12] Valero denies CPR's statement here and responds that the appropriate market price for slurry on any particular day was the price a trader could sell the slurry to a third party.  It does not appear to the Court that Valero's statement is actually responsive to the statement of fact.

[13] Valero offers the same response to this statement as it did to the previous statement of fact.

had some effect on demurrage. (*Id.* ¶ 41.) Egan's report, on which Valero relies exclusively for its damages calculation, does not separate damages on a claim-by-claim basis, even though two of the five counts of the Counterclaim relate only to Rocha – and have nothing whatsoever to do with any discounts agreed to by Tryon. (*Id.* ¶ 42.)

In its Counterclaim and Third-party Complaint, Valero has alleged that CPR is liable as a joint tortfeasor with Tryon and Rocha for breach of fiduciary duty, tortious interference with contractual relationships, and breach of contract. In Count I, Valero contends that Tryon breached his fiduciary duty to Valero by accepting gifts from CPR and/or Jones without disclosing them to Valero. In Count II, Valero alleges that Rocha breached her fiduciary duty to Valero by accepting cash gifts from a CPR employee without disclosing them to Valero. With respect to both of these counts, Valero alleges that CPR and/or Jones knowingly participated in the breach of fiduciary duty and is liable as a joint tortfeasor. Tryon and Rocha are not named as parties in these pleadings. In Count III, CPR alleges that CPR and/or Jones tortiously interfered with Tryon's employment contract with Valero by knowingly providing Tryon with gifts in violation of his employment agreement. In Count IV, Valero alleges a substantially similar claim against CPR for the cash gifts a CPR employee provided to Rocha. However, in its response in opposition to CPR's Motion for Summary Judgment, Valero concedes that it cannot establish this claim. Finally, Valero alleges in Count V of its Counterclaim and Third-party Complaint that CPR breached the terms of the parties' contract for the sale of Memphis slurry[14] by offering Valero employees gifts.

---

[14] Specifically, Valero has alleged that each load of slurry sold to CPR in 2008 and 2009 was a spot sale. The parties exchanged a "deal sheet" and a sales contract confirmation for each load. Countercl. ¶¶ 171-73. Valero contends that each transaction included an implied covenant of good faith and fair dealing. *Id.* ¶¶ 175-76. By giving Tryon and Rocha gifts, CPR breached this implied covenant. *Id.* ¶ 177. In the alternative, Valero pleads that if the Court finds that a

## **STANDARD OF REVIEW**

Federal Rule of Civil Procedure 56(a) provides that "[t]he court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.[15]  In reviewing a motion for summary judgment, the evidence must be viewed in the light most favorable to the nonmoving party.[16]  When the motion is supported by documentary proof such as depositions and affidavits, the nonmoving party may not rest on his pleadings but, rather, must present some "specific facts showing that there is a genuine issue for trial."[17]  It is not sufficient "simply [to] show that there is some metaphysical doubt as to the material facts."[18]  These facts must be more than a scintilla of evidence and must meet the standard of whether a reasonable juror could find by a preponderance of the evidence that the nonmoving party is entitled to a verdict.[19]  When determining if summary judgment is appropriate, the Court should ask "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-side that one party must prevail as a matter of law."[20]

---

contract existed between Valero and CPR, CPR breached the terms of the contract by providing these gifts.  *Id.* ¶¶ 179-83.

[15] Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Canderm Pharmacal, Ltd. v. Elder Pharms, Inc.*, 862 F.2d 597, 601 (6th Cir. 1988).

[16] *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986).

[17] *Celotex*, 477 U.S. at 324.

[18] *Matsushita*, 475 U.S. at 586.

[19] *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 252 (1986).

[20] *Id*. at 251-52.

Summary judgment must be entered "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial."[21]  In this Circuit, "this requires the nonmoving party to 'put up or shut up' [on] the critical issues of [her] asserted causes of action."[22]  Finally, the "judge may not make credibility determinations or weigh the evidence."[23]

## ANALYSIS

### I.    Choice of Law

A federal court sitting in diversity applies the law of the forum state, including the forum's choice-of-law rules.[24]  Tennessee has adopted the "most significant relationship" test of the Restatement (Second) of Conflict of Laws to choice-of-law questions for tort claims such as Valero's claims for breach of fiduciary duty and tortious interference with a contractual relationship.[25]  Under this approach, "the law of the state where the injury occurred will be applied unless some other state has a more significant relationship to the litigation."[26]  The Restatement's most significant relationship test "provides a 'default' rule whereby trial courts can apply the law of the place where the injury occurred when each state has an almost equal

---

[21] *Celotex*, 477 U.S. at 322.

[22] *Lord v. Saratoga Capital, Inc.*, 920 F. Supp. 840, 847 (W.D. Tenn. 1995) (citing *Street v. J.C. Bradford & Co.*, 886 F.2d 1472, 1478 (6th Cir. 1989)).

[23] *Adams v. Metiva*, 31 F.3d 375, 379 (6th Cir. 1994).

[24] *Montgomery v. Wyeth*, 580 F.3d 455, 459 (6th Cir. 2009).

[25] *Montgomery*, 580 F.3d at 459 (citing *Hataway v. McKinley,* 830 S.W.2d 53, 59 (Tenn. 1992)).

[26] *Hataway*, 830 S.W.2d at 59 (citing Restatement (Second) of Conflict of Laws § 145 (1971)).

relationship to the litigation."[27]  The Tennessee Supreme Court has concluded that "generally the law of the state where the injury occurred will have the most significant relationship to the litigation."[28]

Applying Tennessee's most significant relationship test, the Court holds that Texas law governs Valero's claims concerning its former employees.  The Court finds that the injuries flowing from the alleged breaches of fiduciary duty and tortious interference with a contractual relationship occurred in the state of Texas.  Both Tryon and Rocha were employed by Valero in the state of Texas, and all of the acts upon which Valero's claims are based appear to have occurred in Texas.  These acts allegedly resulted in economic losses to Valero, a company with its principal place of business in Texas.  For these reasons, the Court concludes that the state of Texas has the most significant relationship to these claims.  Additionally, both parties have cited extensively to the law of the state of Texas and conceded that Texas law should govern these claims.  Therefore, the Court will apply Texas law to Valero's claims for breach of fiduciary duty and tortious interference with a contractual relationship.

## II.     Breach of Fiduciary Duty

### A.     The Parties' Arguments

In its Motion for Summary Judgment on Valero's Counterclaim, CPR argues that it is entitled to judgment as a matter of law on Valero's breach of fiduciary duty claims.  CPR asserts that Valero cannot prove several elements of these claims.  Neither Tryon nor Rocha owed

---

[27] *Id.*

[28] *Id.*

Valero a fiduciary duty because they did not occupy a position of special trust or confidence. Neither CPR nor Jones knowingly participated in a breach of fiduciary duty because these parties had no knowledge of Valero's Code of Business Conduct and Ethics prohibiting employees from accepting gifts from vendors like CPR. CPR argues that Valero has failed to adduce evidence of a causal connection between CPR's furnishing gifts to Tryon and Rocha and any damages suffered by Valero. While it is true that Tryon granted CPR discounts on slurry sales, Valero took away Tryon's authority to grant the discounts in October 2008. According to CPR, Stanich and Olson continued to give CPR discounts as great or greater than the discounts Tryon had given before October 2008. Valero also cannot prove what a fair market price for a given load of slurry on a date certain would have been. In the absence of such evidence, Valero cannot establish that any discount was excessive. Therefore, CPR argues that it is entitled to summary judgment on Valero's breach of fiduciary duty claims.

In its response in opposition to CPR's Motion, Valero argues that it can adduce evidence in support of its breach of fiduciary duty claims. Both Tryon and Rocha owed Valero a fiduciary duty because each employee was granted discretion over Valero business and generally expected to act in the best interests of Valero. Both Tryon and Rocha breached their respective fiduciary duties to Valero by accepting gifts in violation of their employment agreements. Valero also cites evidence that after Valero terminated her, Rocha breached her duty by meeting with Jones and Hayes and disclosing privileged information about the lawsuit between CPR and Valero.[29] Valero argues that CPR and/or Jones's knowingly participated in each employee's breach of

---

[29] Apparently, Jones recorded the conversations with Rocha without Rocha's knowledge. Rocha Tr. 132:9-25. Rocha testified at her deposition that she gave CPR this information with the intent to assist CPR in the suit.

fiduciary duty. CPR and/or Jones are charged with knowledge of the general fiduciary duty arising from the employer-employee relationship. Valero denies that the fiduciary duties of Tryon and Rocha were special fiduciary duties, about which CPR and/or Jones could not have known. Valero asserts that it has proof that Tryon granted CPR excessive discounts in the amount of $1.98 million. Therefore, Valero believes that it has adduced enough evidence to survive summary judgment on these claims.

**B.     Law**

Under Texas law, a plaintiff alleging a breach of fiduciary duty must prove (1) a fiduciary relationship between itself and another party; (2) the other party's breach of his fiduciary duty to the plaintiff; and (3) injury to the plaintiff or benefit to the other party as a result of the breach of duty.[30] The first element, the existence of a fiduciary relationship, is a question of law.[31] Texas defines a "fiduciary" as "any person who occupies a position of peculiar confidence towards another."[32] "Fiduciary duties are imposed on parties to certain relationships based on the special nature of the relationships."[33] One such special relationship giving rise to a fiduciary duty is an agency relationship.[34] The Texas Supreme Court has explained that "[t]he agreement to act on behalf of the principal causes the agent to be a

---

[30] *Navigant Consulting, Inc. v. Wilkinson,* 508 F.3d 277, 283 (5th Cir. 2007) (citing *Jones v. Blume,* 196 S.W.3d 440, 447 (Tex. App. 2006)).

[31] *Nat'l Plan Adm'rs, Inc., v. Nat'l Health Ins. Co.*, 235 S.W.3d 695, 700 (Tex. 2007).

[32] *Kinzbach Tool Co. v. Corbett-Wallace Corp.*, 160 S.W.2d 509, 512 (Tex. 1942).

[33] *Nat'l Plan Adm'rs*, 235 S.W.3d at 700 (citation omitted).

[34] *Abetter Trucking Co. v. Arizpe,* 113 S.W.3d 503, 510 (Tex. App. 2003).

fiduciary, that is, a person having a duty, created by his undertaking, to act primarily for the benefit of another in matters connected with his undertaking."[35]  Although employees are not *ipso facto* fiduciaries of their employers,[36] an employee who acts as his or her employer's agent "has a duty to deal openly with the employer and to fully disclose to the employer information about matters affecting the company's business."[37]  For example, a fiduciary charged with negotiating on behalf of his employer "must disclose any adverse interest in the matter of the negotiation."[38]  Therefore, a court must determine the nature of an employee's fiduciary duty by considering "all aspects of the relationship" between the employer and the employee.[39]

The second element of this claim, the breach of the duty, is a question of fact for the jury.[40]  Likewise, the third element, an injury caused by the breach, is a fact question.[41]  Proximate cause consists of two elements, foreseeability and cause in fact.[42]  A plaintiff cannot establish proximate cause "by mere guess or conjecture" but only "by evidence of probable

---

[35] *Johnson v. Brewer & Pritchard, P.C.,* 73 S.W.3d 193, 200 (Tex. 2002) (quoting Restatement (Second) of Agency § 13, cmt. a (1958)).

[36] *Id.* at 201.

[37] *Abetter,* 113 S.W.3d at 510.

[38] *Navigant Consulting*, 508 F.3d at 285 (citations omitted).

[39] *Nat'l Plan Adm'rs*, 235 S.W.3d at 700.

[40] *Navigant Consulting*, 508 F.3d at 285-86.

[41] *See id.* at 289.

[42] *McClure v. Allied Stores of Tex., Inc.,* 608 S.W.2d 901, 903 (Tex. 1980); *see also Baker Botts, L.L.P. v. Cailloux,* 224 S.W.3d 723, 734 (Tex. Ct. App. 2007).

force."[43]  "There need not, however, be direct and positive proof, as the jury may infer proximate cause from the circumstances surrounding the event."[44]

Furthermore, where a third party knowingly participates in the breach of duty of a fiduciary, the third party becomes liable as a joint tortfeasor with the fiduciary.[45]  In this case Valero has alleged that CPR and Jones knowingly participated in breaches of fiduciary duty committed by Tryon and Rocha.  A plaintiff alleging participation in the breach of a fiduciary duty must show that the third party knowingly participated in the breach.[46]

Viewing the evidence in the light most favorable to Valero, the Court holds that Valero cannot make out its claim against CPR and/or Jones for participation in a breach of fiduciary duty.  The Court will analyze Valero's breach of fiduciary duty claims as to Tryon and Rocha separately.

### 1.  Hal Tryon

The Court holds that Hal Tryon owed Valero a fiduciary duty to act in the best interests of Valero at all times in his dealings with CPR.  Tryon was part of a team of Valero employees who negotiated the term contract for the sale of slurry with CPR.  Once the parties commenced performance of the contract, Tryon acted as agent for Valero in administering the slurry contract

---

[43] *McClure*, 608 S.W.2d at 903.

[44] *Mosley v. Excel Corp.,* 109 F.3d 1006, 1009 (5th Cir. 1997) (quoting *B.M. & R. Interests v. Snyder,* 453 S.W.2d 360, 363 (Tex. Ct. App. 1970) (internal quotations marks omitted); *see also Havner v. E-Z Mart Stores, Inc.,* 825 S.W.2d 456, 459 (Tex. 1992) ("[C]ircumstantial evidence and inferences therefrom are a sufficient basis for a finding of causation.").

[45] *Kinzbach Tool*, 160 S.W.2d at 514.

[46] *Cox Tex. Newspapers, L.P. v. Wootten,* 59 S.W.3d 717, 722 (Tex. Ct. App. 2001).

with CPR. As part of his routine dealings with CPR, Tryon had authority to negotiate price discounts on each load of slurry CPR purchased between March 2008 and October 2008. According to Valero, Tryon exercised his discretion to give CPR $1.98 million in discounts on the slurry CPR bought during that time frame. As Valero's agent with respect to the CPR sales, Tryon had a fiduciary duty to act solely in the best interests of Valero. This included a duty to grant only those discounts that were in Valero's best interests.

Another aspect of Tryon's fiduciary duty to Valero was an obligation to disclose any interests he had adverse to Valero, including the fact that he accepted gifts from Jones. Valero has alleged that Tryon gave CPR discounts in return for the various gifts CPR and/or Jones gave Tryon. While there is evidence that CPR openly provided gifts to other Valero employees, there is also evidence that CPR and/or Jones provided Tryon with valuable gifts during the relevant time period. For example, Tryon accompanied Jones on a series of hunting trips, including a trip to Alaska for a bear hunt in May 2008.[47] Jones also paid for Tryon's trophies from various hunts and purchased a hunting rifle for Tryon valued at over $5,000. Valero's Code of Business Ethics and Conduct prohibited employees like Tryon from accepting gifts of "significant value" from vendors like CPR. Jones admitted in his deposition that the gifts he gave Tryon had "significant value." Based on this record, the Court holds that at a minimum Tryon had a duty to disclose all gifts to his superiors at Valero. Therefore, the Court concludes that Tryon had a fiduciary duty, and this duty required, among other things, that Tryon grant only price discounts that were in Valero's best interests and that Tryon disclose the gifts he received from CPR and/or Jones.

As for the second element of the claim, the Court finds that Valero has adduced evidence

---

[47] Tryon Dep. Nov. 18, 2010, 95:25-96:15.

from which a reasonable juror could find that Tryon breached his duty. Valero has shown that in industry practice, quality-related discounts are given only where the purchaser suffers a loss on the sale of the product to a third party. There is evidence that Tryon agreed to discounts in transactions where CPR was able to sell slurry between March 2008 and October 2008 at prices "significantly higher than CPR's purchase price."[48]

There is also evidence that Tryon failed to disclose all of the gifts he received from Jones. During the time period when the parties were negotiating a term contract, Tryon received permission to attend a hunting trip with Jones in November 2007.[49] However, Tryon did not disclose that the trip involved alligator hunting in Florida.[50] With respect to the bear hunt in May 2008, Tryon did not disclose the actual details of the hunt and instead told Olson that it was a fishing trip to Alaska. Tryon testified that he did not reveal the true nature of the trip because he did not "want to run the chance that it would get turned down."[51] In July 2008, Tryon returned to Florida on a hunting trip with his son and Jones; however, Tryon did not disclose this trip at all and took the day off as a sick day.[52] In late September and early October 2008, Tryon went on safari with Jones to South Africa. For that trip Tryon simply asked to take vacation time and

---

[48] Egan Aff. ¶ 11, D.E. # 173-9. In his deposition, Egan further describes that CPR was able to sell the Memphis slurry "at premium 3% No. 6 Fuel Oil benchmark." The Court notes that the parties do not further define the phrase "at premium 3% No. 6 Fuel Oil benchmark." The implication is that between March 2008 and October 2008, CPR sold slurry to third parties at a profit, suggesting that discounts were unnecessary.

[49] Tryon Dep. 66:15-25; 78:18-79:14.

[50] *Id.* at 79:15-17.

[51] *Id.* at 96:25-97:10.

[52] *Id.* at 110:9-25.

did not disclose the nature of his plans "[b]ecause I wanted to go" and "I didn't want to take a chance."[53] A reasonable juror might conclude that Tryon's agreement to discount the slurry in conjunction with his failure to disclose his trips and the details of his plans was a breach of his duty to Valero. Therefore, the Court holds that Valero has established these two elements of its breach of fiduciary duty claim as to Tryon.

As for the third element of this claim, the parties hotly dispute whether there was a causal relationship between the discounts Tryon gave CPR and his receipt of the gifts from Jones. CPR contends that the discounts were based on the quality specifications of the slurry while Valero argues that there is enough evidence to create an inference of causation between the gifts and the discounts. Of course, causation is a question of fact for a jury. Nevertheless, the Court need not reach the issue here.

Even if Valero could show that it suffered damages as a result of Tryon's breach of duty, the Court holds that Valero has failed to show that CPR and Jones knowingly participated in Tryon's alleged breach of fiduciary duty. Under Texas law, Valero has the burden to come forward with evidence that CPR and Jones knowingly induced Tryon to breach his duty to disclose the gifts in exchange for discounts on slurry. Valero has argued that CPR and/or Jones were on notice that gifts of the kind Tryon received were prohibited under Valero's Code of Business Conduct and Ethics. Thus, Jones should have known that he was participating in a breach of Tryon's fiduciary duty to Valero when he induced Tryon to accept gifts. However, there is no evidence that CPR or Jones ever knew about the Code or its requirements. Valero concedes as much in its brief. Valero argues not that Jones had actual knowledge of the Code,

---

[53] *Id.* at 128:4-8.

only that the Code was substantially similar to Valero's General Terms and Conditions. Valero provided CPR (and Jones) with a copy of the General Terms and Conditions during the parties' negotiations. Valero's argument is not persuasive.

The Court finds that Valero has failed to account for important distinctions between the two policies. The General Terms and Conditions imposed a contractual duty binding the parties to the contract, CPR and Valero. The General Terms and Conditions flatly stated, "No director, officer, employee or agent of either party shall give or receive any commission, fee, rebate, gift or entertainment of significant value or cost in connection with this Agreement."[54] The Code of Business Conduct and Ethics, on the other hand, created an ethical duty binding employees of Valero, including Tryon. The Code did not prohibit employees from receiving gifts outright. The Code provided guidelines specifically for invitations to "golfing, hunting, fishing, or other entertainment excursions" and required that all such trips first be approved by an appropriate supervisor.[55] The Court finds that the two policies set forth different (arguably inconsistent) standards on gifts and entertainment and applied in different ways. Under the circumstances, it was the Code of Business Ethics that gave rise to Tryon's fiduciary duty to disclose the trips to Valero, and not the General Terms and Conditions, which were part of the parties' contract. The Court holds then that Valero has failed to show that the General Terms and Conditions should have put CPR and Jones on notice of Tryon's fiduciary duties about receiving gifts. Without knowledge (actual or constructive) of the terms of the Code of Business Ethics, CPR and Jones could not have knowingly participated in Tryon's breach of his fiduciary duty.

---

[54] General Terms & Conditions ¶ 23.

[55] Code of Business Conduct & Ethics, Art. IV.

Additionally, despite the broad prohibition on gifts or entertainment of "significant value" in the Terms and Conditions, there is evidence that Valero employees frequently accepted gifts from vendors like CPR as long as employees first disclosed the gift and then obtained permission from a supervisor. For instance, Tryon testified in his deposition that he had followed this procedure when Jones invited him on a hunting trip to South Dakota.[56] At some point after the trip, Tryon began to conceal from his supervisor the gifts and trips provided by Jones. While a reasonable juror might conclude from this evidence that Tryon breached his duty to disclose the gifts, there is no evidence that CPR or Jones induced Tryon to conceal the trips. On the contrary, Tryon denied that Jones ever instructed him to keep the trips secret. Tryon testified, "I don't think Mr. Jones really cared."[57] Tryon also stated that he asked Jones to communicate with him about their trips via Tryon's personal email (as opposed to his Valero account) "[p]robably because I deemed that more personal than business."[58] Tryon repeatedly stated that he did not disclose the trips to his supervisors because he wanted to take the trips and he feared that they would not approve. There is simply no evidence from which a jury could infer that Jones improperly asked or directed Tryon to conceal the trips in violation of a fiduciary duty. Therefore, the Court concludes that CPR and Jones are entitled to summary judgment on Valero's claim for participation in Tryon's breach of fiduciary duty.

### 2. Robin Rocha

The Court holds that CPR is likewise entitled to judgment as a matter of law on Valero's

---

[56] Tryon Dep. 66:10-21.

[57] *Id.* at 83:2-4.

[58] *Id.* at 76:5-77:5.

claim for participation in Robin Rocha's breach of fiduciary duty.  First, the Court concludes that Robin Rocha in her capacity as a scheduler did not owe Valero a fiduciary duty.  In its briefing Valero has cited very little record evidence about Rocha's job duties and responsibilities.  Rocha testified in her deposition that as a scheduler she worked with the refinery and the vendors to schedule deliveries of the product.[59]  Valero has described Rocha's job as one with "considerable authority to direct the loading of barges at the Memphis refinery."[60]  For example, Rocha testified that the refinery would always follow the orders she sent from the corporate office on whether the load would be active or static, a factor affecting the quality specifications of the product.[61]  However, Rocha's  testimony on this issue does not support Valero's characterization that Rocha had "considerable authority" over the manner of loading the product.  Rocha actually testified that the type of loading depended on a number of factors including the quantities of product the refinery had available as well as input from Tryon and consent from CPR.[62]  Based on the record before the Court, the Court holds that Rocha did not owe Valero a fiduciary duty in her capacity as a scheduler.

Valero has also argued that Rocha had a duty not to disclose confidential information about her employment with Valero even after Valero terminated her employment.  More

_____

[59] Rocha Dep., Feb. 1, 2011, 26:6-10.

[60] Counterpls.' Resp. in Opp'n, 12 (citing Rocha Dep. 31:11-18).

[61] Rocha Dep. 31:16-32:24.  Rocha explained that loading static meant "loading out of a tank that hasn't been touched" and loading active meant "pumping something into the tank and there's movement and you're pumping out of the tank at the same time."  *Id.* at 29:23-30:7.  The Court infers that active loading affected the quality specifications of the product, an issue relevant to the discounts Tryon granted CPR.  *Id.* at 30:19-31:5.

[62] *Id.* at 30:12-31:5.

specifically, prior to her termination Rocha was interviewed by an attorney for Valero. Rocha admitted that she later met with Jones and another CPR employee Brian Hayes and disclosed to Jones and Hayes the subject matter of the communications she had with Valero's attorney. There is also evidence that Jones recorded Rocha's statements at the meeting without Rocha's knowledge. CPR denies that the confidentiality of the communications imposed on Rocha a duty not to disclose. Neither party has cited authority for their respective positions. Under Texas law, some informal, confidential relationships give rise to fiduciary duty, and the existence of such a duty is a question of fact.[63] Therefore, the Court could not rule as a matter of law on the issue of whether Rocha owed Valero a fiduciary duty not disclose the confidential communications under the circumstances.

Even if a jury could find that Rocha owed such a duty, Valero has failed to show how Rocha's disclosures damaged its interests. On the question of damages, Valero has admitted in its brief that it has no evidence that Rocha's conduct resulted in economic damages.[64] Nevertheless, Valero asserts that its breach of fiduciary duty claim "does not require a showing of economic harm"[65] and that it is "entitled to recover the amount of any wrongful benefit that . . . Rocha received from CPR."[66] There is proof that Rocha received $3,500 in cash from Hayes as

---

[63] *Crim Truck & Tractor Co. v. Navistar Intern. Transp. Corp.*, 823 S.W. 2d 591, 594 (Tenn. 1992) (superseded by statute on other grounds).

[64] Counterpls.' Resp. in Opp'n 23 n.5. Valero made this statement in conceding its claim of tortious interference with a contractual relationship as to Rocha.

[65] *Id.*

[66] *Id.* at 22 (citing *Kinzbach Tool*, 160 S.W.2d at 514) ("A fiduciary cannot say to the one to whom he bears such [a] relationship: You have sustained no loss by my misconduct in receiving a commission from a party opposite to you" and the fiduciary "must account to his principal for all he received").

well as other gifts while she was still employed as a scheduler at Valero.  However, Valero ignores the fact that its Counterclaim seeks actual damages from Rocha's alleged breach of duty, not disgorgement of Rocha's improper gain.  Valero's Counterclaim demands actual damages in excess of $75,000 as well as punitive damages.[67]  In light of the fact that Valero has conceded its inability to prove actual economic damages and otherwise failed to plead any other form of damages, CPR is entitled to summary judgment on Valero's claim for participation in Rocha's alleged breach.  Therefore, CPR's Motion is **GRANTED** as to this claim.

## III.    Tortious Interference with Contractual Relationship

## A.    The Parties' Arguments

CPR next attacks Valero's claim for tortious interference with a contractual relationship. CPR contends that Valero cannot prove this claim because there is no evidence that CPR and/or Jones knowingly induced Tryon to breach his employment agreement with Valero.  Jones states in an affidavit that he was unaware that the gifts to Tryon and Rocha were prohibited by their employment agreements.  CPR further argues, just as it did on Valero's breach of fiduciary duty claims, that Valero cannot prove that the alleged tortious acts proximately caused Valero's damages.  Therefore, the Court should grant CPR summary judgment on this claim.

Valero argues in response that it can establish all of the elements of its tortious interference with contractual relationships claims against CPR and Jones.[68]  According to Valero,

---

[67] Valero's Answer & Countercl. ¶ 147.  Valero has not sought leave to amend its pleadings.

[68] Valero has consented to the dismissal of its tortious interference claim with respect to Rocha.  Counterpls.' Resp. in Opp'n 23 n.5.

Tryon's acceptance of gifts from CPR violated the terms of Tryon's employment contract. CPR had reason to know of the terms of Tryon's employment because CPR knew about Valero's General Terms and Conditions, a copy of which was provided to CPR during the parties' negotiations of their term contract. The General Terms and Conditions included a prohibition on either party giving gifts to the other party's officers or employees. Valero argues that its General Terms and Conditions "essentially incorporates" its Code of Business Conduct and Ethics, which prohibits Valero employees from accepting gifts from vendors. Thus, CPR and Jones had notice that providing gifts to Valero employees was prohibited. Alternatively, Valero argues that the General Terms and Conditions put CPR and Jones on notice that loyalty to Valero was a condition of Tryon's employment.

As for the damages, Valero reiterates that the gifts to Tryon were the proximate cause of $1.98 million in excessive discounts Tryon gave CPR. Valero asserts that there is evidence that the discounts were "excessive" and that the gifts Tryon received were "unusual" by industry standards, thereby creating an inference of causation. Valero has proffered the expert analysis of Joseph Egan who has opined that the discounts Tryon authorized "were above and beyond what the marketplace . . . required." Any comparison of the discounts Tryon approved prior to October 2008 and the discounts Stanich and Olson approved after October 2008 must account for all of the market-based factors that would affect the discount. Finally, Valero contends that a jury could infer CPR's intent to interfere from circumstantial evidence. CPR provided valuable gifts to Tryon including an African safari, a hunting rifle valued at more than $5,000, and several other hunting excursions. The timing of some gifts coincided with discounts Tryon approved. And yet CPR never disclosed to Valero any of the gifts Tryon received, even when some of the

trips occurred within a short period of time before a meeting between the parties. Moreover, Jones communicated with Tryon about their trips via Tryon's personal email. Based on this record, Valero argues that summary judgment on its tortious interference claim would be inappropriate.

**B.      Law**

A party alleging tortious interference must prove four elements to sustain its claim: (1) that a contract subject to interference existed; (2) that the alleged act of interference was willful and intentional; (3) that the willful and intentional act proximately caused damage; and (4) that actual damage or loss occurred.[69] An at-will employment agreement can be the subject of a claim of tortious interference under Texas law.[70] A plaintiff must prove that the interfering party had knowledge of the contract and of the fact that he was interfering with the performance of the contract.[71] In order to recover on such a claim, a plaintiff must prove that the interfering party acted willfully and intentionally to induce a contracting party to breach its duties.[72] Under Texas law, a willful act must be more than simple participation in some act with a breaching party; there must be evidence that the interfering party acted with the knowledge or belief that interference with a contract would result from his actions.[73] Finally, causation in a tortious interference case is "but for" causation, meaning that the act was a substantial factor in causing

---

[69] *ACS Investors, Inc. v. McLaughlin*, 943 S.W.2d 426, 430 (Tex. 1997).

[70] *Sterner v. Marathon Oil Co.,* 767 S.W.2d 686, 688 (Tex. 1989).

[71] *Mark III Sys., Inc. v. Sysco Corp.*, No. 01-05-00488-CV, 2007 WL 529960, at *5 (Tex. Ct. App. Feb. 22, 2007) (citing Restatement (Second) of Torts § 766 cmt. i).

[72] *Browning-Ferris, Inc. v. Reyna,* 865 S.W.2d 925, 927 (Tex. 1993).

[73] *Sw. Bell Tel. Co. v. John Carlo Tex., Inc.,* 843 S.W.2d 470, 472 (Tex. 1992).

the injury "without which the harm would not have occurred."[74]

C.    **Tortious Interference with Tryon's Employment Contract**

The Court holds that Valero has failed to present evidence to establish all of the elements of its claim for tortious interference with its contractual relationship with Hal Tryon.  Therefore, CPR is entitled to judgment as a matter of law on this claim.  First, it is undisputed that Tryon and Valero had an employment contract subject to interference.   Tryon apparently was an at-will employee at Valero, and among the terms and conditions of his employment was a prohibition on accepting gifts from vendors.  Pursuant to its Code of Business Conduct and Ethics, Valero had a policy prohibiting employees like Tryon from accepting gifts and entertainment such as trips from Valero vendors.  A reasonable juror could conclude that Valero's Code of Business Conduct and Ethics was binding on Tryon as a condition of his employment with Valero. Viewing this evidence in the light most favorable to Valero, Tryon arguably had a contractual duty not to accept trips from Jones.

However, there is no evidence that CPR willfully and knowingly interfered with Tryon's employment contract and the Code of Business Conduct's prohibition on accepting gifts.  Valero has failed to show that CPR had any knowledge of the Code of Business Conduct.  The Court has already rejected Valero's argument that Valero's General Terms and Conditions for its sales agreements incorporated the terms of Valero's Code of Business Conduct for Valero employees. For the reasons already discussed, the Court holds that Valero has not shown that CPR's knowledge of the General Terms and Conditions of Valero sales agreements amounted to

---

[74] *Doe v. Boys Clubs of Greater Dallas, Inc.*, 907 S.W.2d 472, 477 (Tex. 1995).

knowledge of the Valero Code of Business Conduct. In the absence of some proof that CPR and Jones knew about the terms of Tryon's employment contract prohibiting his receipt of gifts, Valero has not shown that CPR or Jones acted knowingly and intentionally to interfere with Tryon's employment contract. The Court concludes that Valero has failed to make out its claim for tortious interference with its contractual relationship with Tryon.[75] Therefore, CPR's Motion is **GRANTED** as to this claim.

## IV.    Breach of Contract

For the reasons stated in its contemporaneously entered order on the parties' other motions for summary judgment, the Court holds that Tennessee law governs the parties' breach of contract claims. CPR seeks summary judgment on Valero's breach of contract claim.[76] CPR does not deny that the parties had a contract or that the terms of the contract prohibited either party from offering gifts to the other party's officers or employees. CPR simply reiterates its position that Valero has failed to prove that it suffered any damages flowing from the breach of the parties' contract. CPR argues that Valero has no evidence that any of the allegedly excessive discounts Tryon gave CPR were based on any factor other than the quality specifications of the particular load of slurry. CPR contends that in the absence of some proof of causation, Valero cannot make out its claim for breach of contract. Therefore, the Court should grant CPR summary judgment.

---

[75] The Court also rejects Valero's alternative argument that based on the General Terms and Conditions, CPR was on notice that loyalty to Valero was a condition of Tryon's employment. Valero has cited no authority for this proposition.

[76] CPR has briefly argued that Valero cannot state such a claim as to Jones. Valero concedes this point in its response brief, and so the Court does not address it further.

Valero argues that the General Terms and Conditions, including the term barring the giving or receiving of gifts by its employees, were incorporated into any contract between the parties. CPR breached the term prohibiting gifts to employees when it offered Tryon the hunting trips and other gifts of significant value and when a CPR employee gave Rocha cash gifts. Valero states that there is evidence that the gifts were connected to the discounts Tryon authorized and that as a result of the discounts, Valero lost $1.98 million in profits. Valero argues that it has adduced evidence from which a reasonable juror could conclude that the gifts and the discounts were causally connected. Therefore, CPR's Motion should be denied on this issue.

Viewing the evidence in the light most favorable to the non-moving part, the Court holds that Valero has adduced sufficient evidence of causation to survive summary judgment. As the Court already noted, there is evidence that in industry practice, quality-related discounts are given only where the purchaser suffers a loss on the sale of the product to a third party. There is evidence that Tryon agreed to discounts in transactions where CPR was able to sell slurry between March 2008 and October 2008 at prices "significantly higher than CPR's purchase price," suggesting that the discounts Tryon granted may have been unjustified.[77] It is further undisputed that Tryon received gifts of significant value from Jones during the same time period. Accepting that evidence as true, a reasonable juror could conclude that Tryon's decision to give excessive discounts was causally connected to his receipt of gifts of significant value from Jones. Therefore, CPR's Motion is **DENIED** as to this issue.

## CONCLUSION

---

[77] Egan Aff. ¶ 11, D.E. # 173-9.

CPR's Motion for Summary Judgment on Valero's counterclaims against it and William

Jones is **GRANTED IN PART**, **DENIED IN PART**.

**IT IS SO ORDERED.**

                                **s/ S. Thomas Anderson**
                                S. THOMAS ANDERSON
                                UNITED STATES DISTRICT JUDGE

                                Date: October 17th, 2011.